# EXHIBIT C

Version 7.5 clean
12/29/2024

## SUBCONTRACTOR AGREEMENT

This Subcontractor Agreement ("Agreement") is entered into by and between Public Partnerships LLC ("PPL") and Consumer Directed Choices, Inc. ("SUBCONTRACTOR"), as of December 30, 2024 ("Effective Date").

**WHEREAS**, PPL is the single state-wide fiscal intermediary selected by New York State Department of Health ("NYSDOH") pursuant to RFP #20524 New York State Fiscal Intermediary Services, as amended by Amendments ## 1, 2 and 3 and by the Questions and Answers document issued by the NYSDOH (the "RFP") to serve as the joint employer of and to provide wage and benefit processing for consumer directed personal assistants ("PAs") working in the Consumer Directed Personal Assistant Program ("CDPAP") to provide care to CDPAP consumers, and other responsibilities specified in this Agreement in accordance with 18 N.Y.C.R.R. § 505.28(i);

**WHEREAS**, SUBCONTRACTOR possesses the expertise and skills to assist CDPAP consumers in registering, facilitating, and maintaining their participation in CDPAP,

**WHEREAS**, PPL wishes to contract and retain SUBCONTRACTOR as a subcontractor to facilitate the delivery of fiscal intermediary services in CDPAP;

**THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is acknowledged, PPL and SUBCONTRACTOR hereby agree as follows:

1. **Description of Services.** SUBCONTRACTOR shall provide the professional services assigned by PPL and more fully described in **Attachment A** (the "Subcontracted Services"). SUBCONTRACTOR acknowledges and agrees that it shall render Subcontracted Services in a prompt and diligent manner. Changes to the Subcontracted Services may be made only through a signed written amendment to this Agreement. PPL at all times recognizes its responsibility as joint employer of the PAs, to the extent of such employment responsibilities, as if PPL had not engaged SUBCONTRACTOR for the performance of any duties, best practices, or other services related to this RFP and FI services.

2. **Term.** SUBCONTRACTOR shall provide the Subcontracted Services during the term of PPL's contract with NYSDOH pursuant to the RFP (the "Prime Contract"), unless this Agreement is terminated earlier pursuant to Section 5 or extended by written agreement of the parties. Unless otherwise specified by PPL in writing, SUBCONTRACTOR shall provide the Subcontracted Services for the full duration of this Agreement. SUBCONTRACTOR agrees to extend the term of this Agreement as may be needed to reflect extensions of the Prime Contract.

3. **Compensation.** PPL shall compensate SUBCONTRACTOR pursuant to the provisions contained in Attachment B and this Section 3, and shall not pay SUBCONTRACTOR any other benefits, expenses, or compensation.

1

Version 7.5 clean
12/29/2024

a.    Upon termination or expiration of this Agreement SUBCONTRACTOR other than for cause, SUBCONTRACTOR shall be entitled to receive compensation for Subcontracted Services that it satisfactorily provided prior to the effective date of termination, provided that NYSDOH has accepted the Subcontracted Services or the associated deliverables and has paid PPL for them.  Upon termination by PPL for cause, PPL may deduct from any compensation otherwise owed to SUBCONTRACTOR all costs, expenses, and damages reasonably attributable to the breach by SUBCONTRACTOR; SUBCONTRACTOR promptly shall return to PPL any compensation that was paid in excess of this net amount due.

b.    Changes to the compensation provisions of this Agreement may be made only through a signed written amendment to this Agreement.

4.    **Consumers to be Served:**

a.    PPL will include SUBCONTRACTOR in its recommendations to consumers when appropriate based on geographic location, cultural competency, and language abilities.  PPL will work in good faith to assist SUBCONTRACTOR to reach its desired capacity.  Unless SUBCONTRACTOR agrees in writing, PPL will not recommend more than 20,000 new consumers per month.

b.    All consumers recommended by PPL to SUBCONTRACTOR must be verified as eligible for CDPAP services at the time of recommendation. PPL shall ensure that eligibility verification is completed prior to recommendation.

c.    PPL shall recommend to SUBCONTRACTOR all Consumers that SUBCONTRACTOR is already serving at the time this Agreement becomes effective. However, any Consumer who elects to receive Subcontracted Services from another Subcontractor shall have the right to transfer to the Subcontractor of their choice in accordance with program guidelines.

d.    SUBCONTRACTOR may perform outreach and education activities to inform eligible consumers of its availability to serve as a CDPAP facilitator. These activities shall comply with applicable laws, regulations, and program requirements.

e.    PPL shall compensate SUBCONTRACTOR at the rates stated in this Agreement for all consumers eligible for services at the beginning of the month, even if such consumers lose eligibility during the month.

5.    **Termination.**  The term of this Agreement is set forth in Section 2.  The Agreement may be terminated before the end of the term pursuant to the following subsections of this Section 5.

a.    Termination for Cause:  This Agreement may be terminated immediately by either party:

2

(1)     Following a material breach of this Agreement and a failure to cure such breach within 30 days after written notice specifying the breach and required corrective actions.  If the breach cannot reasonably be cured within 30 days, the non-breaching party may grant an additional 30 days, subject to reasonable approval; or

(2)     Immediately upon notice if either party engages in conduct that violates applicable laws or regulations, or if continued performance becomes unlawful; or

(3)     If either party files a petition under any chapter of the Bankruptcy Act, 11 U.S.C. §§ 101 et seq., an involuntary petition under that Act is filed against either party, a party commences an action in any country under laws providing for the relief of winding up of insolvent or liquidating persons or entities, or files for the appointment of a receiver or becomes insolvent, and such matters are not discharged or relieved within 60 days; or

(4)     Upon exclusion, debarment, or suspension of either party by competent authority, if such exclusion, debarment, or suspension precludes the participation by such party in fulfilling its obligations under this Agreement, or indictment of either party in any criminal proceeding; or

(5)     Upon written mutual consent of the parties.

Termination for cause shall not relieve PPL of its obligation to compensate SUBCONTRACTOR for all Subcontracted Services satisfactorily rendered prior to the termination effective date.

**b.**     Termination for Convenience:  This Agreement may be terminated upon the mutual consent of the parties. This Agreement may be terminated for convenience by either party upon 90 days' written notice to the other party. SUBCONTRACTOR may terminate this Agreement with thirty (30) days' written notice if changes to PPL's Prime Contract materially impact SUBCONTRACTOR's ability to meet its obligations under this Agreement.

**c.**     Termination by Action of NYSDOH:  This Agreement is conditioned on (i) the execution and ongoing effectiveness of the underlying Prime Contract and (ii) NYSDOH's initial and ongoing acceptance and approval of SUBCONTRACTOR as a subcontractor.  This Agreement may be terminated by either party immediately if any of these conditions are not met or no longer met for any reason, including termination by NYSDOH of the Prime Contract for any reason, expiration of the Prime Contract , or in the event NYSDOH revokes, in writing, its approval of SUBCONTACTOR performing Subcontracted Services under this Agreement.

