**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CONSUMER DIRECTED CHOICES, INC.,

                    *Plaintiff,*

vs.

PUBLIC PARTNERSHIPS, LLC,

                    *Defendant.*

Case No. 1:25-CV-0868 (AJB/DJS)

AMENDED COMPLAINT AND JURY TRIAL DEMANDED

Plaintiff, Consumer Directed Choices, Inc. ("CDChoices"), by and through its undersigned counsel, for its Complaint alleges as follows:

**I. PRELIMINARY STATEMENT**

1.      Defendant Public Partnerships, LLC ("PPL") has repeatedly breached, and continues to breach, its obligations to Consumer Directed Choices, Inc. ("CDChoices") under the parties' Subcontractor Agreement (the "Agreement").

2.      PPL's conduct has been intended to "punish" and "make an example" out of CDChoices. PPL's breaches have damaged CDChoices and threaten its ability to continue to operate as a business. PPL's breaches simultaneously deny a vulnerable Medicaid population the opportunity to be served by CDChoices.

3.      From 2001 to the present, CDChoices has served within New York State's Medicaid-funded Consumer Directed Personal Assistance Program ("CDPAP") and provided fiscal intermediary ("FI") services in New York. The CDPAP program was established to grant chronically ill and physically disabled individuals (referred to as CDPAP consumers) greater flexibility and autonomy in managing their home care services. Unlike traditional home care models, CDPAP allows consumers—including children, adults, and seniors—to direct their own care by hiring, training, and supervising their own CDPAP Personal Assistants. CDPAP Personal

1

Assistants ("PAs") provide essential support services, including personal care, home health aide services, and even advanced skilled nursing tasks ("CDPAP services") under the direct supervision of the consumer or their designated representative.

4. As an FI under CDPAP, CDChoices' role has been to facilitate the administration of the program on behalf of the disabled consumer by handling wage and benefit processing, regulatory compliance, and support services to ensure consumers receive high-quality, consumer-directed care in their homes. The services provided under CDPAP, including the FI services provided by CDChoices, are critical to allowing disabled New Yorkers to remain in their homes and communities, rather than being institutionalized in nursing homes or group settings.

5. Effective April 1, 2025, New York reorganized CDPAP to transition to a single statewide FI. The reorganization mandated the transition to a single statewide FI (rather than the previous hundreds of FI's), (the "Transition"). That single statewide FI would then work with certain subcontractors to help it administer CDPAP benefits as required by law.

6. The New York State Department of Health ("DOH") awarded the contract to serve as the single statewide FI to PPL. The Transition required all CDPAP consumers and PAs to register with the PPL system, PPL@Home, and subsequently submit all claims for reimbursement through PPL@Home. That Transition has not been smooth.

7. The United States Department of Justice stated in federal court that "The transition process—transferring, within a short period of time, CDPAP services for hundreds of thousands of patients from hundreds of Fiscal Intermediaries to PPL—has been plagued by myriad structural, operation, and logistical defects."

8. Initially, the New York DOH announced that all consumers and PAs were required to enroll for PPL@Home by March 31, 2025. Failure to register, according to DOH, would result

in those consumers and PAs losing their caregiving services or payment for services provided.

9.    On March 31, 2025, United States District Judge Block of the U.S. District Court for the Eastern District of New York issued a temporary restraining order (the "TRO") against "implementing those sections of … the 'CDPAP' Amendment." It "restrains [DOH] from disallowing other Fiscal Intermediaries from servicing those CDPAP participants who have not yet registered with PPL."

10.    On April 10, 2025, the Court entered a preliminary injunction directing DOH to ensure that PAs "continue[d] to be timely paid for their services and receive statutory benefits consistent with applicable labor and employment laws."

11.    Meanwhile, as part of the Transition, and effective December 30, 2024, PPL subcontracted with CDChoices to assist it in fulfilling its obligations as the new single statewide FI.  That Subcontractor Agreement was entered by PPL and CDChoices and remains in full force and effect as of the date of this Complaint's filing.

12.    Under the parties' Agreement, CDChoices became one of a limited number of subcontractors (sometimes referred to as subcontracted community-based partners or CDPAP "Facilitators") for the new CDPAP.  CDChoices was selected by PPL as one of only four Core Regional Home Care Partner Facilitators, along with more than 30 other subcontracted partners. CDChoices agreed to provide the various services to consumers who were assigned to CDChoices under the subcontract with PPL, including (1) providing consumers with an orientation to CDPAP, (2) providing the consumer options for PAs to complete the hiring process with PPL, (3) notifying the consumer of their CDPAP start date and weekly and monthly service hours, (4) providing the consumer with an annual reminder to ensure the annual PA health assessment is completed 30 days prior to the health assessment's expiration, (5) supporting and monitoring electronic visit

verification or "EVV" compliance by consumers and PAs, including the submission of time sheets, (6) monitoring consumer overutilization and PA overtime reports provided by PPL and developing a Utilization Plan to stay within the authorized hours of service and/or minimize the use of excess hours or overtime, (7) providing telephonic customer support to consumers and PAs to answer questions related to their CDPAP services, (8) facilitating a consumer's right to change their relationship to another CDPAP Facilitator, (9) immediately reporting to PPL any suspicion of fraud, waste, and abuse, and (10) performing other services as mutually agreed to by the parties.

13.    In return, PPL agreed to (1) include CDChoices in its recommendations to CDPAP consumers when appropriate based on geographic location, cultural competency, and language abilities, (2) ensure that all consumers PPL recommends to CDChoices are verified as eligible for CDPAP services at the time of recommendation, (3) recommend CDChoices to all consumers that CDChoices was already serving at the time the Agreement became effective, (4) allow CDChoices to perform outreach and education activities to inform eligible consumers of its availability to serve as a CDPAP Facilitator, and (5) compensate CDChoices at the rates stated in the Agreement, among other things.

