UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CONSUMER DIRECTED CHOICES, INC.,

                    Plaintiff,

   -against-

PUBLIC PARTNERSHIPS, LLC,

                    Defendant.

Case No. 25-cv-0868-AJB/DJS

## DECLARATION OF DEBORAH DREXLER

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      I am the General Counsel and Chief Compliance Officer of Public Partnerships LLC ("PPL"), a position I have held since 2022.  In my role, I am the lead attorney for the nation's largest and most experienced financial management service provider to Medicaid programs and Medicaid recipients.

**A.      Relevant Terms of the Agreement.**

2.      On December 30, 2024, PPL entered into a Subcontractor Agreement with Consumer Directed Choices, Inc. ("CDChoices") governing CDChoices' provision of services to Consumers and PAs as a Facilitator for PPL (the "Agreement").  *See* ECF 14-3.[1]

3.      The Agreement lays out the scope of the services that CDChoices was to provide in Attachment A, all of which involve providing Consumers and PAs who are transitioning or have transitioned to PPL with truthful, accurate information about PPL's services and systems.  For example, Paragraph 2 of Attachment A required CDChoices to "provid[e] the Consumer options for PAs to complete the hiring process with PPL"; Paragraph 7 of Attachment A required

---

[1]      Citations to "ECF" are citations to the docket in the instant matter.

CDChoices to "provid[e] telephonic customer support to Consumers and PAs to answer questions related to their CDPAP services"; and Paragraph 8 of Attachment A required CDChoices to "facilitat[e] a Consumer's right to change their relationship to another CDPAP facilitator, upon the Consumer's request."

4.      For example, Paragraph 2 of Attachment A required CDChoices to "provid[e] the Consumer options for PAs to complete the hiring process with PPL"; Paragraph 7 of Attachment A required CDChoices to "provid[e] telephonic customer support to Consumers and PAs to answer questions related to their CDPAP services"; and Paragraph 8 of Attachment A required CDChoices to "facilitat[e] a Consumer's right to change their relationship to another CDPAP facilitator, upon the Consumer's request."

5.      Section 3 provides the terms for Compensation.  Section 3 of the Agreement states: "PPL shall compensate SUBCONTRACTOR pursuant to the provisions contained in Attachment B and this Section 3, and shall not pay SUBCONTRACTOR any other benefits, expenses, or compensation."

6.      Attachment B lays out a "Per Member Per Month" ("PMPM") pay structure. CDChoices was to be paid in three different, discrete ways.  First, there was a "One-Time Transition Payment" where CDChoices would be paid a flat, $48 fee for each Consumer who completed their transition to PPL during the Transition Period, defined as January 6, 2025 to March 30, 2025.

7.      Second, there was a "Monthly PMPM Payment" method where CDChoices would be paid a monthly fee of either $50, $55, or $60 per active Consumer registered with CDChoices as its Facilitator.  The amount of the Monthly PMPM Payment depended on how many service hours that Consumer used.

2

8.    Lastly, CDChoices would be paid a "Monthly Value Based Payment" based on the EVV compliance rate for all PAs associated with CDChoices as a Facilitator.

9.    Separately, in an effort to address the significant, potential conflicts of interest faced by former FIs who benefited significantly from the original CDPAP framework and were opposed to the imposition of PPL as the sole statewide FI, CDChoices agreed to perform its obligations under the Agreement in accordance with the "PPL Subcontractor Code of Conduct."  Specifically, the Subcontractor Code of Conduct states that: "[i]n carrying out [its] contracted work responsibilities, [CDChoices] owe[d] a duty of loyalty to PPL, and indirectly, to NYSDOH."  In exercising its agreed-upon duty of loyalty to PPL, CDChoices agreed that it "must disclose to PPL the relevant facts *whenever* [CDChoices] believe[d] that a conflict, real or apparent, may exist."

10.    The PPL Subcontractor Code of Conduct also emphasizes the need for candor and clarity in performing obligations under the Agreement, providing that any Subcontractor (including CDChoices) "may not present claims, reports, or client submissions that the Subcontractor knows or should know are false or fraudulent, or that are intentionally misleading." *See* ECF No. 14-3.

