**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CONSUMER DIRECTED CHOICES, INC., | |
| *Plaintiff,* | |
| vs. | Case No. 1:25-CV-0868 (AJB/DJS) |
| PUBLIC PARTNERSHIPS, LLC, | |
| *Defendant.* | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

**Page**

I.  CDChoices Faces Irreparable Harm. ............................................................................ 2

    A.  Without an Injunction, CDChoices May Not Exist at the End of Litigation. ......... 2

    B.  CDChoices' Harms Are Not Speculative Nor Conclusory. .................................... 3

    C.  CDChoices Timely Sought Relief. ........................................................................ 4

II.  CDChoices Is Likely to Succeed on the Merits. ............................................................ 5

    A.  PPL Did Not Terminate the Agreement. ................................................................ 5

        1.  CDChoices Did Not Breach and the Alleged Breaches Were Immaterial. ............................................................................................... 5

        2.  PPL Did Not Terminate the Agreement. ....................................................... 6

    B.  CDChoices Non-Breach of Contract Claims Are Likely to Succeed. ................... 8

III.  Granting the Injunction Will Not Disserve, But Will Serve, the Public Interest. .............. 9

IV.  The Balance of Hardships Tips in CDChoices' Favor. ..................................................... 10

i

## TABLE OF AUTHORITIES

**Page**

CASES

*fuboTV Inc. v. Walt Disney Co.*,
745 F. Supp. 3d 109 (S.D.N.Y. 2024), *appeal dismissed*, No. 24-2210, 2025
WL 523263 (2d Cir. Jan. 8, 2025) ...................................................................................2

*Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)................................................................................4

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
754 F. Supp. 2d 616 (S.D.N.Y. 2010)...........................................................................10

*Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*,
706 F. Supp. 2d 350 (S.D.N.Y. 2009).............................................................................7

*Sea Tow Servs. Int'l, Inc. v. Pontin*,
607 F. Supp. 2d 378 (E.D.N.Y. 2009) .............................................................................8

*Treppel v. Biovail Corp.*,
No. 03 CIV. 3002 (PKL), 2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004) ......................9

*Warren v. City of Athens, Ohio*,
411 F.3d 697 (6th Cir. 2005) ..........................................................................................2

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
423 F.3d 137 (2d Cir. 2005)............................................................................................5

STATUTES

N.Y. Soc. Serv. Law
§ 365-f............................................................................................................................10

OTHER AUTHORITIES

*Publish*, Black's Law Dictionary (12th ed. 2024) ..............................................................9

CDChoices' Motion for Preliminary Injunction and its supporting evidence established why a preliminary injunction is necessary here:  PPL breached the parties' Agreement in a number of ways, and those breaches create irreparable harm.  PPL's response merely confirms that need.

First, PPL attempts to waive away its conduct by suggesting all of CDChoices' harms should only be compensable via monetary damages awarded after a typical case path.  But whether damages are calculable is not the standard.  The question is:  If CDChoices must wait 18 months or longer for all of the litigation to complete, a trial to occur and judgment enter, will it be fully and adequately compensated for all of PPL's breaches and tortious conduct.  The unrebutted evidence answers that question as "No."  Indeed, if there were any question remaining, the attached declarations from consumers who wanted to continue using CDChoices but were prevented by PPL's actions, confirm the point.  *E.g.*, Ex. B, Decl. D. Whalen ¶ 6 ("I would prefer to receive services from CDChoices."), Ex. C, Decl. T. Grimes ¶ 16 (same).

Second, PPL argues that it did not breach the Agreement because PPL had already terminated it.  PPL's own conduct belies that assertion:  the letters PPL invokes never stated PPL was terminating; as late as June 9, 2025, PPL told CDChoices it had chosen not to issue a written termination notice; throughout April and May 2025 PPL corresponded with CDChoices as if it were an active facilitator; PPL paid CDChoices for some work it did in April; and PPL continued to suggest it could "reinstate" CDChoices upon negotiation.  Those are not the actions of a party who had chosen to terminate the parties' Agreement as provided in its terms.

The reason for this is clear:  PPL selected CDChoices as one of four Core Regional Home Care Partners out of hundreds of FIs because of the quality of CDChoices' services to Medicaid beneficiaries and PA's and its accordant reputation.[1]  In late 2024 and early 2025, PPL described

---

[1] CDChoices' numerous awards evidence its reputation.  Ex. A, Decl. C. Graber ¶ 3.

CDChoices as "very, very impressive," "master class," and "top amongst the chosen few."