3

Version 7.5 clean
12/29/2024

6.　**Notices and Contact Persons.**　Any notices, requests, consents and other communications hereunder shall be in writing and shall be effective upon any of the following: (1) when delivered personally to the person designated below to receive notices for the party (the party's "Contact Person"); (2) when e-mailed to the party's Contact Person at the e-mail address listed below with an acknowledgment of receipt; or (3) five days after being deposited into the United States mail (either certified mail with return receipt requested, or first class postage prepaid), addressed to the party's Contact Person at the address set forth below.　The individuals listed below shall serve as each party's Contact Person for purposes of this Agreement unless the party replaces the Contact Person by written notice to the other party as required by this Section.

| **For PPL:** | **For SUBCONTRACTOR** |
|---|---|
| Sherwin Krug | Christopher Graber |
| Chief Financial Officer | Chief Executive Officer |
| Public Partnerships LLC | Consumer Directed Choices, Inc. |
| 8000 Avalon Blvd., Suite 300 | 7 Washington Square |
| Alpharetta, GA 30009 | Albany, NY 12205 |
| skrug@pplfirst.com | Chris@CDChoices.org |
| with a copy to: | with a copy to: |
| legal@pplfirst.com | Hongwei Zhang, Sr. VP of Operations |
| | HZhang@CDChoices.org |

7.　**Good Standing Representations.**

a.　SUBCONTRACTOR represents that neither it, nor any of its employees, officers, board members or representatives:

(1)　has been excluded, debarred, proposed for debarment or exclusion, or suspended from participating in any federal, state, or local governmental program;

(2)　has been declared ineligible to participate in any federal, state, or local governmental program; or

(3)　is listed on any federal or state exclusion database, including the Office of Inspector General's List of Excluded Individuals/Entities.

b.　SUBCONTRACTOR further represents that no direct or indirect owner, shareholder, director of officer of SUBCONTRACTOR is also a PPL employee or family member of a PPL employee.　An individual is an "indirect owner" when such individual has ownership in an entity, trust, or other corporate vehicle that itself directly or indirectly owns a portion of SUBCONTRACTOR.

c.　SUBCONTRACTOR shall notify PPL immediately if for any reason (1) the representations in this Section 6 are no longer true; (2) SUBCONTRACTOR files

4

any action referenced in Section 4.a.(2) above, or (3) SUBCONTRACTOR is debarred, suspended or indicted as referenced in Section 4.a.(3) above.  Upon such notification, PPL shall have the right to terminate this Agreement immediately, without notice.

d.    SUBCONTRACTOR agrees to indemnify PPL against any losses suffered by PPL as the result of any inaccuracies in the representations made by SUBCONTRACTOR.

8.    **Standards of Conduct.**

a.    SUBCONTRACTOR shall comply with all applicable laws, rules, and regulations relating specifically to the performance of the RFP and this Agreement.

b.    SUBCONTRACTOR shall comply with the provisions of the Subcontractor Code of Conduct attached as Attachment C.

c.    If SUBCONTRACTOR staff is permitted or required to provide in-person services, including but not limited to at a PPL worksite or the worksite of a PPL client, SUBCONTRACTOR agrees to adhere to all applicable health-related, safety-related, and security-related policies and procedures. SUBCONTRACTOR acknowledges that, based on current or future public health conditions and guidelines, additional measures may be required for specific engagements, including but not limited to masking, vaccination, virtual delivery of services, and other requirements.

d.    SUBCONTRACTOR agrees and shall comply with the terms and conditions of the Business Associate Agreement attached as Attachment D.

9.    **Relationship of the Parties.**

a.    The parties agree that SUBCONTRACTOR is an independent contractor under both common and statutory law and that PPL shall control only the result of the Subcontracted Services, not the method or means of performance. SUBCONTRACTOR need not adhere to policies and procedures applicable to PPL employees, may perform the Subcontracted Services according to its own schedule at its own offices or at any other location, and shall use its own tools, equipment and supplies.  SUBCONTRACTOR is solely responsible for hiring its own employees and compensating such employees in accordance with state and federal law.  SUBCONTRACTOR is not required to perform the Subcontracted Services on a full-time basis for PPL and may perform services for other individuals and organizations consistent with the requirements of this Agreement, including Attachment C. PPL shall deliver to SUBCONTRACTOR statements of income at the end of each tax year consistent with SUBCONTRACTOR'S independent contractor status.

5

b.   Neither SUBCONTRACTOR nor any of its employees is an employee, agent, partner, or joint-venturer of PPL.  SUBCONTRACTOR understands that neither it nor its employees are eligible for benefits or privileges provided by PPL to its employees

c.   SUBCONTRACTOR shall secure and maintain at its own expense all licenses and permits, if any, anecessary to perform the Subcontracted Services, and shall provide copies thereof upon request by PPL.

d.   SUBCONTRACTOR acknowledges that PPL shall not withhold state or federal taxes from SUBCONTRACTOR'S compensation and that SUBCONTRACTOR shall be solely responsible for paying all applicable state and federal taxes owed on income earned under this Agreement, including unemployment insurance, social security taxes, self-employment taxes, Medicare taxes and state and federal withholding taxes, for both SUBCONTRACTOR and any of SUBCONTRACTOR's employees who perform Subcontracted Services.

e.   SUBCONTRACTOR has no authority to and shall not purport to bind, represent, or speak for PPL or otherwise incur any obligation on behalf of PPL for any purpose unless expressly authorized by PPL.

f.   SUBCONTRACTOR shall provide its federal employer tax identification number to PPL in writing.

**10.   Record Maintenance.**

a.   With respect to all records of any kind that SUBCONTRACTOR acquires or creates for purposes of performing the Subcontracted Services, SUBCONTRACTOR shall retain such records for at least 6 years after the expiration or termination of this Agreement SUBCONTRACTOR shall not destroy or dispose of records that are required to be preserved under applicable laws, regulations, or this Agreement, and shall maintain records in an orderly manner.

b.   Upon reasonable written notice, and during SUBCONTRACTOR's regular business hours, SUBCONTRACTOR shall make available to PPL any records relating to the Subcontracted Services, including records supporting any itemized billing statements provided by SUBCONTRACTOR pursuant to Section 3. Reasonable notice shall mean no less than ten (10) business days, unless an earlier response is required by law, regulation, or imminent deadlines for audits or compliance matters.

c.   SUBCONTRACTOR shall cooperate with PPL and NYSDOH in the event of any audit directly and specifically relating to the Subcontracted Services, including audits concerning compliance with applicable laws, regulations, or contractual

6

Version 7.5 clean
12/29/2024

obligations. PPL shall provide reasonable notice of such audits, including details on the scope, purpose, and anticipated timeline.

d. Upon the termination or expiration of this Agreement, SUBCONTRACTOR shall deliver to PPL, within a mutually agreed-upon timeframe, all records, notes, data, memoranda, work product, and equipment in its possession that are the property of PPL. SUBCONTRACTOR shall also provide all necessary documentation reasonably required to support the project for which SUBCONTRACTOR has provided Subcontracted Services, while retaining copies of such records as may be required to comply with applicable legal or regulatory obligations

e. Notwithstanding the foregoing, nothing in this Section shall require SUBCONTRACTOR to produce records, documents, or data that are privileged, confidential, or unrelated to the Subcontracted Services, unless disclosure is required by law or regulatory obligation.