14.    Only two days after the Transition, on April 3, 2025, PPL shut off CDChoices' access to PPL's administrative system, PPL@Home, that allowed CDChoices to fulfill its functions as a Facilitator under the subcontract.  CDChoices could not file consumer and PA paperwork, monitor registration progress, or perform other necessary functions to support consumers and PAs.

15.    PPL further breached the Agreement when it failed to recommend CDChoices to consumers.  Pursuant to the Agreement, PPL was required to recommend CDChoices as a Facilitator to CDChoices' then-existing consumers and to new consumers to assist CDChoices in

reaching a capacity of 50,000 consumers.  Instead, PPL (1) transferred consumers to other Facilitators; and (2) stopped recommending CDChoices to consumers and managed care plans, told them that CDChoices was "terminated" as a Facilitator, actively steered and assigned them to other Facilitators instead, and removed CDChoices from PPL's website that lists Facilitators.  The loss of these consumers has caused CDChoices extensive damages.

16.    PPL also breached its contractual obligations when it disparaged CDChoices. Among other things, PPL falsely told third parties that CDChoices was "terminated" as a CDPAP subcontractor while PPL knew it, in fact, had not even attempted to terminate the Agreement until June 9, 2025—and even then, PPL failed to effect termination as required by the Agreement. PPL's disparagement violated the Agreement and caused CDChoices to lose the opportunity to serve CDPAP consumers.

17.    Finally, PPL breached its contractual obligations to CDChoices when PPL attempted to terminate the Agreement.  The Agreement requires the non-breaching party to notify the other party of material breaches and afford the breaching party 30 days to cure.  PPL has not sent the required notice and did not afford CDChoices 30 days to cure any alleged breaches.  At the time of the purported termination, CDChoices was in compliance with the Agreement.

18.    On July 7, 2025, the parties in the class action before Judge Block submitted a proposed settlement that allows fiscal intermediaries to continue to service consumers until August 1, 2025, and further provides that "DOH shall direct the MCOs and LDSS to send a letter to all Fully Registered Consumers" by July 11, 2025.  As of the filing of this complaint, PPL continues to exclude CDChoices from the "List of Approved CDPAP Facilitators" on its website, which DOH links to for consumers (https://www.health.ny.gov/health_care/medicaid/program/longterm/cdpap/).

19.     PPL is reportedly the subject of a current investigation being conducted by the U.S. Department of Justice.[1]

20.     This case is necessary to stop PPL's improper conduct, prevent irreparable harm to CDChoices, and to compensate CDChoices for the damages resulting from that conduct.

## II. JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1332(a).

22.     Venue is proper here pursuant to 28 U.S.C. § 1391(b)(2).

## III. PARTIES

23.     Plaintiff CDChoices is a not-for-profit corporation organized under the New York Not-for-Profit Corporations Law in 1997, and, *inter alia*, operates as a FI in the CDPAP.  It has offices throughout New York, including at 7 Washington Square, Albany, New York.

24.     Defendant PPL is a limited liability company organized under the laws of Delaware and with its principal place of business at 8000 Avalon Blvd., Suite 300, Alpharetta, Georgia.

## IV. FACTS

### A. Medicaid Managed Care

25.     CDPAP provides services to certain Medicaid Managed Care beneficiaries by allowing the beneficiary—the consumer—to select and train their caregiver—the PA.  The PA often provides care and assistance with daily living tasks inside of the consumer's home.  CDPAP allows the consumer to select a PA who they trust, such as a family member, friend, neighbor, or someone from their community.  Prior to April 1, 2025, CDPAP supported approximately 280,000

---

[1] Vaughn Golden, *Feds investigate Gov. Kathy Hochul's home care program reforms after chaotic rollout: source*, NEW YORK POST (June 2, 2025), https://nypost.com/2025/06/02/us-news/feds-investigate-gov-kathy-hochuls-home-care-program-reforms-after-chaotic-rollout-source/.

New York residents ("consumers") who employed over 300,000 PAs.

26.    New York's CDPAP is a Medicaid-funded initiative established under New York Social Services Law § 365.  To participate in CDPAP, a consumer must be eligible for Medicaid and meet various other criteria such as requiring long-term care.  CDPAP allows eligible Medicaid beneficiaries to receive some or total assistance with personal care services, home health aide services, or skilled nursing tasks, ensuring they can remain in their homes and communities rather than being institutionalized in a nursing facility or group home.  Unlike traditional home care models, CDPAP is consumer-directed, granting beneficiaries greater control over their care by enabling them to hire, train, supervise, and, if needed, discharge their own CDPAP PAs.  The individuals providing this care, known as "consumer directed personal assistants," may include family members (excluding spouses, parents of children under 21, or designated representatives), friends, or other trusted individuals.  NY Social Services Law § 365-f(1–3).

27.    For decades, FIs have played a critical role in supporting CDPAP participants by ensuring compliance with statutory and regulatory requirements.  Pursuant to Social Services Law § 365-f(4-a), 18 NYCRR § 505.28(j), and 10 NYCRR § 766.11(c)–(d), FIs perform such tasks as processing wages, benefits, and payroll withholdings for CDPAP PAs; managing compliance with tax, workers' compensation, disability, and unemployment insurance requirements; verifying the health status of CDPAP PAs before service delivery; maintaining personnel records, including timesheets and medical documentation; and monitoring the ability of consumers or their designated representatives to fulfill their responsibilities under the program.  These FI functions permit CDPAP participants to receive uninterrupted and high-quality consumer-directed care in their homes and communities.

28.    From 2001 to the present, CDChoices, a not-for-profit 501(c)(3) charitable

corporation, has provided FI services in New York.  CDChoices was one of hundreds of FIs serving consumers and PAs throughout New York.

29.     Effective April 1, 2025, however, New York reorganized CDPAP and mandated the transition to a single statewide FI that then subcontracted some duties to a limited number of Facilitators.