**B.    CDChoices' Breach of the Agreement, and PPL's Termination of the Agreement**

11.    The deadline for enrollment set by the NYSDOH for all Consumers and PAs to transition their services from former FIs to PPL by enrolling in PPL@Home was March 31, 2025 (the "Registration Deadline") .

12.    On March 26, 2025, a class action lawsuit was filed against the NYSDOH seeking a temporary restraining order (the "TRO") allowing the Consumers and PAs to continue registering with PPL even if they had not fully registered by the March 31 deadline.

3

13.     On March 31, 2025 at or around 6:40 p.m. ET, Judge Block of the United States District Court for the Eastern District of New York issued the requested TRO, and extended the Registration Deadline to April 4, 2025. *See* ECF 14-1.

14.     The TRO, in relevant part, stated: "Defendant James V. McDonald, as Commissioner of the New York State Department of Health, shall, upon filing of this Order, be immediately and temporarily restrained from implementing those sections of Part HH of Chapter 57 of the New York Session Laws of 2024 (the "CDPAP" Amendment) that amend subdivision 4-a(ii-a) (see section 1 of Part HH) and 4-a-1(a) (see section 3 of Part HH) of section 365-f of the social services law." *Id.*

15.     Those sections of the statute stated as follows:

> 4-a (ii-a) The commissioner shall require any managed care plans, managed long-term care plans, local social service districts, and other appropriate long-term service programs offering consumer directed personal assistance services to contract with the statewide fiscal intermediary set forth in subparagraph (i) of this paragraph to provide all fiscal intermediary services to consumers.

> 4-a-1. (a) Fiscal intermediary registration. Except for the statewide fiscal intermediary and its subcontractors, as of April first, two thousand twenty-five, no entity shall provide, directly or through contract, fiscal intermediary services. All subcontractors of the statewide fiscal intermediary, shall register with the department within thirty days of being selected as a subcontractor.

16.     The TRO then emphasized: "Importantly, this Order does not prevent the Statewide Fiscal Intermediary ("PPL") from operating, processing applications, servicing and paying CDPAP participants who have already registered with PPL.  Rather, this Order restrains Defendant from disallowing other Fiscal Intermediaries from servicing those CDPAP participants who have not yet registered with PPL. *Id*.

17.     Based on its clear, unambiguous terms, the only effect of the TRO was to "restrain[] Defendant from disallowing other Fiscal Intermediaries from servicing those CDPAP participants

who have not yet registered with PPL" in an effort to give those Consumers and their PAs additional time to complete that registration before other FI services were suspended. *Id*.

18.    On March 31, 2025 at 6:07 PM ET, only approximately 30 minutes prior to the issuance of the TRO, the Chief Executive Officer ("CEO") of CDChoices, Chris Graber, reached out to PPL asking for its perspective on what action to take in light of the TRO issued by Judge Block. A true and correct copy of the March 31, 2025 CDChoices Email is attached as **Exhibit A**.

19.    Only a few hours later, and before PPL had the opportunity to digest the scope and impact of the TRO or respond to CDChoices' email, CDChoices issued a statement to Consumers and their PAs (the "March 31 Message").[2]

20.    In the March 31 Message, CDChoices told Consumers the following:

> On Monday evening, a federal judge issued a **Temporary Restraining Order** that halts the State's transition to PPL. As a result, your transition has been **paused**, and **no changes will be made to your current services**.
>
> Please continue to manage your CDPA services with CDChoices' support. On April 1 (today), there is **no change to how you schedule and submit hours,** and your Personal Assistants should continue using the **CareTime** system for Electronic Visit Verification (EVV) to get paid. The transition to PPL's EVV system, Time4Care, will not occur until further notice.

ECF 15-3, Ex. D (emphasis in original).

21.    Similarly, CDChoices sent certain PAs the following on March 31, 2025:

> On Monday evening, a federal judge issued a **Temporary Restraining Order** that pauses the State's transition to PPL. As a result**, your transition to PPL has been paused**. Today, April 1, there will be **no changes to your current employment or EVV system.**

---

[2]    PPL believes the March 31 Message went out to all Consumers associated with CDChoices, and not simply those who had not yet registered with PPL. PPL received complaints from health care plans that CDChoices was soliciting Consumers to go back to CDChoices. A true and correct copy of certain emails referencing complaints from Consumers attached as **Exhibit B**.