PPL's breaches of the Agreement have prevented CDChoices from serving those very consumers and threaten CDChoices' longstanding business. The Court should grant the Motion.

## I. CDChoices Faces Irreparable Harm.

CDChoices has shown that it is suffering immediate irreparable harm as a result of PPL's actions—the loss of relationships, staff, business opportunities, and industry good-will.

### A. Without an Injunction, CDChoices May Not Exist at the End of Litigation.

PPL argues that compensating CDChoices is "straightforward" math, and therefore no injunction is appropriate. Resp. at 10–11. But PPL ignores Second Circuit caselaw, the Agreement's duration, and its requirement for PPL to help CDChoices achieve its desired capacity.

CDChoices' Motion cited Second Circuit and New York caselaw illustrating that "the loss of potential business opportunities, such as relationships with customers and business partners, may constitute irreparable harm." Dkt. 15-1 at 15–17. Moreover, "when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, **even though the amount of direct financial harm is readily ascertainable**." 11A Wright & Miller's Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2025) (emphasis added). Here, if not reinstated, CDChoices will lose up to 99% of its annual revenues and its ability to attract new consumers. Dkt. 15-1 at 15. Courts throughout the Second Circuit have held such a loss is irreparable. *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 145 (S.D.N.Y. 2024), *appeal dismissed*, No. 24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025) (collecting cases).

Moreover, the future lost profits complicate calculation because the Agreement had only just begun. *See Warren v. City of Athens, Ohio*, 411 F.3d 697, 712 (6th Cir. 2005) ("[F]uture lost profits are much harder to quantify [and] if these lost profits were of such magnitude that the viability of their business were threatened … a permanent injunction would be appropriate").

PPL's brief lays out a "straightforward" methodology for calculating monetary damages, but it never states *when* it would have fulfilled its agreed obligation to provide CDChoices with 50,000 consumers—a key factor in calculating CDChoices damages. PPL provides no answer to its own "straightforward" problem, further illustrating the need for an injunction here.

### B.    CDChoices' Harms Are Not Speculative Nor Conclusory.

CDChoices provided uncontroverted evidence that it faces extinction and loss of staff, customers, and relationships. PPL argues these damages are speculative because of a lack of "evidence of how much potential business was lost," the transition to the SFI (not PPL's breach) caused CDChoices' lost profits, and CDChoices did not present evidence regarding "how or why its goodwill or reputation has been … harmed." Resp. at 12–15. Each argument lacks merit.

The evidence is clear that CDChoices suffered the loss of goodwill and reputation because PPL severed existing and future consumer relationships. PPL falsely told consumers and managed care plans that CDChoices had been terminated as a Facilitator. Then on April 3, 2025, PPL transferred *all* of CDChoices' consumers to other Facilitators. Dkt. 15-3 ¶ 28. This extraordinarily disruptive conduct was based on a false premise and further severed the consumers' relationships with CDChoices. These consumers did not request this transfer. *E.g.*, Ex. C, Decl. T. Grimes ¶ 12. Many of these consumers would choose CDChoices as their Facilitator if that were an option. *Id.* CDChoices has suffered and continues to suffer concrete harms from PPL's breaches.

CDChoices presented its estimated lost reimbursements *under the Agreement*. Dkt. 15-3 ¶¶ 46, 49. These lost revenues are not the result of the transition to the SFI, but are losses caused by PPL's breach and are calculated under the terms of the Agreement itself. CDChoices faces "unquestionably 'considerable'" damages from PPL's actions. *Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020).

CDChoices' CEO submitted a declaration noting how CDChoices derives 99 percent of its

3

revenue from the CDPAP and "CDChoices has lost hundreds of thousands in reimbursement per month in the short term and will lose future reimbursements totaling at least $2.7 million per month." Dkt. 15-3 ¶¶ 46, 49. Those figures derive from the "per member per month" rates applicable to the CDPAP consumers whom CDChoices should have been and should be serving. At the time of PPL's breach, CDChoices was serving 4,077 members per month, and that number alone amounts to approximately $250,866 per month. Ex. A, Decl. C. Graber ¶¶ 11–13.

Further, the Agreement required PPL to work in good faith to help CDChoices reach its capacity—50,000 consumers per the capacity plan that PPL required CDChoices to submit during the Agreement's negotiations. *See* Dkt. 15-3 at 20–24. Given CDChoices' stellar reputation, CDChoices reasonably anticipated (and indeed, increased its temporary staffing) that it would promptly scale up to that capacity, which, under the rates set forth in the Agreement would reach approximately $2.7 million per month. The damages are not speculative where PPL agreed to assist CDChoices in achieving that amount of revenue. And of course, the easiest way to know whether the figures would have been reached would have been for PPL to comply with its obligation to work in good faith to assist CDChoices. PPL cannot now benefit from its own breach by contending its failure to abide by the Agreement now makes CDChoices damages too speculative. *Guardian Music Corp. v. James W. Guercio Enters., Inc.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008).