**11. Legal Actions, Indemnification and Insurance.**

a. SUBCONTRACTOR shall promptly notify PPL of any court case, administrative hearing, or other proceeding in which SUBCONTRACTOR is named with respect to any PA's labor or employment-related claim arising after the PA's first date of employment with PPL. In such cases, PPL will intervene in the claim and will indemnify and hold harmless SUBCONTRACTOR with regard to liability incurred as a result of a decision, verdict or other determination rendered with respect to such claims.

b. Each party shall indemnify and hold harmless the other party from all claims, losses, expenses, fees (including attorney's fees), costs, judgments, and liabilities arising from: (1) the indemnifying party's breach of this Agreement; (2) the indemnifying party's failure to meet statutory, regulatory, or legal obligations; or (3) third-party claims arising from either's party's participation under this Agreement. For the avoidance of doubt, third-party claims shall not include claims brought in accordance with Section 13.d., including legal actions by SUBCONTRACTOR for indemnification, breaches of this Agreement by PPL, or other material claims directly resulting from PPL's actions or omissions. This Section shall not limit or restrict the SUBCONTRACTOR's right to pursue legal remedies, including damages or equitable relief, for breaches of this Agreement or for indemnification.

c. SUBCONTRACTOR shall maintain during the term of this Agreement such insurance, including general liability and worker's compensation insurance, as will fully protect both PPL and SUBCONTRACTOR from claims that may arise from SUBCONTRACTOR's performance of the Subcontracted Services. Upon request by PPL, SUBCONTRACTOR shall provide PPL with a certificate of insurance and shall have PPL included as an additional insured under SUBCONTRACTOR's applicable insurance policies.

7

Version 7.5 clean
12/29/2024

12.    **Assignments and Subcontracts.** SUBCONTRACTOR may neither assign nor further subcontract its obligations under this Agreement to any other entity without the prior written consent of PPL. In addition, even if SUBCONTRACTOR receives PPL's written consent to subcontract its obligations under this Agreement, it must also provide PPL with a copy of any specific proposed written sub-subcontract, which PPL has the discretion to reject and in turn withhold its consent to allow the sub-subcontractor to render services. Furthermore, for any invoice that SUBCONTRACTOR submits to PPL for payment, which invoice includes or incorporates compensation that SUBCONTRACTOR has paid or will pay to the sub- subcontractor, SUBCONTRACTOR must include sub-subcontractor's invoices with any supporting detail, to PPL, unless PPL agrees in writing that such documentation is not required.

13.    **Prohibited Activities**

a.    **Communication with Representatives of New York State Prohibited.** SUBCONTRACTOR shall not, directly or indirectly, communicate with any representative, official, employee, or agent of New York State government, including NYSDOH or any other state agency, the Governor's office, or the legislative or judicial branch, regarding matters related to PPL, this Agreement or the Subcontracted Services, except as expressly authorized in advance and in writing by PPL President or Chief Executive Officer.

b.    **Media Communications Prohibited.** Except as specifically authorized by PPL in advance and in writing by the PPL's President or Chief Executive Officer, SUBCONTRACTOR (1) shall not communicate with any media or any media representative concerning PPL, this Agreement, or the Subcontracted Services and (2) shall not refer to PPL, this Agreement or the Subcontracted Services, display PPL's name or logo, or suggest any affiliation, sponsorship, or partnership with PPL, on any website or on social media without prior written approval from PPL.

c.    **Lobbying Activities Prohibited.** SUBCONTRACTOR shall not engage in any lobbying activities, either directly or through a retained lobbyist, related to PPL, this Agreement or the Subcontracted Service, without the prior written approval of PPL's President or Chief Executive Officer. This includes, but is not limited to, efforts to influence government decision-making or policy related to this Agreement. Subcontractors must disclose to PPL the use of lobbyists in connection with PPL business, and must comply with state and federal lobbying regulations, including state-specific registration, conflict, and gift restrictions.

d.    **Legal Actions Prohibited.** SUBCONTRACTOR shall not fund, initiate, support, or participate in any lawsuits, legal proceedings, or administrative actions against PPL, NYDOH, or any other party relating to PPL, this Agreement, or the Subcontracted Services, provided that nothing in this Section shall prohibit SUBCONTRACTOR from pursuing legal action for: (1) breach of this Agreement by PPL; (2) rates of payment and unpaid or denied claims submitted

8

Version 7.5 clean
12/29/2024

by SUBCONTRACTOR for services provided by SUBCONTRACTOR in its former role as fiscal intermediary for the CDPAP program; or (3) enforcement of its rights to indemnification under Section 11.b.  For the avoidance of doubt, permissible actions under this Section, including claims relating to indemnification or breaches of this Agreement, shall not be construed as violating Section 11.b., regardless of whether such actions involve third-party claims or litigation arising from PPL's obligations under this Agreement.

14.    **Proprietary or Confidential Information.**  For purposes of fulfilling its obligations under this Agreement, one party (the "Disclosing Party") may convey to the other party (the "Receiving Party") information that is considered proprietary and confidential to the Disclosing Party.

(a)    "Proprietary or Confidential Information" is defined as information -- including but not limited to trade secrets, strategies, financial information, sales information, pricing information, operational techniques, software, and intellectual property -- that (i) has not been previously published or otherwise disclosed by the Disclosing Party to the general public; (ii) has not previously been available to the Receiving Party or others without confidentiality restrictions; (iii) reasonably would be considered confidential and proprietary notwithstanding the absence of any designation; or (iv) is not normally furnished to others without compensation;  and which the Disclosing Party wishes to protect against unrestricted disclosure or competitive use.  In addition, the term "Proprietary or Confidential Information" shall also mean all information or data, regardless of whether it is in tangible form, that is disclosed or otherwise made available by the Disclosing Party to the Receiving Party and designated as "confidential" or "proprietary" by the Disclosing Party.  Such designation shall be clear and in writing, either before the Proprietary or Confidential Information is disclosed or within a reasonable time afterwards.  The term "Proprietary or Confidential Information" includes the original information provided by Disclosing Party as well as all copies.

(b)    Proprietary or Confidential Information does not include information that, without a breach of this Agreement, is (i) known to the Receiving Party without restriction when received, or thereafter developed independently by the Receiving Party; (ii) obtained by the Receiving Party from a source that is lawfully in possession of such information (other than the Disclosing Party) through no breach of this Agreement or any other confidentiality obligations; or (iii) in the public domain when received, or thereafter in the public domain through no fault of the Receiving Party.

(c)    The Receiving Party shall preserve Proprietary or Confidential Information securely and in strict confidence, exercising no less than the same degree of care used to protect the security and confidentiality of its own confidential and proprietary information, and in any event no less than reasonable care.

(d)    The Receiving Party shall use and disclose Proprietary or Confidential only for

9

Version 7.5 clean
12/29/2024

purposes of the Subcontracted Services. The Receiving Party shall not divulge any such Proprietary or Confidential Information to any employee who is not working on the Subcontracted Services, without the prior written consent of the Disclosing Party.

**(e)**    The Receiving Party shall not disclose the Proprietary or Confidential Information to any third party without prior written authorization from the Disclosing Party.