30.     The DOH awarded the contract to serve as the single statewide FI to PPL.

31.     As part of the transition to the single statewide FI, all CDPAP consumers and PAs, over 600,000 people, needed to register with the PPL system, PPL@Home.  Consumers and PAs were then required to submit all claims for reimbursement and required documentation through PPL@Home.  PAs also had to log their time through PPL's EVV system, Time4Care, or submit their time with paper time sheets.

32.     Many consumers and PAs did not understand that the failure to register would result in the loss of their caregiving services or payment for services provided.  Other consumers and PAs faced significant difficulties in their efforts to transition to PPL and needed more time to complete the registration process.

33.     On March 31, 2025, to prevent the potential catastrophic result of such a vulnerable population losing access to caregivers, Judge Block of the United States District Court for the Eastern District of New York issued a TRO order against "implementing … the 'CDPAP' Amendment."  It also "restrain[ed] [DOH] from disallowing other Fiscal Intermediaries from servicing those CDPAP participants who have not yet registered with PPL."  Ex. A.

34.     On April 10, 2025, the Court entered a preliminary injunction that outlined steps DOH had to take to ensure PAs "continue to be timely paid for their services and receive statutory benefits consistent with applicable labor and employment laws."  Ex. B at 4.

35.     That case, along with many others against DOH and PPL regarding the implementation of the transition to the single statewide FI, remain pending in courts throughout New York.

36.     CDChoices has thoroughly documented the substantial operational challenges it encountered as a Facilitator under PPL's administration, including deficiencies in PPL's systems and processes, a persistent lack of timely or adequate follow-up by PPL to resolve such issues, and the numerous obstacles faced by consumers and their PAs as a result.  PPL has often not paid PAs, causing consumers to fear the loss of their care.  In one instance, a consumer wrote:

> My aid hasn't been paid one dime since 4/1/25. We just sent in her third timesheet by email you are not incompliance per the recent injustion on 4/8/25 -4/10/25. Where no matter where we were she POAS would get paid every week You now owe her 120 hrs and she can't stay and pay her bills as well!!!! This has been a nightmare and will end up without an aid 40 hours per week I've had her since 8/22 and I live alone I have several specialist and a stroke 1 yr ago that has left me with cognitive issues. I'm extremely scared depressed and feel totally betrayed by the system **Whats going to happen to me now???** On top of that my GP was suppose to get me a bedside commode and wheelchair back on March 11. Still waiting and no one seems to have a valid reason for it and fell again at home in bathroom one night last week. Non compliant everywhere I go. I want to go back to my Okd FI until all documents are in your systems at PPL but I can't get my MCO to send them the service autho to PPL. You have everything else you requested. Can't you get with my Medicaid plan expediate the autho that's needed to be DONE with this Chaos ???? I have severe spinal stenosis in my lumbar and neck since my fall I'm in severe pain and can barely walk, bal myself on toilet or get in and outta bed. I need answers or you to handle this immediately If I fall again I could end up paralyzed I never would have believed that I'd end up like this 😢. I worked so hard since I was 15 and was a kind and generous person and to be here now like this is surreal and to think others like me are being treated like this is enough to make me look forward to dying (emphasis added).

37.     A designated representative for a consumer emailed PPL and CDChoices similarly expressing a fear of losing the consumer's PA.  The designated representative wrote:

> This transition[] is suppose[d] to be more efficient, but at what cost. The elderly suffering. This is the PA['s] lively hood. People depend on their paycheck to pay the roof over there head & for the food they eat.  If the transitioning was not ready then you should not have giving us deadlines to meet until you can guarantee the

pay would arrive in our checking account weekly. To date Chrissy, after submitting all her documents has yet to be paid via direct pay. Thru the old system Diana's Angela has never missed a pay check thru direct pay nor have they miss a weekly payment to our debit card.  Please correct this asap. **We are told our Facilitator has not access to the portal to-see payroll.  If PPL could not handle this, then why not give The FI access to payroll.** We cannot lose this PA who is taking care of my mom monday thru friday with cleaning, meal preparing to assure she eats & taking her medicines, laundry & all her needs so she doesn't fall n hurt herself. (emphasis added).

38.     One PA emailed CDChoices because she was "having such a hard time reaching anyone at PPL" and she "ha[d]n't seen any paycheck at all."  She wrote:

Hi Karen, I spoke with you on April 10 and you were so kind to send me timesheets. I have been having such a hard time reaching anyone at PPL and I am trying to get on board with an agency to process my paychecks. No one is answering the phone at either of the Long Island agencies and no one I spoke to you. You had said that your agency could represent me I would love to go ahead with that if you could do that I submitted two timesheets almost a month ago, but I haven't seen any paycheck at all. Perhaps it's because I don't have an agency set up yet. Can you please guide me and tell me what I need to do next I would like to set up with your agency if I can OK thank you so much ….

39.     Another PA also complained about not receiving payment and how the PA had always received payment when CDChoices was the FI.  He emailed PPL the below:

Hello,
I DIDNOT GET A CHECK FOR THIS PAY PEROID, THE PAY PERIOD BEFORE THIS ONE SHORTED ME HOURS.
I DID THE WORK I EXPECT TO GET PAID
THIS TRANSISITON IS NOT FREINDLY AND SHOULD NOT SHORT PEOPLE OF THEIR TIME OR NOT PAY PEOPLE AT ALL WE HAVE BILLS TO PAY JUST LIKE THE COMPANY WHO IS TAKING OVER CD CHOICES.

CD CHOICES WAS THE BEST EVER

I WAS TOLD A CHECK WOULD BE COMING THURSDAY, MAY 1,
NO CHECK CAME BUT MY BILLS ARE DUE.

40.     These issues have negatively impacted the care provided to consumers.

**B.  PPL Subcontracted with CDChoices to Serve as a Facilitator**

41.     As part of the Transition, PPL selected CDChoices as a Facilitator because

10

CDChoices "possesses the expertise and skills to assist CDPAP consumers in registering, facilitating, and maintaining their participation in CDPAP." Ex. C at 1. PPL selected CDChoices as one of four lead Core Regional Home Care Partners, along with more than 30 additional community-based home care agencies, to serve as subcontracted CDPAP Facilitators. The parties signed the Subcontractor Agreement effective December 30, 2024.