> Please continue to use the **Caretime** system for Electronic Visit Verification (EVV), and **do not begin using PPL's Time4Care system** until further notice.

ECF 15-3, Ex. D (emphasis in original).

22. On April 1, 2025, the CEO of PPL, Vince Coppola, issued a statement to all PPL's Subcontractors, including CDChoices, a message regarding the scope and impact of the TRO. *See* ECF No. 14-4.

23. There, PPL informed its Subcontractors as follows: "We expect you to continue to fulfill, in all respects, your contractual duties to PPL and to the program, including continuing work to register consumers and PAs with PPL and help them onboard.  If asked about the TRO, we expect you will respond with the truth—that the TRO is limited in scope, temporary in nature, and should not affect their ongoing registration effort with PPL. *Id*.

24. Moreover, PPL explicitly stated: "Any action by a facilitator to retain or somehow re-direct the registration of a consumer with PPL will be considered a blatant violation of our agreement and of the scope and intent of the TRO." *Id*.

25. Upon information and belief, CDChoices made no effort to retract or adjust the March 31, 2025 communications to Consumers and PAs to reflect PPL's April 1, 2025 letter.

26. Later on April 1, 2025, PPL learned of CDChoices' communications to Consumers and PAs.

27. Based on the March 31, 2025 communications' references to the TRO as a "pause" of the transition to PPL and based on CDChoices' unilateral determination to "pause" any transition from CDChoices' platforms to PPL, among other things, we believed the communications were a self-serving, deliberate attempt by CDChoices to confuse people, and to keep Consumers and PAs from completing their statutorily mandated transition to PPL and keep

being paid by New York State as a fiscal intermediary (as opposed to being paid by PPL as a Facilitator) for as long as possible.

28.    On April 1, 2025, PPL sent a letter to CDChoices demanding that it cease and desist its communications to Consumers and PAs. (the "April 1 Letter").  Specifically, PPL highlighted the following language in CDChoices' statements as problematic and misrepresentative of the TRO's scope and impact:  (1) that the transition of PAs to PPL "has been paused"; (2) that there will be "no changes to [a PAs] current employment or EVV system until further notice"; (3) that PAs should "continue to use the Caretime System for Electronic Visit Verification (EVV)" and (4) that PAs must "not begin using PPL's Time4Care system until further notice."  A true and correct copy of PPL's April 1, 2025 Letter is attached as **Exhibit C**.

29.    In the April 1 Letter, PPL demanded that CDChoices "must immediately cease and desist from making any further statements that state or suggest that consumers or PAs should cease or slow their efforts to register with PPL or that PAs should continue to submit time to their current facilitators." *See* **Ex. C**.

30.    Additionally, PPL demanded that CDChoices "immediately issue a correction to your previous public statements, making it clear that all consumers and PAs should continue registering with PPL and should submit time on PPL's EVV app, as soon as they are able." *Id*.

31.    PPL concluded the April 1, 2025 Letter by stating:  "If you are unable or unwilling to comply with these directives, please let us know, so that we can make plans to assign your consumers to other facilitators and end our contractual relationship." *Id*.

32.    From PPL's perspective, it was critical that CDChoices immediately issue corrective statements to its Consumers and PAs regarding the status of the transition from CDChoices to PPL, especially as the delays to the Registration Deadline were intended to be

temporary stopgaps to permit as many Consumers and PAs possible to transition without any loss of services. As CDChoices was aware, leaving these statements uncorrected would only cause additional delays in effecting the transition, and implementing the revised CDPAP. And from PPL's perspective, any delay in correcting these statements or responding to PPL's letters was deliberate—especially in light of the quickness with which CDChoices issued the incorrect statements in the first place.

33.    CDChoices did not respond to the April 1, 2025 letter.

34.    In light of CDChoices messaging to Consumers and PAs, and their refusal to either correct their misrepresentations to Consumers and PAs or even *respond* to the April 1, 2025 cease and desist letter, PPL was forced to send CDChoices notice of termination of the Agreement on April 2, 2025.