###    C.    CDChoices Timely Sought Relief.

PPL argues that its intentional harm of CDChoices and associated consumers should be excused because, according to PPL, CDChoices "waited" to seek relief. Resp. at 15. PPL ignores CDChoices' good faith efforts to appease PPL and negotiate a resolution.

The parties negotiated for several months, exchanging proposed amendments. After PPL gave CDChoices notice of alleged breaches, CDChoices immediately implemented the demanded

4

actions. Dkt. 15-3 ¶ 26. PPL suggested it would reinstate CDChoices if CDChoices agreed to an amendment to the Agreement. *Id.* ¶ 38. The parties continued to discuss the proposed amendment over the ensuing months to understand its intent. *Id.* ¶ 38. Only on June 9, 2025, did PPL refuse to participate in any further negotiations. *Id.* ¶ 45. CDChoices filed this action less than a month later and then moved for a preliminary injunction shortly thereafter. Dkts. 1, 15. Those filings included a lengthy and detailed complaint, correspondence and contractual documents, and witness declarations that CDChoices compiled. Far from "delay," CDChoices worked to avoid having to "run to the courthouse," and when forced to file, it quickly compiled detailed evidentiary support.

PPL's caselaw actually supports CDChoices. For example, in *Weight Watchers Int'l, Inc. v. Luigino's, Inc.* the Second Circuit noted that purported delays of even *seven months* were not inherently unreasonable. 423 F.3d 137, 145 (2d Cir. 2005). Here, in contrast, PPL at most calculates a supposed five-week "delay." That timeline strongly supports CDChoices' timely invocation of its rights.

## II.    CDChoices Is Likely to Succeed on the Merits.

PPL cannot contest that it breached the Agreement in a number of ways, as well as committed other wrongful acts. Its Response tries to deflect the blame, but fails.

### A.    PPL Did Not Terminate the Agreement.

Critically, PPL never points to any written notice of termination, which is required under the Agreement. That, of course, is because PPL has not terminated the Agreement.

#### 1.    CDChoices Did Not Breach and the Alleged Breaches Were Immaterial.

The parties disagree about the scope and impact of Judge Block's TRO, but that does not mean PPL had a right to breach the Agreement. Notably, in a hectic and short time frame in which CDChoices had to communicate with its consumers about the TRO, CDChoices sought PPL's guidance, but PPL did not respond. In fact, PPL did not provide any guidance until the next day—

5

after the TRO was in effect and impacting consumers and PAs.  Dkt. 35 ¶¶ 18–22 (noting PPL did not respond to CDChoices' request for information and issued a statement on April 1, 2025).

Meanwhile, CDChoices accurately communicated the TRO's effect.  Judge Block's Order reads that "this Order does not prevent the Statewide Fiscal Intermediary ("PPL") from operating, processing applications, servicing and paying CDPAP participants who have already registered with PPL" and "this Order restrains Defendant from disallowing other Fiscal Intermediaries from servicing those CDPAP participants who have not yet registered with PPL."  CDChoices told the CDPAP participants who had already registered with PPL that "Effective today, April 1, your services will begin with PPL" and the CDPAP participants who had not yet registered with PPL that "no changes will be made to [their] current services" and to "continue to manage [their] CDPA services with CDChoices' support."  Dkt. 15-3 at 29.  These were accurate.[2]  **But even if they were not**, they did not give PPL the right to immediately terminate the Agreement.

2.    PPL Did Not Terminate the Agreement.

PPL argues that it terminated under various provisions of the Agreement or that New York law recognizes the improper attempts at termination.  Resp. at 17–22.  PPL's communications, and the Agreement's plain terms, belie PPL's new after-the-fact litigation position.

a.  PPL did not terminate under Section 5(a)(2) of the Agreement.

PPL never provided a written notice of termination under Section 5(a)(2).  As PPL notes, a party may immediately terminate under this provision "upon notice."  Neither of PPL's letters or communications cited to this provision for termination.  Dkt. 14-5, Exs. E–F.  The first letter is a "cease and desist letter" that did not even use the terms "breach" or "termination."  *Id.*, Ex. E.