**(f)**    All Proprietary or Confidential Information shall remain the property of the Disclosing Party notwithstanding any disclosure under this Agreement.  The Receiving Party recognizes and agrees that nothing contained in this Agreement nor the exchange of Proprietary or Confidential Information under this Agreement shall be construed as transferring or granting any right, title, interest, or license under any copyrights, inventions, or patents now or hereafter owned or controlled by either Party.  The Disclosing Party does not grant the Receiving Party any express or implied right to or under the Disclosing Party or another party's patents, copyrights, trademarks, trade secret information, or other proprietary rights.  The Receiving Party shall not make, have made, use, or sell for any purpose any product or other item using, incorporating, or derived from any Proprietary or Confidential Information of the Disclosing Party.

**(g)**    If and to the extent that Proprietary or Confidential Information includes information that is confidential or proprietary to a third party, the Disclosing Party warrants that the disclosure does not violate any agreement with the third party or any rights of the third party, including any agreement or rights under the Health Insurance Portability and Accountability Act ("HIPAA") and other federal or state laws governing medical records, and shall indemnify the Receiving Party as to any claim against it by the third party or a government agency relating to such disclosure.

**(h)**    Rights and obligations under this Agreement shall take precedence over specific legends or statements that may be associated with Proprietary or Confidential Information when received.

**(i)**    The Receiving Party shall immediately notify the Disclosing Party upon discovery of any loss or unauthorized disclosure of its Confidential Information.

**(j)**    The Receiving Party shall not export, directly or indirectly, any U.S. technical data acquired pursuant to this Agreement, or any products utilizing such data, in violation of the United States export laws or regulations.

**(k)**    If the Receiving Party is requested or required to disclose Proprietary or Confidential Information pursuant to a subpoena or an order of a court or governmental agency having jurisdiction, the Receiving Party shall, prior to any disclosure of Proprietary or Confidential Information:

     i.    Provide the Disclosing Party with prompt written notice of the existence, terms, and circumstances surrounding the legal or governmental request or

10

requirement, no later than 2 business days after receiving it;

ii. Consult with the Disclosing Party on the appropriate response to the request;

iii. Cooperate with the Disclosing Party in its reasonable efforts to obtain an order or otherwise limit or restrict the disclosure of its Proprietary or Confidential Information that is subject to the legal or governmental request or requirement, at Disclosing Party's sole expense; and

iv. Only after fully complying with the above steps, if disclosure of Proprietary or Confidential Information is still required, furnish only such portion of the Proprietary or Confidential Information as the Receiving Party is advised by counsel is legally required to be disclosed.

(l) Upon termination or expiration of this Agreement, each party shall cease use of Proprietary or Confidential Information received from the other party. At the written request of the Disclosing Party at any time during this Agreement, or within 30 days of the termination or expiration of this Agreement, the Receiving Party shall promptly return all copies of such information in its possession, custody, or control, promptly furnishing the Disclosing Party with written certification of such return. If the Disclosing Party does not request the return of Proprietary or Confidential Data within 30 days of the termination or expiration of this Agreement, the Receiving Party shall destroy all copies of such information in its possession, custody or control and shall, upon the Disclosing Party's request, furnish the Disclosing Party with written certification of such destruction. If return or destruction is not practicable, the Receiving Party shall so notify the Disclosing Party and shall keep such information secure and confidential in perpetuity.

(m) The termination or expiration of this Agreement for any reason shall not discharge the obligations of the Parties with respect to the protection of Proprietary or Confidential Information set forth in this section.

(n) Other than as set forth in Section 14(g) above, neither party makes any representation or warranty as to the accuracy or completeness of its Proprietary or Confidential Information disclosed under this Agreement.

(o) This Agreement and its terms shall be treated as Proprietary and Confidential Information.

**15.    Intellectual Property.**

a.    SUBCONTRACTOR acknowledges NYSDOH's claim to materials created by PPL and SUBCONTRACTOR in the course of providing the CDPAP Services. However, both parties acknowledge that systems, documents, and other intellectual property created independently by SUBCONTRACTOR for future use in multiple programs are not subject to this claim, even if such systems, documents and intellectual property are used in the course of providing CDPAP

11

Version 7.5 clean
12/29/2024

Services.

b.      Each party warrants, represents, and guarantees that its use or creation of any intellectual property under this Agreement does not infringe upon the intellectual property rights of any third party and shall indemnify, defend, and hold the other party harmless from all claims, losses, expenses, fees (including attorney's fees), costs, and judgments that may be asserted against PPL as a result of any breach by the party of this Section.

16.     **Non-Solicitation.** During the term of this Agreement and for one year thereafter, each party shall not, without the prior written consent of the other party, directly or indirectly solicit, entice, encourage, offer special inducements, or otherwise recruit any employee of the other party. However, notwithstanding anything above to the contrary, this Section shall not restrict the right of SUBCONTRACTOR to solicit or recruit generally in the media, and shall not prohibit each party from hiring, without prior written consent, an employee of the other party who answers an advertisement or who otherwise voluntarily applies for hire without having been personally solicited or recruited by the the other party.

17.     **Competing Arrangements.** During the term of this Agreement and for one year thereafter, SUBCONTRACTOR (1) shall not market any services that directly compete with the Subcontracted Services, either on its own or in combination with other individuals or organizations and (2) shall not contract directly or indirectly with NYDOH for services directly related to the Subcontracted Services without first giving PPL the first right of refusal to include SUBCONTRACTOR exclusively in any proposal PPL makes to NYDOH for the services. For avoidance of doubt, this means that if PPL wishes to submit a bid to NYDOH in the future for work directly related to the Subcontracted Services, SUBCONTRACTOR will agree, upon PPL's request, to serve as PPL's subcontractor for the bid, and will not (1) bid on the work itself or (2) participate in any other entity's bid for the work.

18.     **SUBCONTRACTOR Diversity Representation.** [Reserved]

19.     **Waiver.** The failure of a party to enforce a provision of this Agreement shall not constitute a waiver with respect to that provision or any other provision of this Agreement.

20.     **Entire Agreement.** This Agreement (including the attachments) constitutes the entire agreement between the parties with respect to the subject matter of the Subcontracted Services, and supersedes all prior agreements and understandings, both written and oral. Notwithstanding the foregoing, any separate written agreement between the parties regarding the confidentiality and security of information exchanged or used by the parties for purposes of this Agreement shall be effective unless and until it is specifically terminated.

21.     **Amendment.** This Agreement may be amended only by written agreement of the parties, signed by authorized representatives and referencing this Agreement.

12

Version 7.5 clean
12/29/2024

22.   **Severability.**  If any provision in this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions in this Agreement shall continue in full force and effect.

23.   **RFP Incorporation and Predominance.**  SUBCONTRACTOR also agrees to abide by all terms set forth in the RFP applicable to it as a subcontractor, including. Section 4.9, Privacy, Security and Confidentiality Requirements.  In the event of any conflict in terms between the RFP and this Subcontract, the RFP's terms shall govern unless explicitly and expressly stated herein.