42.    The Agreement sets forth the respective responsibilities and obligations of the parties. Per Sections 4(a) and 4(c) of the Agreement, PPL agreed to recommend consumers to CDChoices and work in good faith to assist CDChoices to reach its desired capacity:

    a.   PPL will include SUBCONTRACTOR in its recommendations to consumers when appropriate based on geographic location, cultural competency, and language abilities. PPL will work in good faith to assist SUBCONTRACTOR to reach its desired capacity. Unless SUBCONTRACTOR agrees in writing, PPL will not recommend more than 20,000 new consumers per month.

    …

    c.   PPL shall recommend to SUBCONTRACTOR all Consumers that SUBCONTRACTOR is already serving at the time this Agreement becomes effective. However, any Consumer who elects to receive Subcontracted Services from another Subcontractor shall have the right to transfer to the Subcontractor of their choice in accordance with program guidelines.

43.    Attachment A to the Agreement provides further details on the capacity that PPL would help CDChoices achieve. It reads: "PPL will support SUBCONTRACTOR in efforts to reach full capacity as stated in its approved capacity plan." PPL required CDChoices to submit a capacity plan as part of the negotiations for the Agreement. That capacity plan laid out the process for CDChoices to achieve a capacity of facilitating 50,000 CDPAP consumers.

44.    The Agreement also contains a termination provision. Section 5(a)(1) of the Agreement provides that either party may terminate the Agreement upon "a material breach of this Agreement" but only if there is a "failure to cure such breach within 30 days after written notice specifying the breach and required corrective actions."

45.    If terminated for cause, PPL still had to compensate CDChoices for services rendered prior to the termination.  Ex. C § 5(a).

46.    The Agreement further prohibits the parties from disparaging each other.  The parties agreed to "not at any time make disparaging statements … about the other party or any of its respective employees, officers, directors, products or services."  Ex. C § 26(b).

47.    Under the Agreement, PPL agreed to compensate CDChoices through three payment mechanisms.  First, PPL would make a one-time Transition Payment of $48 per consumer for facilitating the transition of consumers and their associated PAs during the period from January 6, 2025, through March 30, 2025 (the "Transition Period").  Ex. C Att. B.  Second, PPL agreed to pay CDChoices a monthly per-member-per-month ("PMPM) payment of $50 to $60 per active consumer, depending on the number of service hours for that active consumer.  *Id.*  Third, CDChoices could earn an additional Monthly Value-Based Payment ("MVBP") of $4.00 per consumer based on the compliance and retention rates for PAs (payment for the period April 1, 2025, through June 30, 2025, was to be paid regardless of whether performance metrics were achieved).  *Id.*

**C.  PPL Breached the Agreement by Not Affording CDChoices an Opportunity to Cure**

48.    After entry of the TRO by Judge Block on March 31, 2025, CDChoices notified its consumers and their PAs.  CDChoices also posted information about the evolving legal landscape on its website.

49.    CDChoices notified fully registered consumers and PAs that they must use PPL's system, PPL@Home, for CDPAP as of April 1, 2025.  In relevant part, this message to fully registered consumers read:

> Earlier today, a federal judge issued a Temporary Restraining Order that pauses the transition to PPL for a limited group of consumers.  However, **your transition will go ahead** as scheduled because you have already completed your registration with

PPL.

**Effective today, April 1, your services will begin with PPL.**  Your Personal Assistants must begin using PPL's **Time4Care** system for Electronic Visit Verification (EVV). Please be advised that your PA(s)' access to **CareTime** ended on 3/31/2025.  (emphasis in original).

50.    The message to PAs for fully registered consumers contained similar information:

We are reaching out to share a legal update regarding the transition to Public Partnerships LLC (PPL) for specific consumers. Yesterday evening, a federal judge issued a **Temporary Restraining Order** that delays the State's transition to PPL for a specific group of consumers. However, since your **consumer/employer has completed their registration with PPL**, your transition to PPL will continue as scheduled.

**Effective today, April 1**, your employment will officially **move to PPL**, and you will be required to use PPL's **Time4Care** system for Electronic Visit Verification (EVV) for shifts worked. Please note that you can no longer access **CareTime** to clock in and out.  (emphasis in original)

51.    Consumers and PAs that had not fully registered would continue to use the system they had been using.  CDChoices sent these legacy consumers the following message:

On Monday evening, a federal judge issued a **Temporary Restraining Order** that halts the State's transition to PPL.  As a result, your transition has been **paused**, and **no changes will be made to your current services**.

Please continue to manage your CDPA services with CDChoices' support.  On April 1 (today), there is **no change to how you schedule and submit hours**, and your Personal Assistants should continue using the **CareTime** system for Electronic Visit Verification (EVV) to get paid. The transition to PPL's EVV system, Time4Care, will not occur until further notice.  (emphasis in original).

52.    CDChoices sent the legacy PAs for the not fully transitioned consumers a similar message.  In relevant part it read:

On Monday evening, a federal judge issued a **Temporary Restraining Order** that pauses the State's transition to PPL. As a result, **your transition to PPL has been paused**.  Today, April 1, there will be **no changes to your current employment or EVV system**.

Please continue to use the **Caretime** system for Electronic Visit Verification (EVV), and **do not begin using PPL's Time4Care system** until further notice.

(emphasis in original).

53.     CDChoices provided further information about the TRO on its website.   In relevant part the website stated:

> Today, on March 31, a U.S. District Court judge issued a Temporary Restraining Order (TRO), effective immediately.  This order prevents the New York State Department of Health (NYSDOH) from enforcing the CDPA program's single Statewide Fiscal Intermediary (SFI) transition to Public Partnerships LLC (PPL) for consumers who have not yet registered with PPL.  This means other Fiscal Intermediaries can still operate and provide services to their existing consumers who have not completed their registration with PPL during this temporary period.  However, the order does not shut down PPL or stop it from processing applications or servicing and paying personal assistants who have already registered with PPL.  The TRO does not stop the switch to PPL as the single SFI. …
>
> While the TRO is in place until at least Friday, it is important that consumers and personal assistants make every effort to complete their registration(s).