35.    In its April 2, 2025 notice of termination of the Agreement, PPL notified CDChoices that the following actions amounted to material breaches of the Agreement: (1) making public statements to personal assistants (PAs) working in the Consumer Directed Personal Assistance Program (CDPAP) that may be false, coercive or deceptive, as detailed in my letter dated April 1, 2025; (2) communicating to PAs and others directions that are contrary to Judge Block's Temporary Restraining Order dated March 31, 2025 (TRO); (3) posting information on your website encouraging consumers and their PAs to continue receiving services from your organization after April 1, 2025, rather than from PPL; and (4) failing to fulfill your contractual duties under the Agreement to assist consumers and their PAs to register with PPL. A true and correct copy of the April 2, 2025 notice of termination is attached as **Exhibit D**.

36.    Notably, PPL stated in the April 2, 2025 letter: "It may not be possible to undo the damage you caused to consumers, to PAs, to CDPAP in general, and to PPL's legitimate business interests when you took these actions." *Id.*

37.    But in an effort to salvage the relationship between PPL and CDChoices, PPL gave CDChoices an opportunity to cure its breaches. Specifically, PPL instructed CDChoices that it needed to complete the following actions to address its material breaches of the Agreement: (1) immediately issue a correction to your previous public statements, making it clear that all consumers and PAs should continue registering with PPL and should submit time on PPL's EVV app, as soon as they are able; (2) immediately remove all information from your website and other public sources that states or implies that consumers and their PAs should not continue the registration process with PPL; (3) immediately resume counseling consumers who have already taken registration steps with PPL that their best course of action is to continue as planned with PPL, and counseling workers who have started the registration process that they should start submitting time to PPL; and (4) if asked about the TRO, respond that the TRO is limited in scope, temporary in nature, and should not affect a CDPAP participant's registration efforts. *See* Ex. D.

38.    While Section 5(a)(2) of the Agreement provides a 30-day cure period, the nature of CDChoices' breach, the fast-approaching April 4, 2025 Registration Deadline imposed by the TRO, and the quickness required to close the transition process to PPL did not allow for a 30-day cure period here. As a result, PPL's April 2, 2025 notice asked that CDChoices "reply within 48 hours with evidence that you have taken these corrective actions." *Id*.

39.    PPL's identified, expedited time frame was intentional. Only 48-hours remained between when PPL sent its notice of termination and the termination of the TRO and the

Registration Deadline it set.  So, to have any practical effect on Consumers and PAs who had not yet completed registration, CDChoices needed to take remedial action within 48 hours.

40.    CDChoices did not respond to this letter.

41.    Instead, PPL learned that CDChoices doubled down and continued to send the same messaging to Consumers and PAs regarding the scope and impact of the TRO, and instructing them to continue using CDChoices' systems for CDPAP administration.  PPL believed that these messages were purposeful confusion by CDChoices and frustrated the entire purpose of the role of a Facilitator.

42.    CDChoices' refusal to engage with PPL regarding these fraudulent communications, and its apparent refusal to stop sending these fraudulent communications to Consumers and PAs, was deeply concerning to PPL as it evidenced that CDChoices was attempting to solicit Consumers and PAs who had not yet transitioned to PPL to further delay or stall that process in contravention of N.Y. Soc. Serv. Law § 365-f and the Agreement.

43.    PPL believed that with access to the PPL@Home system, CDChoices could expand its solicitation efforts by identifying other Consumers and PAs using PPL's systems that they could solicit into returning to CDChoices' systems instead.

44.    With all of this in mind, and with no response whatsoever from CDChoices, PPL was left with no choice but to terminate the Agreement immediately.  The exigency of the transition and the messages' frustration of the purpose of the Agreement forced PPL's hand. Effecting the transition quickly and completely was the best way to service the Consumers.

45.    Accordingly, on April 3, 2025, PPL sent a separate email to the CEO of CDChoices, Mr. Graber, notifying CDChoices of PPL's immediate termination of the Agreement.  In that email, PPL stated "We have received complaints that you are instructing PAs associated with consumers

who are fully registered with PPL that they "should not transition to PPL's EVV system until further notice," and that "your PAs should keep using CareTime for EVV – do not switch to Time4Care." PPL attached records of those subsequent communications with Consumers and their PAs to the April 3, 2025 email. A true and correct copy of the April 3, 2025 PPL Email is attached as **Exhibit E**.