---

[2] PPL insinuates that delaying the transition would have profited CDChoices.  Resp. at 17 n.4.  But CDChoices had transitioned 72 percent of its consumers by the March 31, 2025 deadline, Dkt. 15-3 ¶ 32, and the TRO only lasted two days.  The math and these facts do not support this insinuation.

6

The second letter expressly stated that it was providing notice pursuant to "Section 5(a)(1)," which provides for termination 30 days after an uncured breach. *Id.*, Ex. F.

Further, CDChoices did not commit any "unlawful" acts warranting termination. PPL attempts to assert a claim for tortious interference of prospective business relationships, but this argument fails right out of the gate. Judge Block's TRO—a legal order—allowed CDChoices to continue to provide services to unregistered CDPAP participants. Actions in support of this were legally permissible. CDChoices continued to transition these CDPAP participants, but provided services until they completed the transition. Thus, CDChoices facilitated the establishment of PPL's business relationship with these consumers. The opposite of interference.

        b.   PPL did not terminate the Agreement under Section 5(a)(1).

Nor did PPL terminate the Agreement under Section 5(a)(1). Again, that provision required uncured material breach after 30 days' written notice. Yet, PPL prohibited CDChoices' access within *mere hours* after it sent the April 2, 2025 letter.

Further, CDChoices cured the alleged breaches and PPL accepted the cure. On April 11, 2025, CDChoices provided PPL with documentation of its curative actions. Dkt. 15-3, Ex. J. Satisfied with CDChoices' curative measures, PPL responded by offering to "reinstate CDChoices if the company were willing to execute a contract amendment." *Id.*, Ex. K. Over the next several months, the parties negotiated the amendment and PPL never mentioned the need to cure past breaches. *Id.* ¶¶ 38–45. PPL's conduct undermines the assertion that it had terminated.

PPL's caselaw is inapplicable. There, the parties' contract contained a termination provision that required notice within a prescribed time period. *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 706 F. Supp. 2d 350, 356 (S.D.N.Y. 2009). The terminating party, however, gave notice of an intent "to discontinue the agreement immediately." *Id.* The

7

Court, however, ruled that, under the "erroneous date" rule, the termination was effective at the "first proper termination date." *Id.* Here, PPL did not give notice of an intent to terminate or even a termination date. *See* Dkt. 14-6. It provided notice of breach, not of termination.

    c. New York Law Does Not Support PPL's Attempt to Terminate.

PPL next argues that New York law, despite the clear terms of the Agreement, allows it to terminate the Agreement for "incurable breaches." Resp. at 20–22. But PPL acknowledged CDChoices curative measures and PPL's notice letter referred to the alleged breaches as curable.

New York law only permits termination without an opportunity to cure "where it would be a futile act." Such limited circumstances arise where a breach went to the "very heart of the contract." *Sea Tow Servs. Int'l, Inc. v. Pontin*, 607 F. Supp. 2d 378, 389–90 (E.D.N.Y. 2009). A few stray statements regarding ongoing litigation and attempted transition were not breaches at the "very heart of the" parties' contract. The uncontroverted evidence shows that CDChoices never stopped providing the agreed upon services, facilitated the transition of thousands, and remained committed to attempting to continue to serve Medicaid beneficiaries.

PPL also characterized the alleged breaches as curable. In its notice, PPL "direct[ed] [CDChoices] to attempt to cure [its] material breach." Dkt. 14-6. CDChoices implemented these directed actions and PPL accepted the curative measures. *See* Dkt. 15-4, Ex. H (offering reinstatement after reviewing curative measures). Having received the benefit of its demands, PPL cannot now argue CDChoices' alleged breaches were uncurable.

**B.    CDChoices Non-Breach of Contract Claims Are Likely to Succeed.**

PPL's arguments against the non-breach of contract claims fare no better. Resp. at 22–23.

First, PPL falsely stated CDChoices was terminated and published this falsity to third parties. PPL did not terminate the Agreement, so CDChoices could not have been "terminated" when PPL communicated to third parties that CDChoices was "terminated." CDChoices alleges

8

that PPL communicated to managed care plans and consumers that CDChoices was "terminated," which includes publication. Dkt. 14 ¶¶ 15–16, 69, 118–19, 131–32, 141–42; Dkt. 15-3 ¶¶ 42–43, 61; *see Publish*, Black's Law Dictionary (12th ed. 2024) ("To *communicate* (defamatory words) to someone other than the person defamed." (emphasis added)).  These allegations satisfy the requirements for defamation.  CDChoices also alleges the reckless and malicious nature of these statements.  PPL knew these statements were false and the consequences of these statements.  PPL acted at least recklessly in making these untrue statements.  Dkt. 15 at 12.