SUBCONTRACTOR explicitly agrees and acknowledges that it is bound by the standards and penalties set forth in any performance standards or the Service Level Agreements in the RFP to the extent they concern or relate to the Subcontracted Services. Accordingly, SUBCONTRACTOR shall indemnify, defend, and hold PPL harmless for any fines, sanctions, penalties, fees, damages, liquidated damages, costs, claims, charges, performance credits, and liabilities of any kind, including reasonable attorney's fees, incurred by PPL or assessed against PPL with respect to any matter within the Subcontracted Services, or on account of the acts or omissions of SUBCONTRACTOR, that results in NYDOH alleging a breach of, or a failure to meet, any performance standards or Service Level Agreements in the RFP.

24.   **Equal Employment Opportunity:  PPL is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) and that these laws are incorporated herein by reference. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability. The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws.**

25.   **Applicable Law and Venue.**  This Agreement, and all other aspects of the business relationship between the parties, is construed, interpreted, and enforced under and in accordance with the laws of the State of New York, without regard to choice of law provisions.  The parties also consent to the personal jurisdiction in its courts, agree that the state and federal courts of Albany County, New York shall have exclusive jurisdiction over the enforcement of this Agreement, and waive any objection to venue in the state and federal courts for Albany County, New York.

26.   **Miscellaneous.**

Version 7.5 clean
12/29/2024

a.     LIMITATION OF LIABILITY.  NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES SUFFERED BY THE OTHER PARTY, INCLUDING, BUT NOT LIMITED TO, SUCH DAMAGES ARISING FROM ANY TYPE OR MANNER OF COMMERCIAL, BUSINESS, OR FINANCIAL LOSS, EVEN IF THE OTHER PARTY HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE.

b.     Each party agrees that they shall not at any time make disparaging statements or induce others to make disparaging statements, in any form, about the other party or any of its respective employees, officers, directors, products or services.

c.     Neither party shall be responsible for delays or failures in performance resulting from acts of God, acts of civil or military authority, terrorism, fire, flood, strikes, war, epidemics, pandemics, shortage of power, or other acts or causes reasonably beyond the control of that party.  The party experiencing the force majeure event agrees to give the other party notice promptly following the occurrence of a force majeure event, and to use diligent efforts to re-commence performance as promptly as commercially practicable.

d.     The captions and headings in this Agreement are for convenience only and are not intended to, and shall not be construed to, limit, enlarge, or affect the scope or intent of this Agreement. nor the meaning of any provisions hereof.

e.     In the event of any conflict between the terms of this Agreement and the Attachments, the following order of precedence shall govern:

(1)     Agreement
(2)     Attachment D – Business Associate Agreement
(3)     Attachment C – Code of Conduct
(4)     Attachment A – Subcontracted Services
(5)     Attachment B – Compensation

f.     Each party acknowledges that they been provided with the opportunity to consult with and be represented by independent counsel in negotiating this Agreement. Each party represents that they have read and understand this Agreement and that they are freely and voluntarily entering into this Agreement in exchange for the consideration described herein.  This Agreement shall not be construed in favor of or against either party by reason of authorship.

Version 7.5 clean
12/29/2024

g.  Each individual signing below on behalf of a party hereby represents and warrants that they have full power and authority to enter into this Agreement on behalf of such party. Each party to this Agreement hereby represents and warrants that it has full power and authority to enter into this Agreement, that the execution, delivery, and performance of this Agreement has been fully authorized and approved, and that no further approvals or consents are required to bind such party.

**IN WITNESS WHEREOF,** the parties have executed this Agreement by the signatures of their respective authorized representatives.

**PUBLIC PARTNERSHIPS LLC**                    **Consumer Directed Choices, Inc.**

*Sherwin Krug*
Sherwin Krug (Dec 30, 2024 10:16 EST)

By: Sherwin Krug                               By: *[signature]*

Title: CFO                                     Title:  CEO

Date: Dec 30, 2024                             Date: 12/29/24

Rev 08/23

15

Version 7.5 clean
12/29/2024

**ATTACHMENT A**
**SUBCONTRACTED SERVICES**

Pursuant to the terms and conditions of this Agreement, SUBCONTRACTOR shall provide the following Subcontracted Services, which shall not exceed the scope of services set forth in the RFP unless explicitly authorized by PPL in writing and in advance of the provision of such Subcontracted Services:

SUBCONTRACTOR will provide the following support services to CDPAP consumers who have enrolled with the facilitator in the PPL@Home portal ("Consumers") and to personal assistant caregivers who are associated with enrolled Consumers ("PAs"):

1. Providing Consumers with an orientation to CDPAP, consisting of the following:

   a. An overview of a Consumer's responsibilities as joint employers of their PAs, including Electronic Visit Verification ("EVV"), service utilization and overtime usage;

   b. An overview of the Consumer's registration process including online through the PPL@Home portal;

   c. An overview of the PA hiring process, including the requirement for an initial and annual health assessment , including the requirement for a complete immunization record (Measles, Mumps, Rubella), health assessment within the last 12 months, evidence of a completed PPD (Mantoux Skin Test), and annual risk assessments after baseline screening.

   d. An overview of EVV, review of EVV options, compliance requirements, and how to access more training materials; and

   e. Training on fraud waste and abuse prevention and detection, including proper utilization of authorized services and the requirements of the False Claims Act.

2. Providing the Consumer options for PAs to complete the hiring process with PPL consisting of the following:

   a. Ensuring that the Consumer has instructions on how PAs can complete hiring paperwork through PPL@Home.

   b. Collecting PA information from Consumer to log PA into PPL@Home and email or mail PA hiring documentation if Consumer and PA do not want to use PPL@Home.

   c. Upon receipt, entering documentation into PPL@Home and following up on missing documentation.

   d. Reviewing required documents, including but not limited to USCIS Form I-9, IRS Form W-4, NY IT-2104-I and Difficulty of Care exemption form for completion.

   e. Ensuring the Consumer has the new hire training and orientation schedule and online resources explaining the hiring process, wages and benefits.

16

Version 7.5 clean
12/29/2024

    f.   Providing information on PA health assessment scheduling with PPL's third-party vendor.

3. Notifying the Consumer of their CDPAP start date and weekly and monthly service hours

4. Providing the Consumer with an annual reminder to ensure the annual PA health assessment is completed 30 days prior to the health assessment's expiration;

5. Supporting and monitoring EVV compliance by Consumers and PAs, consisting of the following:

    a.   Following up directly with Consumers and PAs in situations where EVV utilization is below 90% for the previous quarter to identify barriers to compliance and implementing a plan to resolve the non-compliance;

    b.   Monitoring EVV compliance plans and notifying PPL when a Consumer or PA is not complying with the plan;

    c.   Reporting to PPL Consumers and PAs who remain non-EVV compliant after 1 month of follow up and intervention.

    d.   Ensuring proper documentation explaining EVV exemptions related to disability or access to internet or telephonic service the result in paper timesheet submission.

    e.   Ensuring that all paper timesheets are signed and dated by both the Consumer and PA.

6. Monitoring Consumer overutilization and PA overtime reports provided by PPL and developing a Utilization Plan to stay within the authorized hours of service and/or minimize the use of excess hours or overtime, as appropriate, **without** reducing necessary services to the Consumer. SUBCONTRACTOR'S Utilization Plan must include documentation of the follow-up on overutilization of service hours or excessive overtime use that puts the health and safety of the Consumer or PA at risk, the outcome of the meeting and the expectation of the Consumer to resolve the overuse.