54.     The following day, PPL Senior Vice President Bonnie Vaughn sent CDChoices a letter signed by Vince Coppola, PPL's Chief Executive Officer, outlining PPL's position regarding the TRO.  PPL expressed its "disappoint[ment] in the issuance of the TRO" by U.S. District Judge Block.  Ex. D.

55.     The letter then outlined PPL's expectations of Facilitators to "help quell that confusion in the coming days[,]" "fulfill, in all respects, your contractual duties to PPL and to the program[,]" and "[i]f asked about the TRO, we expect you will respond with the truth—that the TRO is limited in scope, temporary in nature, and should not affect their ongoing registration effort with PPL."  *Id.*  The letter concluded by stating that "[a]ny action by a facilitator to retain or somehow re-direct the registration of a consumer with PPL will be considered a blatant violation of our agreement and of the scope and intent of the TRO" and "we will be unable to continue our partnership with any facilitator who cannot meet these expectations and who does not follow in all respects the terms of its agreement with PPL, as well as be truthful about the scope of the TRO."

14

*Id.*

56.     Later that same day, PPL's General Counsel Deborah Drexler sent CDChoices a cease and desist letter.  In that letter, PPL alleged that CDChoices made certain statements regarding the TRO "that may be false, coercive or deceptive, and that may jeopardize our working relationship."  Ex. E at 1.  PPL argued the TRO did not pause the Transition.  PPL then demanded CDChoices "immediately cease and desist from making any further statements that state or suggest that consumers or PAs should cease or slow their efforts to register with PPL or that PAs should continue to submit time to their current facilitators."  *Id.* at 2 (emphasis in original).  PPL also demanded that CDChoices issue a corrective statement.  *Id.*

57.     On April 2, 2025, Deborah Drexler sent CDChoices a third letter styled as a "notice of breach of contract pursuant to Section 5(a)(1) of the Agreement" (the "Notice").  Ex. F.  The Notice outlined four alleged breaches of the Agreement:

> 1. Made public statements to personal assistants (PAs) working in the Consumer Directed Personal Assistance Program (CDPAP) that may be false, coercive or deceptive, as detailed in my letter dated April 1, 2025;
>
> 2. Communicated to PAs and others directions that are contrary to Judge Block's Temporary Restraining Order dated March 31, 2025 (TRO);
>
> 3. Posted information on your website encouraging consumers and their PAs to continue receiving services from your organization after April 1, 2025, rather than from PPL; and
>
> 4. Failed to fulfill your contractual duties under the Subcontractor Agreement to assist consumers and their PAs to register with PPL.

58.     The letter demanded that CDChoices issue certain "corrective statements" within 48 hours.

59.     CDChoices did not breach the Agreement through any of these actions, nor are any of the alleged breaches material.

60.     For the first, PPL used the phrase "may be."  PPL thus did not even claim that

15

CDChoices' statements were "false, coercive or deceptive."

61.     Second, CDChoices quickly informed consumers about the rapidly evolving legal landscape in the wake of the issuance of the TRO.  Attachment A of the Agreement required CDChoices to communicate to consumers regarding "their CDPAP start date" and to consumers and PAs regarding registration, hiring, training, and other administrative matters.  Ex. C at 16–17.  And by informing consumers about the TRO, CDChoices did just that as the TRO significantly impacted CDPAP start dates, specifically whether consumers transitioned to PPL or not, and the process for registering consumers and PAs to complete hiring, training and other administrative matters.

62.     Third, the TRO "restrain[ed] [DOH] from disallowing other FIs from servicing those CDPAP participants who have not yet registered with PPL."  Ex. D.  As a consumer's FI, CDChoices then had the legal right under the TRO to continue to service any unregistered CDPAP consumers and PAs.  Further, CDChoices' website stated that "the order does not shut down PPL or stop it from processing applications or servicing and paying personal assistants who have already registered with PPL.  **The TRO does not stop the switch to PPL as the single FI.**"  Ex. G (emphasis added).  Further down, the website reads:  "While the TRO is in place until at least Friday, it is important that consumers and personal assistants **make every effort to complete their registration(s)**."  *Id.* (emphasis added).  As the website showed, CDChoices encouraged consumers and PAs to register to receive services from PPL—the exact opposite of what PPL alleged CDChoices had done.

63.     Fourth, CDChoices assisted consumers and PAs with registering before and after issuance of the TRO.  As of March 31, 2025, PPL reported that CDChoices had registered 72% of

16

its consumers, over 2,500 individuals.[2]  These numbers belie any contractual breach, especially in light of the TRO that issued because PPL failed to transition all consumers by the April 1, 2025 deadline.

64.    In the Notice PPL demanded that CDChoices take certain "corrective actions" *within 48 hours*—despite the Agreement allowing *30 days* to cure.  PPL directed CDChoices to issue a correction for previous statements about registering with PPL, remove certain information from its website, counsel consumers to register with PPL and to submit time to PPL, and respond to inquiries about the TRO "that the TRO is limited in scope, temporary in nature, and should not affect a CDPAP participant's registration efforts."  Ex. F at 2.

65.    Notwithstanding the demand for a cure within *48 hours* and an agreement that allowed CDChoices *30 days to cure*, PPL then emailed CDChoices *just 15 hours later*, on the morning of April 3, 2025, declaring that "[PPL] can no longer allow you to act as our subcontractor, and we have removed all of your access to PPL@Home."  Ex. H.  PPL shut off CDChoices' access to PPL@Home and transferred CDChoices' consumers to other Facilitators.

66.    PPL transferred thousands of CDChoices' consumers to other Facilitators to "punish" and "make an example" out of CDChoices.