46.    PPL concluded that email by informing CDChoices that "Accordingly, we can no longer allow you to act as our subcontractor, and we have removed all of your access to PPL@Home."

47.    That same day, on April 3, 2025, PPL received a letter from the attorney for CDChoices, Hermes Fernandez, responding to the April 3 email.

48.    CDChoices' April 3 letter acknowledged that the April 3, 2025 email from PPL terminated PPL's contract with CDChoices.

49.    CDChoices' letter provided additional evidence that the March 31, 2025 communications (sent subsequently again and again) amounted to a deliberate attempt to prompt Consumers and PAs from completing the statutorily mandated transition to PPL by making misrepresentations about the TRO.  A true and correct copy of the April 3, 2025 letter from CDChoices  is attached as **Exhibit F**.

50.    Specifically, CDChoices' April 3 letter falsely claimed that the Agreement only required CDChoices to provide "support services *to CDPAP consumers who have enrolled* with the facilitator in the PPL@Home portal ("Consumers") and *to personal assistant caregivers who are associated with enrolled* Consumers ("PAs")," ignoring its clear, unambiguous Agreement to assist with the transition from CDChoices to PPL.  *See* Ex. G.  Indeed, CDChoices went so far as

11

to state that steering Consumers or PAs away from the transition to PPL "would not be a violation of the Agreement.

51.     Additionally, CDChoices' April 3 Letter made clear that it had no intention to correct its misrepresentations to Consumers or to PAs, stating:  "Nor does CDChoices have any obligation to repeat and publish PPL's unsupportable reading of the TRO which is now in effect, or to take any of the actions that PPL is now demanding in your email or letters." *Id.*

52.     CDChoices' April 3 Letter underscored the need to terminate the Agreement, and to terminate CDChoices' access to PPL's internal systems and databases as it confirmed that CDChoices stood by its misrepresentations of the TRO, and had no intention to correct those misrepresentations, and revealed that CDChoices had no intention of upholding its duty of loyalty to PPL.

53.     After CDChoices' April 3 Letter, I had a call with Mr. Fernandez to discuss possible reinstatement of CDChoices as a Facilitator for PPL.  We planned on having a meeting to discuss a possible resolution on April 9, 2025.

54.     Between April 3 and April 9, 2025, I received no communications from CDChoices regarding *any* corrective measures taken by CDChoices.

55.     On April 9, 2025, Mr. Fernandez sent another letter that included a proposal for reinstating CDChoices as a subcontractor with PPL.  A true and correct copy of CDChoices' April 9 letter is attached as **Exhibit G**.  CDChoices cast this and future proposals as attempts to be "reinstated," as it understood it had been terminated as a subcontract.

56.     Again, CDChoices continued to refuse to acknowledge that the March 31, 2025 communications (and all subsequent communications that mirrored it) misrepresented the scope and impact of the TRO.

57.     On April 10, 2025, Mr. Fernandez reached out to me again to check on the status of the amendment, claiming that CDChoices' actions over the past week—including its March 31, 2025 communications with Consumers and PAs—were consistent with the terms of the TRO and the subsequently issued PI.

58.     That same day, I responded.  First, I stated that I did not agree that "the communications issued by CDChoices last week were consistent with the terms of the PI."  And because I had received no evidence of efforts to rescind or correct the March 31, 2025 communications as of April 10, 2025, I requested to see such evidence as soon as possible.

59.     Second, I asked CDChoices how it could reconcile competing duties as a Facilitator for PPL (and the attendant responsibility to help Consumers and PAs transition to PPL as soon as possible) with its financial interest in continuing to pay PAs as an independent FI, particularly in light of CDChoices' proposed amendment to the Agreement which would permit CDChoices to terminate the Agreement *immediately* in the event that any court or legislative body permitted additional entities to provide FI services.  A true and correct copy of the April 10, 2025 email exchange between PPL and CDChoices is attached as **Exhibit H.**

60.     Put differently, CDChoices' proposed amendment to the Agreement revealed what PPL had already recognized (and what prompted PPL to remove CDChoices' system access to begin with):  CDChoices was hoping to have its cake (serve as a Facilitator for PPL in the event of a transition) and eat it, too (but keep as many Consumers and PAs on its own payroll for as long as possible in the event that something came along to frustrate or stall the transition).  But such was prohibited under the Agreement, and was precluded by the statute.