Second, PPL's statements were consumer-oriented in that they affected consumers' choice in Facilitators and misled CDChoices' consumers, causing harm to CDChoices.  4F N.Y.Prac., Com. Litig. in New York State Courts § 127:8 (5th ed. 2024).  PPL's statements "caused CDChoices to lose the opportunity to serve CDPAP consumers."  Dkt. 14 ¶ 16; *see also* Ex. B, Decl. D. Whalen ¶ 6, Ex. C, Decl. T. Grimes ¶ 16.

Finally, PPL tortiously interfered with CDChoices' relationships with consumers when it made defamatory statements that caused consumers to select different Facilitators.  *Id.*  Therefore, PPL's defamatory statements are an improper means.  *See Treppel v. Biovail Corp.*, No. 03 CIV. 3002 (PKL), 2004 WL 2339759, at *17–18 (S.D.N.Y. Oct. 15, 2004), *on reconsideration*, No. 03CIV3002PKL, 2005 WL 427538 (S.D.N.Y. Feb. 22, 2005).

## III.    <u>Granting the Injunction Will Not Disserve, But Will Serve, the Public Interest.</u>

In a last-ditch effort to avoid the consequences of its actions, PPL argues that enforcing the parties' Agreement "would effectively reward CDChoices for its efforts to undermine the passage of the CDPAP Amendment."  Resp. at 25.  This misrepresents both the facts and CDChoices' argument.  Indeed, the evidence makes clear that, rather than "undermine the passage of the CDPAP Amendment," CDChoices had already transitioned 72% of its consumers to PPL by the March 31, 2025 deadline.  Dkt. 15-3 ¶ 32.  CDChoices sought to support the public interest in

9

implementing the transition to the single statewide FI by requiring PPL to abide by the law that requires it to contract with Facilitators.  N.Y. Soc. Serv. Law § 365-f (4-a)(a)(ii-b).

CDChoices provides high-quality services that consumers request.  Many consumers would still use CDChoices if that were an option.  Ex. B, Decl. D. Whalen ¶ 6, Ex. C, Decl. T. Grimes ¶ 16.  CDChoices centers its services around the consumer.  For example, CDChoices has consumers on its board of directors to advise CDChoices of their needs.  Ex. C, Decl. T. Grimes ¶ 7.  CDChoices also provides a portal where consumers can find PAs that meet their cultural, language, and medical needs.  Ex. A, Decl. C. Graber ¶ 18; Ex. B, Decl. D. Whalen ¶ 9.  PPL does not provide that, nor do other Facilitators.  CDChoices provides a "*unique product*."  Resp. at 14 (citing *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 585 (W.D.N.Y. 2011)).

Further, PPL provides no answer for the clear public interest in ensuring consumers have the option of a Facilitator in their geography with "cultural and linguistic competency," N.Y. Soc. Serv. Law § 365-f (4-a)(a)(ii-b); Ex. B, Decl. D. Whalen ¶¶ 6–8; Ex. C, Decl. T. Grimes ¶¶ 8, 16, and the public's interest in holding parties to their agreements.  *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010).

## IV.    The Balance of Hardships Tips in CDChoices' Favor.

PPL does not rebut CDChoices' arguments that the balance of hardships tip in CDChoices' favor.  Resp. at 25.  Requiring PPL to abide by the Agreement poses only the burden PPL agreed to undertake when entering the Agreement.

## CONCLUSION

CDChoices respectfully requests that the Court enjoin PPL to prevent the extinction of CDChoices and restrain PPL from undermining the Agreement.

Dated:    July 28, 2025
          New York, New York

Respectfully submitted,

*/s/ Melanie Chan*
Rebecca C. Martin (admission pending)
Melanie Chan
Ryan McMullan (admission pending)
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
rcmartin@jonesday.com
melaniechan@jonesday.com
rmcmullan@jonesday.com

B. Kurt Copper (admitted *pro hac vice*)
Chance B. McCraw (admitted *pro hac vice*)
2727 N. Harwood
Dallas, TX 75201
(214) 969-5163
bkcopper@jonesday.com
cmccraw@jonesday.com

*Attorneys for Plaintiff CDChoices*

11

**CERTIFICATE OF SERVICE**

I, Chance B. McCraw, hereby certify that on this 28th day of July, 2025, the foregoing document was filed electronically and made available for viewing and downloading from the Court's Electronic Case Filing System by all counsel of record.

*/s/ Chance B. McCraw*

12