7. Providing telephonic customer support to Consumers and PAs to answer questions related to their CDPAP services. However, SUBCONTRACTOR shall direct to PPL questions about payroll, benefits, workers' compensation, disability, unemployment insurance, or other duties outside SUBCONTRACTOR's scope..

8. Facilitating a Consumer's right to change their relationship to another CDPAP facilitator, upon the Consumer's request.

9. Immediately reporting to PPL any suspicion of fraud, waste, and abuse.

10. Performing other services as mutually agreed to by the Parties.

PPL will support SUBCONTRACTOR in efforts to reach full capacity as stated in its approved capacity plan. PPL will allow SUBCONTRACTOR to amend its capacity plan upon mutual agreement.

Version 7.5 clean
12/29/2024

**ATTACHMENT B**
**COMPENSATION**

Pursuant to the terms and conditions of this Agreement, PPL shall compensate SUBCONTRACTOR as follows based on Per Member Per Month ("PMPM") payment tied to the Member (Consumer):

1. **One-Time Transition Payment:**

   SUBCONTRACTOR will earn a one-time payment for facilitating the transition of Consumers and their associated Personal Assistants ("PAs") to PPL as their fiscal intermediary during the period between January 6, 2025 – March 30, 2025 (the "Transition Period").

   The One-Time Transition Payment will be as follows:
   a. For each completed transition to PPL of a Consumer and all associated PAs during the Transition Period: $48.00
   b. A "completed transition" means that the Consumer and all associated PAs (1) have completed all registration paperwork, (2) are fully registered in PPL's systems, and (3) have completed one payroll cycle in which at least one of the Consumer's PAs has received a paycheck.
   c. The $48.00 will be paid as a $4.00 PMPM payment over the 12-month period following the completed transition (the "Transition Payment Period.")
   d. The first $4.00 PMPM payment will be paid within 10 business days of PPL receiving its administrative PMPM from DOH for that Consumer.
   e. If a Consumer becomes disassociated with SUBCONTRACTOR during the Transition Payment Period, SUBCONTRACTOR will still receive the $48.00 payment.
   f. Termination or expiration of this Agreement shall not relieve PPL from paying the Transition Payment due to SUBCONTRACTOR.

2. **Monthly PMPM Payment:**

   On an ongoing basis, for each active Consumer that is registered with PPL as their fiscal intermediary and with SUBCONTRACTOR as their facilitator, SUBCONTRACTOR will receive a PMPM payment in accordance with the following schedule:

   a. Tier 1 Consumers (service hours of 1 – 159.75 per month): $50.00 PMPM

   b. Tier 2 Consumers (service hours of 160 – 479.75 per month): $55.00 PMPM

   c. Tier 3 Consumers (service hours of 480 and above): $60.00 PMPM

   An "active Consumer" is a Consumer that has had at least one PA paid during the month pursuant to a normal payroll cycle.

18

The Monthly PMPM Payment will be paid in the following month and will be paid within 10 business days of PPL receiving its administrative PMPM from DOH for that Consumer.

3. **Monthly Value Based Payment**:

PPL shall provide SUBCONTRACTOR with a Monthly Value-Based Payment ("MVBP") based on the following metrics:

a. If the average EVV compliance rate for all PAs associated with SUBCONTRACTOR in a particular month is at least 90%, SUBCONTRACTOR will receive an additional $2.00 PMPM per Consumer. The compliance rate for a particular PA is calculated by comparing the number of shifts in which the PA correctly logs in and out using an approved EVV tool each month against the total number of shifts worked that month. For purposes of this calculation, any non-compliance attributable to consumer and/or personal assistant exemptions to EVV, as permitted by applicable Federal and State laws or regulations, shall be excluded from the compliance rate calculation as not to reduce or negatively impact the total EVV compliance rate for all PAs in a particular month. For example, if a PA works a total of 24 shifts per month, and correctly logs in and out using an approved EVV tool for 22 of those shifts, their compliance rate is 92.67% (22 divided by 24).

b. If the retention rate of all PAs associated with the SUBCONTRACTOR is greater than 85% for the month, SUBCONTRACTOR shall receive an additional $2.00 PMPM per Consumer. The retention rate shall be measured by calculating the percentage of PAs associated with SUBCONTRACTOR on the first business day of the month who remain associated with SUBCONTRACTOR on the last business day of the month.

PPL shall pay SUBCONTRACTOR the entire MVBP (totaling an additional $4.00 PMPM per month) for the three-month period starting on April 1, 2025 and ending on June 30, 2025, regardless of whether the above metrics are met.

Beginning on July 1, 2025, the MVBP will be calculated according to the metrics above.

The MVBP will be paid in the following month and will be paid within 10 business days of PPL receiving its administrative PMPM from DOH.

Version 7.5 clean
12/29/2024

**ATTACHMENT C**
**PPL Subcontractor Code of Conduct**

Public Partnerships LLC ("PPL") performs professional services for its clients, most of which are state and local government agencies, with the highest standards of ethics and integrity. PPL expects its Subcontractors to meet the same standards in the performance of contracted services. Violation of this Code of Conduct by a Subcontractor may serve as a basis for the termination of its contractual relationship with PPL. Subcontractors are responsible for all employees, agents, and vendors they utilize in performing services for PPL, and are expected to ensure that such individuals and entities abide by the requirements of this Code of Conduct as well as with all applicable laws and regulations.

Subcontractors are expected to comply with the following standards:

**DISCRIMINATION AND HARASSMENT**
PPL is committed to maintaining a workplace that is free of unlawful discrimination and harassment, including unsolicited and unwelcome sexual overtures and conduct. Such behavior is illegal, can upset the professionalism of the PPL work environment, and can interfere with employee morale, work performance, and efficiency. Subcontractors must likewise maintain workplaces free from unlawful discrimination and harassment.

**CONFIDENTIAL INFORMATION**
PPL is committed to safeguarding confidential information entrusted to PPL by its clients and others. Subcontractors that are entrusted with such information may not use it for any purpose other than performing work responsibilities under the contract, and may not share or otherwise disclose such confidential information to anyone outside of PPL. Subcontractors may be required to execute specific non-disclosure and confidentiality agreements.

The same use and disclosure restrictions apply to PPL business information, including but not limited to security codes, passwords, trade secrets, strategies, employee compensation, and the dollar value and scope of services of PPL contracts.

Absent express written permission from PPL, Subcontractors may not communicate with the news media or disclose information on corporate and individual social media accounts concerning PPL and its work. Subcontractors also are expected to guard against unintentional disclosures of confidential information, such as through discussions in public places or the use of inaccurate e-mail addresses or telefax numbers.

**INTELLECTUAL PROPERTY**
Ideas, inventions, software, and other intellectual property are of fundamental importance to the business of PPL and to its clients. Subcontractors may not use PPL intellectual property for purposes other than PPL business. Intellectual property that is created by Subcontractors within the scope of their business with PPL is the exclusive property of PPL, or PPL's client, except as may be specifically authorized by PPL in a written agreement with the Subcontractor.