67.    CDChoices implemented each one of PPL's demanded corrective actions by April 4, 2025.  CDChoices issued "corrective statements" PPL demanded, removed certain information from its website, assisted consumers and PAs attempting to register with PPL, and accurately communicated the effect of the TRO to consumers and PAs.

68.    Nevertheless, PPL continued to deny CDChoices' access to PPL@Home, hindering

---

[2] This number uses PPL's strict definition for registered.  The definition for registered evolved throughout the Transition, in part due to Judge Block's issuance of the TRO.  Subsequent reporting shows a higher value.

17

CDChoices from performing under the Agreement.

69.    PPL also hindered CDChoices by telling consumers and Managed Care Plans that CDChoices had been terminated.  PPL knew this was not true because PPL had not terminated the Agreement with CDChoices.  Indeed, on June 9, 2025, PPL explicitly told CDChoices it had been *avoiding terminating the contract* until that date—and even then, PPL never took the steps set forth in the Agreement to terminate CDChoices.

70.    Consumers and Managed Care Plans could no longer use CDChoices as a Facilitator.

71.    Since April, CDChoices has sought to resolve the parties' issues in good faith. Initially, PPL led CDChoices to believe that PPL intended to reinstate CDChoices' access, at least if CDChoices were willing to give up its contractual rights.  Indeed, on April 11, 2025, PPL's General Counsel wrote that PPL "would be willing to reinstate CDChoices if the company were willing to execute a contract amendment" PPL drafted that would give PPL the right to terminate the Agreement without notice or an opportunity to cure.

72.    CDChoices did not sign the Amendment but attempted to work with PPL on resolving the prior disagreements.

73.    Nonetheless, on June 9, 2025, PPL, through its General Counsel Deborah Drexler, told CDChoices during a phone call that PPL was terminating the Agreement effective June 9, 2025.  PPL refused to put this statement in writing because of the legal implications for terminating the Agreement without notice.

74.    PPL's purported termination is another breach of the Agreement.

### D. PPL Breached by Not Assisting CDChoices in Reaching Its Desired Capacity

75.    Section 4(a) of the Agreement requires PPL to "work in good faith to assist [CDChoices] to reach its desired capacity." Ex. C.

18

76.    Yet PPL has taken actions that *prevent* CDChoices from reaching its desired capacity.

77.    On April 3, 2025, PPL shut off CDChoices' access to PPL@Home.  This left CDChoices unable to submit PA timesheets, billing, and perform other necessary functions to support consumers and PAs.

78.    PPL also transferred CDChoices' consumers to other Facilitators.  CDChoices was serving over 3,500 consumers when PPL transferred CDChoices' consumers to other Facilitators. Many of these consumers chose CDChoices over other Facilitators to assist them in fulfilling their CDPAP obligations.  PPL has refused to transfer these consumers back to CDChoices.  As a result, CDChoices has lost massive amounts of revenue each month.  And many consumers were forced to work with other non-CDChoices subcontractors, who they did not choose.

79.    PPL also stopped recommending CDChoices to consumers.  Section 4(a) of the Agreement requires PPL to recommend CDChoices "when appropriate based on geographic location, cultural competency, and language abilities."  Ex. C.  But PPL moved consumers away from CDChoices even if CDChoices was an appropriate Facilitator based on geographic location, cultural competency, and language abilities.

80.    As of this Complaint's filing, CDChoices is not able to serve any consumers through PPL's system.  By not recommending CDChoices, PPL has sought to end CDChoices' participation in CDPAP.  This has caused devastating financial harm to CDChoices.  It already has been forced to sever its relationship with certain contractors and lay off certain employees, and it soon will be forced to lay off additional employees if PPL's conduct is not rectified.

81.    It also has harmed, and continues to harm, consumers.

82.    PPL's actions breached the Agreement.

**E. PPL Breached the Agreement's Recommendation Provision**

83.    Separately from the above, PPL was required under the Agreement to recommend all then-existing consumers of CDChoices to CDChoices.

84.    Section 4(c) of the Agreement provides: "PPL shall recommend to SUBCONTRACTOR all Consumers that SUBCONTRACTOR is already serving at the time this Agreement becomes effective."  Ex. C.

85.    PPL did not recommend CDChoices' then-existing consumers to CDChoices.  To the contrary, PPL transferred these consumers to other Facilitators.

86.    Thus, PPL breached the Agreement.

**F. The Parties' Agreement Obligates PPL to Reimburse CDChoices' Attorney Fees**

87.    The Agreement states:

Each party shall indemnify and hold harmless the other party from all claims, losses, expenses, fees (**including attorney's fees**), costs, judgments, and liabilities **arising from: (1) the indemnifying party's breach of this Agreement**; (2) the indemnifying party's failure to meet statutory, regulatory, or legal obligations; or (3) third-party claims arising from either's party's participation under this Agreement. . . . This Section shall not limit or restrict the SUBCONTRACTOR's right to pursue legal remedies, including damages or equitable relief, for breaches of this Agreement or for indemnification.  Section 11(b)*(emphasis added)*.

88.    PPL, thus, must pay CDChoices' attorney fees for bringing this action.

**V.**
**CLAIMS FOR RELIEF**

**COUNT ONE:  BREACH OF CONTRACT**
**Failure to Assist CDChoices to Reach Its Desired Capacity (Section 4(a) of the Agreement)**

89.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 above as though fully set forth herein.

90.    CDChoices fully performed its obligations under the Agreement.

91.    Section 4(a) of the Agreement requires PPL to "work in good faith to assist

20

[CDChoices] to reach its desired capacity." Ex. C.

92.     On April 3, 2025, PPL shut off CDChoices' access to PPL@Home, and has refused to reinstate access since then.

93.     CDChoices could no longer file consumer and PA paperwork, monitor registration progress, or perform other necessary functions to support consumers and PAs.

94.     PPL's actions prevented CDChoices from reaching its desired capacity and thus breached the Agreement.  By removing CDChoices' ability to serve consumers, PPL has threatened the viability of CDChoices' entire business.  Without access to the database, CDChoices cannot serve consumers through the current CDPAP program.