61.     On April 11, 2025, Mr. Graber sent me a lengthy email requesting reinstatement of CDChoices as a Subcontractor for PPL.  Again, CDChoices itself recognized that the contract had been terminated due to their unlawful actions.

62.     Again, CDChoices failed to take any responsibility for the March 31, 2025 messages. A true and correct copy of the April 11, 2025 CDChoices email and its attachments is attached as **Exhibit I.**

63.     But there, for the first time, CDChoices alleged that it took "corrective actions" on or around April 4, 2025.  Specifically, CDChoices stated that, "[i]n response to the Emergency TRO Order issued at approximately 5:45 PM on April 2, and subsequent clarifications from the Department of Health articulated through the "Notice: Limited Temporary Restraining Order Issued for CDPAP Statewide Fiscal Intermediary Transition," CDChoices acted to *realign our operations* with the updated directives." *See* **Ex. I**.

64.     CDChoices' April 11 Email attached an exhibit, Exhibit B, which purported to be the corrective actions taken by CDChoices.  *See* Ex. I at 7-9.

65.     Review of these corrective actions revealed that they were *not* the actions demanded in PPL's April 2, 2025 notice of termination (and accordingly failed to cure CDChoices' breaches based on the terms of Section 5(a)(2) of the Agreement).  Instead, they were corrective actions that *CDChoices* elected to take following guidance from the NYSDOH.  These actions were both untimely and insufficient to cure CDChoices' misrepresentations to Consumers. *See id*.

66.     Critically, nowhere in these purported "corrective actions" did CDChoices *even acknowledge* (let alone *correct*) the March 31, 2025 communications.  Instead, CDChoices appeared to *build* on its misrepresentations about the TRO, stating "A preliminary injunction hearing was conducted on April 4, which *maintains the Temporary Restraining Order (TRO)*

*initially issued*. This order *remains operative* as we await further legal clarification." *Id.* (emphasis added).

67.     Similarly, nowhere in these purported "corrective actions" did CDChoices specifically state that *all* Consumers and PAs should complete registration with PPL. Instead, CDChoices simply "encourage[d]" them to "proceed with registration or completion of registration." *See id*.

68.     PPL accordingly did not consider these "corrective actions" to be sufficient to "cure" the material breaches laid out in PPL's April 2, 2025 notice of termination.

69.     On April 11, 2025, PPL reached out to CDChoices and informed them that PPL would be willing to *reinstate* CDChoices as a Facilitator for PPL if they executed an amendment to the Agreement. (the "Proposed Amendment"). Again, both parties understood that the contract was no longer operative and had been terminated. True and correct copies of PPL's April 11, 2025 email and the Proposed Amendment are attached as **Exhibit J**.

70.     Review of the Proposed Amendment makes clear that it was focused on ensuring; (1) that CDChoices would use "best efforts" to facilitate the transition to PPL (including by communicating with Consumers and PAs that such transition was *necessary* and needed to be completed as soon as possible); (2) that CDChoices issued sufficiently corrective communications regarding the TRO and PI; and (3) that CDChoices would communicate truthfully with Consumers and PAs through both its one-on-one communications and in its public-facing communications. *See* **Ex. J**. In light of CDChoices apparent conflicts of interest, CDChoices included language in the Amendment that called for PPL to approve of any public facing communications to Consumers and PAs and that would provide PPL the right to terminate the Agreement immediately in the event that CDChoices breached the Agreement (or Amendment) again.

15

71.    On April 13, 2025, Mr. Fernandez indicated that CDChoices was willing to enter into the April 11 Proposed Amendment if PPL could confirm that the Consumers who were formerly assigned to CDChoices would be reassigned to CDChoices, and that CDChoices would be eligible for additional Consumers. A true and correct copy of CDChoices' April 13, 2025 email is attached as **Exhibit K**.