Version 7.5 clean
12/29/2024

**USE OF PPL RESOURCES**

Subcontractors are expected to use their own office resources, such as computers, copy machines, fax machines, telephones, postage, and office supplies, except as authorized by PPL. If PPL authorizes the use of PPL resources, Subcontractors may not use such PPL resources for purposes other than the contracted services.

**INTEGRITY OF CLAIMS AND BILLING**

Subcontractors may not present claims, reports, or client submissions that the Subcontractor knows or should know are false or fraudulent, or that are intentionally misleading. If the contract calls for time and expenses to be billed, Subcontractors must submit approved time sheets and expense reimbursement forms that accurately reflect the time that the Subcontractors worked on a particular contract and the job-related expenses that the Subcontractor incurred in the performance of the contract. Subcontractors shall maintain documentation such as contemporaneous personal notes, diaries, memoranda, and billing receipts to verify the information on billing forms and shall make such documentation available to PPL upon request.

In the event that Subcontractor is required to travel in order to perform services under the contract, Subcontractor must comply with the PPL Expense & Reimbursement Policy in order to secure reimbursement of travel-related expenses.

**CONFLICTS**

In carrying out their contracted work responsibilities, Subcontractors owe a duty of loyalty to PPL, and indirectly, to NYSDOH. Subcontractors must disclose to PPL the relevant facts whenever the Subcontractor believes that a conflict, real or apparent, may exist. This includes disclosing whether any Subcontractor employee (or an employee's relative or household member) is employed or contracted by NYSDOH for which the contracted services are being provided. Other examples include where the Subcontractor is approached by NYSDOH to perform work that PPL could perform.

**GIFTS**

Subcontractors may not accept or solicit gifts of any kind from the PPL client for which it is performing the contracted services, may not give or offer gifts to that client, and may not accept, solicit, give, or offer gifts that may relate to any contracted services, except as may be authorized in writing by PPL.

**POLITICAL ACTIVITIES**

PPL is a non-partisan management consulting firm that does not work for or support any political party or candidate for political office, and it is important that PPL maintains its reputation for impartiality. Subcontractors may not take part in political work in PPL offices or while performing contracted services, use PPL resources for political purposes, identify themselves in political contexts as having any affiliation with PPL, or display political buttons or other insignia while in PPL offices or performing contracted services.

Version 7.5 clean
12/29/2024

**LOBBYISTS**

Subcontractors must disclose to PPL the use of lobbyists in connection with PPL business, and must comply with state and federal lobbying regulations, including state-specific registration, conflict, and gift restrictions.

**WORKPLACE HEALTH AND SAFETY**

PPL is committed to maintaining a workplace that is free of health and safety hazards. Accordingly, the following are prohibited in PPL offices or in connection with PPL business unless authorized in writing by PPL: (a) weapons of any type; (b) the use, sale or distribution of illegal drugs or alcoholic beverages; and (c) smoking, vaping, or ingesting any tobacco or cannabis product.

**REPORTING**

PPL strongly encourages its Subcontractors to report compliance or ethics concerns and to seek guidance on such matters. PPL maintains a strict policy of non-retaliation for good faith reporting of such issues. For any questions or concerns, Subcontractors may utilize the confidential Compliance Hotline at (833) 203-9084 (dial *67 first should you prefer your call to remain anonymous), or via compliance@pplfirst.com.

rev. 08/2023

Version 7.5 clean
12/29/2024

**ATTACHMENT D**
**BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Agreement ("BAA") is entered into by and between Public Partnerships LLC ("PPL") and  Consumer Directed Choices, Inc. ("Business Associate") (collectively the "Parties").  This BAA is effective as of December 30, 2024 (the "Effective Date.)

**WHEREAS**, the Health Insurance Portability and Accountability Act (Public Law 104-191 as amended) and its implementing regulations in effect or as amended (45 CFR Parts 160, 162, and 164) (collectively, "HIPAA") establish specific requirements relating to the privacy, security and confidentiality of certain personally identifiable health information;

**WHEREAS**, PPL and Business Associate have entered into a contract, or are contemplating entering into a contract, pursuant to which Business Associate will perform services for PPL (the "Business Contract");

**WHEREAS**, in the course of performing the services required by the Business Contract, Business Associate may receive, access, create, maintain, transmit, or store personally identifiable health information which is protected by HIPAA and which is owned or in the custody of PPL (the "PHI");

**WHEREAS**, HIPAA requires PPL to obtain satisfactory assurances from its Business Associates that they will appropriately safeguard the PHI; and

**THEREFORE**, pursuant to the above statements and in consideration of the mutual promises herein, the Parties agree as follows:

1. **Definitions**

The terms used in this BAA, but not otherwise defined, shall have the same meaning ascribed by 45 CFR Parts 160 and 164, including the terms Breach, Disclosure, Minimum Necessary, Required By Law, Secretary, Security Incident, Subcontractor, and Use.

2. **Permitted Use and Disclosure of Protected Health Information**

   a.    Business Associate will access, Use and Disclose the PHI only as necessary to accomplish the purposes of the Business Contract, or as Required By Law.

   b.    Business Associate will access, Use and Disclose only the Minimum Necessary amount of PHI required to accomplish the requirements of the Business Contract.

   c.    Business Associate will ensure that the PHI is accessed from, Used, Disclosed to, and stored only within the borders of the continental United States.

3. **Appropriate Safeguards**

   a.    Business Associate will use appropriate safeguards to ensure the confidentiality, security, integrity, and availability of the PHI and to prevent access, use or disclosure of the PHI other than as provided for in this BAA.

23

Version 7.5 clean
12/29/2024

**b.** Business Associate will ensure that such safeguards apply both to PHI in storage and PHI in transmission.

**c.** Business Associate will establish and maintain comprehensive written policies and procedures with respect to such safeguards, and will provide PPL with a copy of those policies upon request.

**d.** With respect to PHI held in electronic form, Business Associate will comply with the requirements of Subpart C of 45 CFR Part 164.

**e.** Business Associate will comply with any written instruction from PPL regarding a change to the permitted access, use or disclosure of the PHI, whether such change is a result of an individual rescinding permission to access, Use or Disclose their PHI or for any other reason.

**4.** **<u>Unauthorized Use or Disclosure, Suspected or Actual Security Incident: Report and Mitigation</u>**

**a.** Business Associate shall report to the designated PPL contact listed in Paragraph 4(d) below, in writing, within 24 business hours of discovery, any access, Use or Disclosure of the PHI other than as provided for in this BAA, and any suspected or actual Security Incident impacting the PHI.  For the avoidance of doubt, the parties agree that inconsequential incidents that occur on a daily basis, such as scans or pings on Business Associate's networks or servers containing PHI, are unsuccessful Security Incidents and shall not be considered a Security Incident subject to reporting, unless so required by the Privacy Rule.

**b.** Business Associate shall take action as soon as possible to correct any unauthorized access, Use or Disclosure of PHI or suspected or actual Security Incident impacting the PHI, and to mitigate any resulting harmful effects.

**c.** After reporting to PPL the unauthorized access, Use or Disclosure of PHI, or suspected or actual Security Incident impacting the PHI, Business Associate shall follow PPL's instructions with respect to any further corrections or remedial actions to be taken.