95.     CDChoices has suffered, and continues to suffer, damages as a result of this breach.

### COUNT TWO:  BREACH OF CONTRACT
### Failure to Recommend Consumers (Section 4(c) of the Agreement)

96.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 95 above as though fully set forth herein.

97.     CDChoices fully performed its obligations under the Agreement.

98.     Section 4(c) of the Agreement provides that "PPL shall recommend to [CDChoices] all Consumers that [CDChoices] is already serving at the time this Agreement becomes effective." Ex. C.

99.     Instead of recommending all then-existing consumers to CDChoices, PPL reassigned CDChoices' consumers to other Facilitators.

100.    Prior to April 3, 2025, CDChoices facilitated over 3,500 consumers.

101.    CDChoices no longer assists any consumers through PPL's system.

102.    PPL reassigned CDChoices' consumers to other Facilitators to "punish" and "make an example" out of CDChoices.

21

103.    CDChoices lost the opportunity to serve these consumers and provide the services that they requested and needed.  PPL breached the Agreement with no regard for patient care. Indeed, many of these consumers have been harmed, and continue to suffer harm due to PPL's actions, including being forced to work with Facilitators who lack the geographic surface area, cultural competency, language, and other attributes CDChoices possesses.

104.    By failing to recommend these consumers to CDChoices in good faith, PPL has breached the Agreement.

105.    CDChoices has suffered, and continues to suffer, damages as a result of this breach.

**COUNT THREE:  BREACH OF CONTRACT**
**Improper Termination of the Agreement (Section 5(a)(1))**

106.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 105 above as though fully set forth herein.

107.    CDChoices fully performed its obligations under the Agreement.

108.    Section 5(a)(1) of the Agreement requires 30 days' notice and an opportunity to cure any material breaches.  Ex. C.

109.    On June 9, 2025, PPL purported to orally terminate the Agreement with CDChoices.  PPL did not provide written notice of termination as required by Section 6 of the Agreement.

110.    PPL did not provide proper notice of any alleged breach of the Agreement.

111.    PPL did not provide CDChoices the required opportunity to cure.

112.    None of the other Termination for Cause provisions in Section 5 of the Agreement allowed PPL to terminate the Agreement.

113.    PPL's "termination" is in breach of the Agreement.

114.    CDChoices has suffered, and continues to suffer, damages as a result of this breach.

22

## COUNT FOUR:  BREACH OF CONTRACT
### Disparaging Statements (Section 26(b))

115.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 114 above as though fully set forth herein.

116.    CDChoices fully performed its obligations under the Agreement.

117.    Section 26(b) of the Agreement prohibits the parties from making "disparaging statements … about the other party."  Ex. C.

118.    PPL communicated to consumers that CDChoices had been "terminated" as a Facilitator.  This was a disparaging statement.

119.    PPL communicated to Managed Care Plans that CDChoices had been "terminated" as a Facilitator.  This was a disparaging statement.

120.    Upon information and belief, PPL made other disparaging statements to third parties regarding CDChoices.

121.    PPL's statements are in breach of the Agreement.

122.    CDChoices has suffered, and continues to suffer, damages as a result of this breach.

## COUNT FIVE:  BREACH OF CONTRACT
### Failure to Compensate for Transitioning Consumers and PAs (Attachment B)

123.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 122 above as though fully set forth herein.

124.    CDChoices fully performed its obligations under the Agreement.

125.     Attachment B of the Agreement requires PPL to reimburse CDChoices for facilitating "each completed transition to PPL of a Consumer and all associated PAs during the

23

Transition Period: $48.00." The Transition Period spanned January 6, 2025 to March 30, 2025.[3]

126. CDChoices facilitated the transition of over 3,500 consumers as well as their associated PAs.

127. PPL has not reimbursed CDChoices for these transitions.

128. PPL's failure to reimburse is in breach of the Agreement.

129. CDChoices has suffered, and continues to suffer, damages as a result of this breach.

**COUNT SIX: DEFAMATION**
**PPL's Statement that CDChoices Had Been "Terminated" as a Facilitator**

130. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 129 above as though fully set forth herein.

131. On or around April 3, 2025, PPL communicated to consumers that CDChoices had been "terminated" as a Facilitator. This was false.

132. PPL communicated to Managed Care Plans that CDChoices had been "terminated" as a Facilitator. This was false.

133. These false statements that PPL told consumers and Managed Care Plans constitute defamation per se because the statements "ha[d] a tendency to hurt and to prejudice the plaintiff's business." *Jack Braunstein, Inc. v. Oleg Cassini, Inc.*, 20 Misc. 2d 291, 195 N.Y.S.2d 671 (N.Y. Sup. Ct. 1959); *see also Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F.Supp. 269, 272 (S.D.N.Y.1989).

134. These false statements were with actual malice or reckless disregard for the truth.

135. Upon information and belief, PPL made other false, defamatory and disparaging

---

[3] Judge Block's TRO/PI extended the Transition Period, allowing registration through July 1, 2025. A recent proposed settlement between consumers, PPL, and DOH proposes extending the Transition Period until August 1, 2025.

statements to third parties regarding CDChoices.

136.   These statements subjected CDChoices to public contempt, hatred, ridicule, aversion, or disgrace.

137.   PPL did not have privilege or authorization to make these statements.

138.   As a result of this defamatory statement, CDChoices lost the opportunity to serve these consumers and provide the services these consumers requested and need.

139.   Above and beyond the damages alleged above, CDChoices has suffered and continues to suffer damages as a result of PPL's defamatory statement.

## COUNT SEVEN: INJURIOUS FALSEHOOD
### PPL's Statement that CDChoices Had Been "Terminated" as a Facilitator

140.   Plaintiff incorporates by reference the allegations in Paragraphs 1 through 139 above as though fully set forth herein.