72.    On April 14, 2025, PPL informed CDChoices of *another* example of CDChoices communicating with prior clients to solicit them back to CDChoices in which CDChoices misrepresented to the Consumer that insurance could not be started with PPL for another ninety (90) days.  PPL also informed Mr. Fernandez that CDChoices would only given "Category A Consumers" back upon reinstatement.

73.    Despite evidence otherwise, Mr. Fernandez responded by claiming that no one on behalf of CDChoices had made any such communications on the day of April 14, 2025.  He also asked for clarification on what "Category A Consumers" were and how many there were.

74.    On April 18, 2025, I informed Mr. Fernandez that "Category A Consumers" were consumers who were fully registered with PPL.

75.    Mr. Fernandez did not respond to my April 18, 2025 email until May 1, 2025.

76.    On May 1, 2025, Mr. Fernandez sent another email to me.  There, Mr. Fernandez asked for clarification on the actual number of "Category A Consumers" who would be assigned back to CDChoices and how they would be identified. A true and correct copy of this email exchange between PPL and CDChoices is attached as **Exhibit L.**

77.    Mr. Fernandez and I did not correspond again until June 5, 2025.

78.    On May 14, 2025, New York State Senator Gustavo Rivera introduced Senate Bill S7954. This Bill sought to amend the CDPAP Amendment (and essentially repeal it), stating: "This

16

bill would create a new class of FIs beyond the current State-wide Fiscal Intermediary (SFI). This new class of FIs would operate as the current SFl in conjunction with entities that are (1) independent living centers that have been operating as a fiscal intermediary since January 1, 2024, or at the discretion of the Commissioner of Health; or (2) an entity selected as a subcontractor under the Single Fiscal Intermediary law as of April 1, 2025."[3]

79.     This Bill further stated: "The Governor has promised that any statutory restructuring of the CDPAP program would result in a more efficient and higher quality program. While some reforms to CDPAP were needed, it was never intended to erase the providers that created the CDPAP program over 30 years ago, operating by all accounts at a high level of quality service and accountability. The selection process implemented by DOH resulted in an out of State for-profit corporation, Public Partnerships LLC (PPL First), being selected as the single SFI."

80.     Four other Senators signed onto the proposed Bill.

81.     The Bill was referred to the Senate Health Committee on May 14, 2024 and no other action has been taken since.

82.     On June 5, 2025, after Senate Bill S7954 failed, Mr. Fernandez reached out to me again. In that email, Mr. Fernandez stated that CDChoices has remained open to resolving this matter amicably and remained willing to execute the Proposed Amendment depending on the number of consumers that would be reassigned to CDChoices. A true and correct copy of the email sent by CDChoices on June 5, 2025 is attached as **Exhibit M**.

---

[3]     *NY State Senate Bill 2025-S7954*, The New York State Senate, https://www.nysenate.gov/legislation/bills/2025/S7954 (last visited Jul. 24, 2025); Kate Lisa, *Lawmakers, Hochul clash on CDPAP legislative fix before session ends* (May 21, 2025 8:12 AM ET), https://spectrumlocalnews.com/nys/central-ny/politics/2025/05/20/lawmakers--hochul-clash-on-cdpap-legislative-fix-before-session-ends

83. Again, no corrective actions in line with the April 2, 2025 notice of termination or the Proposed Amendment were taken by CDChoices between April 2, 2025 and present.

84. On June 9, 2025, I spoke on the phone with Mr. Fernandez and stated that PPL was no longer interested in reinstating CDChoices as a Facilitator, and re-confirmed that the Agreement was terminated, as it had been since April 3, 2025.

85. Since June 9, 2025, PPL and CDChoices have not communicated about CDChoices' status as a Subcontractor for PPL.

86. As of the date of this Declaration, and upon information and belief, CDChoices has never issued a statement to its Consumers or PAs regarding the March 31, 2025 communications or its overall description of the TRO or the PI.

87. PPL remains concerned that, if given access to PPL's internal systems, CDChoices will again violate its duty of loyalty to PPL and will use its access to attempt to solicit Consumers and PAs who have not completed the transition to PPL to use CDChoices' systems instead, and to further confuse or frighten Consumers and PAs in ways that will further frustrate or delay the transition in an effort to benefit CDChoices.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 25, 2025

*Deborah Drexler*

Deborah L. Drexler