**d.** Reports required by this Paragraph 4 must be made to:

Privacy Officer
Public Partnerships LLC
17 Plaza Drive, Latham NY 12110
compliance@pplfirst.com

**5.** **<u>Training</u>**

**a.** Business Associate shall ensure that its workforce (including employees, Subcontractors and other agents that may have access to PHI) complete annual training on the requirements of HIPAA and this BAA; their obligation to safeguard the PHI from unauthorized access, Use or Disclosure; the actions they must take to prevent Security Incidents and Breaches; and how to immediately report any actual or suspected violation of this BAA.

Version 7.5 clean
12/29/2024

**b.**    Upon written request from PPL, Business Associate shall furnish evidence of such training to PPL.

6.    **Availability of Information**

**a.**    Upon request by PPL, Business Associate shall make the PxHI in its possession of custody available to PPL, in a format accessible to PPL, to allow PPL to fulfill its obligations under HIPAA or other privacy or security law.  This includes for an individual's request for copies of their PHI, for an individual's request to amend or correct their PHI, for an individual's request for an accounting of disclosures of their PHI, or for any other compliance related reason.  The obligations under this Paragraph are in addition to the obligations imposed under Paragraph 8(b) below.

**b.**    Upon reasonable notice by PPL or the Secretary during regular business hours, Business Associate shall make available its facilities, systems, procedures, records, internal practices, books and records relating to its access, Use and Disclosure of the PHI in order to determine its compliance with HIPAA and/or this BAA.

7.    **Agents of Business Associate**

**a.**    Business Associate shall ensure that each of its agents who may receive, access, create, maintain, transmit, or store the PHI , including Subcontractors, agrees in writing to the same restrictions and conditions that are imposed upon the Business Associate by this BAA, including the duty to immediately report any unauthorized access, Use or Disclosure of PHI and any actual or suspected Security Incident impacting the PHI (which then shall be reported by Business Associate to PPL in accordance with Paragraph 4).

**b.**    Upon request, Business Associate shall provide PPL with a copy of each such written agreement.

8.    **Record Retention; Return; Destruction**

**a.**    Business Associate shall retain all PHI received from PPL, or created by Business Associate pursuant to the Business Contract, for the duration of the term of this BAA unless otherwise directed by PPL in writing.

**b.**    Within 15 business days of PPL's written request, Business Associate shall provide to PPL a copy of all PHI in its possession or custody, in a format accessible to PPL.

**c.**    Unless otherwise directed by PPL in writing, Business Associate shall, upon the termination or expiration of this BAA or the Business Contract, return to PPL all copies and versions of the PHI in its possession or custody, or destroy them, as directed by PPL.

**d.**    Upon the return or destruction of the PHI, Business Associate shall so certify to PPL in writing.

**e.**    If return or destruction of the PHI is not feasible upon the termination or expiration of the Business Contract or this BAA, the protections of this BAA shall

25

continue to apply to the PHI indefinitely. In this case, Business Associate shall limit further access, Use and Disclosure of the PHI to those purposes that make the return or destruction of the PHI infeasible.

f.   PPL may direct Business Associate to retain the PHI for a specified time period beyond the termination or expiration of this BAA or the Business Contract. For as long as the PHI remains in the Business Associate's possession or custody, Business Associate shall continue to extend the protections of this BAA to the PHI.

**9.   Term and Termination**

a.   **Term.** This BAA is effective on the Effective Date and, except as specified in Paragraph 9(b), 9(c) or (d) below, this BAA will terminate upon the termination of the Business Contract; or upon signed written notice from PPL, whichever is earlier.

b.   **Violations of this BAA.** The Business Associate acknowledges that if violates any term of this BAA, PPL may terminate this BAA and the Business Contract immediately, and may further report the violation to the Secretary.

c.   **Violations of law.** PPL may terminate this BAA and the Business Contract without notice if Business Associate is named as a defendant in a criminal, judicial or administrative proceeding for a violation of HIPAA or other security or privacy law.

d.   **Termination for Cause**. A violation of this BAA shall constitute a breach of the Business Contract, affording PPL any and all the rights conferred upon it by the Business Contract in the event of breach.

e.   **Survival.** The obligations of the Business Associate under this BAA shall survive the termination of this BAA.

**10.   Mutual Indemnification**

Each Party will indemnify, hold harmless, and defend the other Party from any claims, losses, liability, costs, and other expenses incurred as a result of any misrepresentation, breach, or non-fulfillment of this BAA.

**11.   Ownership of PHI**

The Business Associate acknowledges that all PHI received or created under this BAA is either owned by PPL or is in PPL's lawful possession. Business Associate has no ownership rights to the PHI.

**12.   Entire Agreement and Amendment**

a.   **Entire Agreement.** This BAA constitutes the entire agreement between the Parties relating to the safeguarding of the PHI and supersedes all other agreements, communications or understandings whether oral or in writing, between the Parties with respect to the subject matter hereof. To the extent that

Version 7.5 clean
12/29/2024

there is a conflict between this BAA and the Business Contract as it relates to the PHI, this BAA controls.

**b.**   **Amendment.**  This BAA may be amended only by means of a writing signed by authorized representatives of the Parties and referencing this BAA.  The Parties agree to enter into negotiations to amend this BAA promptly upon the reasonable request of either Party, including when changes in the law may make such changes necessary or advisable.

**13.**   **Litigation Assistance**

Business Associate will make itself available to assist PPL by providing information or testifying as a witness in the event of administrative or judicial proceedings based on an alleged violation of HIPAA or other laws relating to security and privacy, except where Business Associate is also a named party in the same proceedings.

**14.**   **Obligation to Disclose Legal Actions**

Business Associate will notify PPL immediately if it is named as a defendant in a criminal, judicial or administrative proceeding for a violation of HIPAA or other security or privacy law. Reports under this Paragraph 13 must be made to the contact person listed in Paragraph 4(d) above.

**15.**   **No Third-Party Beneficiaries**

Nothing in this BAA is intended to confer any rights, remedies, obligations, or liabilities upon anyone other than PPL, Business Associate, and their respective successors or assigns.

**16.**   **Successors and Assigns**

The rights, remedies, obligations, and liabilities of each Party to this BAA shall accrue to their successors and assigns.  Notwithstanding this, each Party shall notify the other in the event of a successorship or assignment, and shall take commercially reasonable steps to ensure that any successor or assign timely executes a new BAA.

*---remainder of page intentionally blank---*

27

Version 7.5 clean
12/29/2024

## 17. <u>Interpretation</u>

This BAA will be interpreted as broadly as necessary to implement and comply with HIPAA. The Parties agree that any ambiguity in this BAA will be resolved in favor of a meaning that complies with and is consistent with HIPAA.

**The undersigned agree by their authorized representatives:**

**PUBLIC PARTNERSHIPS LLC**                    **Consumer Directed Choices, Inc.**

*Sherwin Krug*
Sherwin Krug (Dec 30, 2024 10:16 EST)

By Sherwin Krug                                By: *[signature]*

Title: CFO                                     Title: CEO

Date: Dec 30, 2024                             Date: 12/29/24

Rev 8/23

28