141.   On or around April 3, 2025, PPL intentionally made false statements to third parties regarding CDChoices, including but not limited to statements that CDChoices had been "terminated" as a Facilitator.

142.   PPL acted with *at least* reckless disregard of the truth or falsity of its statement, as PPL knew the statement was false by virtue of the still-existing Agreement between it and CDChoices when PPL told consumers that CDChoices had been "terminated" as a Facilitator.

143.   PPL's defamatory statements are defamation *per se* because they refer to CDChoices' profession.  Thus, CDChoices need not prove damages as they are presumed.

144.   At any rate, as a result of the publication of PPL's statements, CDChoices has sustained special damages.  CDChoices went from facilitating and assisting over 3,500 consumers and can no longer assist any consumers through PPL's system.

145.   CDChoices is entitled to punitive damages because PPL acted with malice.  PPL

knew that its statement was false, by virtue of the still-existing Agreement between it and CDChoices, when PPL told consumers that CDChoices had been "terminated" as a Facilitator. Furthermore, any reasonable person would or should have anticipated the pecuniary harm PPL's statement would have caused CDChoices.

**COUNT EIGHT: DECEPTIVE TRADE PRACTICES**
**N.Y. Gen. Bus. Law § 349**

146.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 145 above as though fully set forth herein.

147.    PPL's false statement to consumers that CDChoices had been "terminated" as a Facilitator constituted a deceptive consumer-oriented act, as the act "ha[d] 'a broader impact on consumers at large in that [such act or practice was] directed to consumers or potentially affect[ed] similarly situated consumers." *Benetech, Inc. v. Omni Fin. Group, Inc.*, 984 N.Y.S.2d 186 (2014) (internal quotation marks and citations omitted); *see also Baskin v. Mabco Transit, Inc.*, 113 N.Y.S.3d 324 (2019).

148.    PPL's false statement impacted consumers at large by forcing the consumers who CDChoices had previously been assisting to work with different Facilitators.

149.    PPL's statement was materially misleading because it was false that CDChoices had been "terminated" as a Facilitator.

150.    The consumers who CDChoices had assisted prior to PPL's reassignment of those consumers to other Facilitators were injured as a result of PPL's statement, as those consumers lost the opportunity to be assisted by CDChoices.

151.    Above and beyond the damages alleged above, CDChoices has suffered and continues to suffer damages as a result of PPL's deceptive trade practices.

152.    Plaintiff is entitled to actual or nominal damages, treble damages, and attorneys'

fees.

### COUNT NINE: TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

153. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 152 above as though fully set forth herein.

154. CDChoices had pre-existing business relationships with consumers at the time PPL and CDChoices entered into their Agreement.

155. PPL interfered with these business relationships when it reassigned CDChoices' consumers to other Facilitators.

156. PPL used wrongful means when it interfered with these business relationships by making its defamatory statements that CDChoices had been "terminated" as a Facilitator for the over 3,500 consumers it had been assisting prior to the transition to the single FI model.

157. PPL's statements caused injury to the business relationships between CDChoices and these consumers, as CDChoices lost the opportunity to assist the consumers it had been assisting prior to the transition to the single FI model.

158. PPL's statements also caused injury to the prospective business relationships between CDChoices and new consumers, as these new consumers were told CDChoices had been terminated and was not an option for Facilitator.

159. But for PPL's statements, consumers would have chosen CDChoices as their Facilitator.

160. CDChoices is entitled to punitive damages because PPL acted with malice. PPL knew that its statement was false, by virtue of the still-existing Agreement between it and CDChoices when PPL told consumers that CDChoices had been "terminated" as a Facilitator. Any reasonable person would or should have anticipated the pecuniary harm PPL's statement caused

CDChoices.

161.    Above and beyond the damages alleged above, CDChoices has suffered and continues to suffer damages as a result of PPL's tortious interference with CDChoices' prospective contractual relations with the consumers who CDChoices had been assisting prior to PPL's unlawful reassignment of these consumers to other Facilitators and new consumers.

## COUNT TEN: DECLARATORY JUDGMENT

162.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 161 above as though fully set forth herein.

163.    The parties have an active dispute regarding the termination and status of the Agreement.

164.    The Agreement requires PPL to give notice to CDChoices of an alleged breach and 30 days to cure.

165.    CDChoices is therefore entitled to a declaration that PPL must abide by the Agreement and specifically, restore CDChoices' access to PPL@Home, recommend CDChoices to consumers, assist CDChoices in reaching its desired capacity, and compensate CDChoices per the Agreement.

## VI.

## PRAYER FOR RELIEF

CDChoices respectfully requests that judgment be entered as follows:

   i.    Award Plaintiff compensatory damages, plus pre- and post-judgment interest as permitted under New York law, to account for PPL's breaches to the parties' agreements; and;

ii.  Issue an Injunction (a) restraining PPL from inhibiting CDChoices' access to the PPL@Home database; (b) prohibiting PPL from disparaging CDChoices by, among other things, falsely stating CDChoices has been terminated; (c) requiring PPL to restore CDChoices to the list of Facilitators provided by PPL to the public, New York Department of Health, managed care entities, and other CDPAP participants; and (d) prohibiting PPL from otherwise breaching the Agreement, including by directing additional consumers to other FIs in violation of the parties' Agreement;

iii. Award CDChoices its attorney fees incurred as a result of this dispute; and

iv.  Award any further relief this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated:  July 15, 2025
        New York, New York

Respectfully submitted,

*/s/ Melanie Chan*
Rebecca C. Martin (admission forthcoming)
Melanie Chan
Ryan McMullan (admission forthcoming)
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
rcmartin@jonesday.com
melaniechan@jonesday.com
rmcmullan@jonesday.com

B. Kurt Copper (admitted *pro hac vice*)
Chance B. McCraw (admitted *pro hac vice*)
2727 N. Harwood
Dallas, TX 75201
(214) 969-5163
bkcopper@jonesday.com
cmccraw@jonesday.com

*Attorneys for Plaintiff CDChoices*

29