**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CONSUMER DIRECTED CHOICES, INC.,


Plaintiff,

-v-                                                    1:25-CV-00868 (AJB/DJS)

PUBLIC PARTNERSHIPS, LLC,


Defendant.
_____

**Hon. Anthony Brindisi, U.S. District Judge:**


## DECISION & ORDER

### I.    INTRODUCTION

On July 1, 2025, plaintiff Consumer Directed Choices ("CDChoices") commenced this action against defendant Public Partnerships, LLC ("PPL").  _See_ Compl., Dkt. No. 1. CDChoices filed an Amended Complaint on July 15, 2025, and a Second Amended Complaint on October 2, 2025.  _See_ Am. Compl., Dkt. No. 14; Second Am. Compl. ("SAC"), Dkt. No. 61.

The operative complaint alleges state-law claims for breach of contract, defamation, injurious falsehood, deceptive trade practices, and tortious interference with prospective contractual relations.  Before the Court are PPL's motion to dismiss and CDChoices' motion for a preliminary injunction.  For the reasons below, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** and the motion for a preliminary injunction is **DENIED**.

## II.    MOTION TO DISMISS

## A.    BACKGROUND[1]

New York's Consumer Directed Personal Assistance Program ("CDPAP") is a Medicaid-funded initiative established under state law, designed to provide individuals with chronic illnesses or physical disabilities greater flexibility and autonomy in managing their home care services.  Second Amended Complaint ("SAC"), Dkt. No. 61 ¶ 3.  Unlike traditional home care models, CDPAP empowers its beneficiaries (or "consumers") to select and train their own caregivers, known as personal assistants ("PAs").  *Id.* ¶ 33.  This approach allows consumers to choose PAs they trust—such as a family member, friend, neighbor or community member—who can assist with daily living tasks within the consumer's home.  *Id.* ¶ 32.

Fiscal intermediaries ("FIs") support CDPAP participants by ensuring their adherence to various statutory and regulatory requirements.  *Id.* ¶ 34.  FIs handle tasks such as processing payroll, managing compliance with tax and insurance obligations, verifying PA health status, maintaining personnel records, and monitoring consumer responsibilities under the program.  *Id.*

Previously, CDPAP allowed for hundreds of FIs, including CDChoices.  *Id.* ¶ 35.  Yet in April 2024, amendments to New York Social Services Law § 365-f ("CDPAP amendment") were enacted, consolidating all FI services under a single statewide provider, PPL, selected by the New York State Department of Health ("NYDOH") on September 27, 2024.  *See* SAC, Ex. B., Dkt. No. 61-2 at 3; *see also* N.Y. Soc. Serv. Law § 365-f.  The CDPAP amendment was initially set to take effect April 1, 2025.  *See* SAC ¶¶ 5, 6.

---

[1] Unless otherwise indicated, the facts stated in this section stem from the operative complaint and its attached exhibits.  The Court "recite[s] the substance of the allegations as if they represent[ ] true facts, with the understanding that these are not findings of the [C]ourt, as [the Court has] no way of knowing at this stage what are the true facts."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).  To the (considerable) extent that the parties cite other materials—whether those material were presented in connection with the motion for a preliminary injunction, attached to the motion practice on the dismissal motion, or otherwise outside the pleadings—the Court has excluded them from its consideration of the motion to dismiss.

Beginning in late December 2024, PPL in its role as "the single state-wide fiscal intermediary" ("SFI"), with the express intent to "retain [CDChoices] . . . to facilitate the delivery of fiscal intermediary services" and to "assist CDPAP consumers in registering, facilitating, and maintaining their participation in CDPAP[,]" entered a subcontract with CDChoices (the "Agreement"). *See* SAC, Ex. C, Dkt. No. 61-3 at 2. PPL has entered similar subcontracts with "more than 30 other subcontracted partners" (or "Facilitators"). SAC ¶ 12. Under the parties' Agreement, CDChoices was responsible for "notifying . . . consumer[s] of their CDPAP start date[,]" "facilitating . . . consumer[s'] right to change . . . to another CDPAP Facilitator," and performing other mutually agreed tasks. *Id.* ¶¶ 11, 12.

In return, PPL agreed to compensate CDChoices through three payment mechanisms. *See* SAC, Ex. C, Dkt. No. 61-3 at 2. The primary component was a monthly per-member-per-month ("PMPM") payment of $50.00 to $60.00 for each active consumer registered with PPL as their fiscal intermediary and with CDChoices as their Facilitator. SAC, Ex. C, Att. B, Dkt. No. 61-3 at 19–20. In addition, CDChoices was eligible for two performance-based bonuses: $2.00 PMPM if the average Electronic Visit Verification ("EVV") compliance rate for all PAs associated with CDChoices reached at least 90% in a particular month, and $2.00 PMPM if the PA retention rate exceeded 85% that month. *Id; see* SAC ¶ 54.

To further incentivize CDChoices' assistance in the expedient transition of CDPAP participants to the new PPL-run system ("PPL@Home") before DOH's initial March 31 deadline, PPL also offered CDChoices a one-time "Transition Payment" of $48.00 for each "completed transition"[2] that CDChoices facilitated between January 6, 2025, and March 30, 2025. *See* SAC, Ex. C., Att. B, Dkt. No. 61-3 at 19; SAC ¶ 54.

---

[2] A "completed transition," as defined by the Agreement, means that "the Consumer and all associated PAs (1) have completed all registration paperwork, (2) are fully registered in PPL's systems, and (3) have completed one

All told, about 280,000 consumers and 300,000 PAs, it would appear, needed to register with PPL@Home by March 31 if they wanted to stay in CDPAP.  *See* SAC ¶ 32.  Missing that deadline—at least as some CDPAP participants first understood it—meant consumers could lose care, or their PAs might not get paid.  *See* SAC ¶ 39; *but see* SAC, Ex. B, Dkt. No. 61-2 at 3 ("On or about March 24, 2025, DOH announced that Consumers and PAs would be permitted an additional 30 days to register with PPL, by April 30, 2025, such that those PAs will receive payment from PPL for all days worked in April 2025 upon registration.").

Still, as the original deadline neared, some participants remained unaware of the risk or of the need to register with PPL.  SAC ¶ 39.  Others had tried to register but ran into logistical problems.  *Id.*  Whatever the case, on March 31, 2025, there were CDPAP consumers who had not fully transitioned to PPL.  *See* SAC, Ex. B, Dkt. No. 61-2 at 3.

To prevent any fallout, that same day, Judge Frederic Block of the Eastern District of New York issued a temporary restraining order ("TRO").  *See generally* SAC, Ex. A, Dkt. No. 61-1.  That case, *Engesser v. McDonald*, had been filed by a group of plaintiffs seeking to represent CDPAP consumers.

The *Engesser* TRO "immediately and temporarily restrained" the defendant— "James V. McDonald, as Commissioner of the New York State Department of Health"—from enforcing specific parts of the CDPAP amendment.  *See* SAC, Ex. A, Dkt. No. 61-1 at 3.

"Importantly," the *Engesser* TRO stated, it "d[id] not prevent the Statewide Fiscal Intermediary ('PPL') from operating, processing applications, servicing and paying CDPAP participants who have already registered with PPL."  *Id.*  "Rather," it restrained the defendant in

---

payroll cycle in which at least one of the Consumer's PAs has received a paycheck."  Dkt. No. 61-3 at 19; *see* SAC ¶ 132 ("Attachment B of the Agreement requires PPL to reimburse CDChoices for facilitating 'each completed transition to PPL of a Consumer and all associated PAs during the Transition Period: $48.00.'").

that case, McDonald, "from disallowing other Fiscal Intermediaries from servicing those CDPAP participants who ha[d] not yet registered with PPL[.]" *Id.* Judge Block set a hearing for April 4, four days later, "on why an appropriate preliminary injunction . . . should not be issued enjoining Defendant [i.e., McDonald] until further order of the [c]ourt[.]" *Id.* at 4.

Judge Block entered the *Engesser* TRO on the evening of March 31. *See* SAC ¶¶ 55, 58. Later that night, CDChoices posted an update on its website "about the evolving legal landscape[.]" SAC ¶¶ 55; *see id.* ¶¶ 58, 68. In this public-facing website update, CDChoices emphasized that the TRO took effect immediately and "prevent[ed] the New York State Department of Health" from "enforcing" the transition to PPL "for consumers who ha[d] not yet registered with PPL." SAC ¶ 60; SAC, Ex. G, Dkt. No. 61-7 at 2.

CDChoices stated that "[t]his mean[t] other Fiscal Intermediaries c[ould] still operate and provide services to their existing consumers who ha[d] not completed their registration with PPL during this temporary period." SAC ¶ 60; SAC, Ex. G, Dkt. No. 61-7 at 2. Still, CDChoices added, the order "d[id] not shut down PPL or stop it from processing applications or servicing and paying assistants who h[ad] already registered with PPL[,]" and it "d[id] not stop the switch to PPL as the single SFI." SAC ¶ 60; SAC, Ex. G, Dkt. No. 61-7 at 2. Elsewhere in the website update, CDChoices noted that, "While the TRO is in place until at least Friday, it is important that consumers and personal assistants make every effort to complete their registration(s)." SAC ¶ 60; SAC, Ex. G, Dkt. No. 61-7 at 2.

That was not the last word from CDChoices that day, or the next. During what it called a "chaotic time[,]" CDChoices "determined it needed to communicate with . . . consumers and PAs who had not yet transitioned to the new system." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 12.

To consumers who had already completed registration with PPL, CDChoices sent a message explaining that the TRO only "pause[d] the transition to PPL" for a "limited" group of consumers.  SAC ¶ 56.  That "pause," the message said, did not apply to them.  *Id.*  The message stated that "[e]ffective today, April 1," their services would start with PPL.  *Id.*  The PAs for this group of "fully registered" consumers were now required to use PPL's EVV system ("Time4Care").  *Id.*  Correspondingly, their PAs' access to CDChoices' EVV system ("CareTime") had ended the day before.  *Id.*

CDChoices sent a similar message to the PAs of those "fully registered" consumers.  SAC ¶ 57.  This message said the TRO "delay[ed]" the State's transition to PPL only for "specific consumers."  *Id.*  But because their consumers had already completely registered, their transition to PPL would "continue as scheduled."  *Id.*  That meant, effective that day, April 1, their employment "w[ould] officially move to PPL[.]"  *Id.*  They would be "required to use PPL's Time4Care system[,]" and could "no longer access CareTime to clock in and out."  *Id.*

To consumers not yet "fully registered" with PPL, CDChoices sent a different message.  SAC ¶ 58.  This message said the TRO had "halt[ed]" the State's transition to PPL.  *Id.*  "As a result," their own transition had been "paused," and "no changes w[ould] be made to [their] current services."  *Id.*  These not yet "fully registered" consumers were also told there was "no change" in how to schedule or submit hours.  *Id.*  As such, their PAs should "continue using [CDChoices'] CareTime system . . . to get paid."  *Id.*  The message closed: "The transition to PPL's EVV system, Time4Care, will not occur until further notice."  *Id.*

CDChoices' message to the PAs of those not-yet-fully-registered consumers offered yet another gloss.  The TRO, this one said, had "paus[ed] the State's transition to PPL."  SAC ¶ 59.  "As a result," CDChoices rationalized, this group of PAs' own transition to PPL "ha[d] been

paused." *Id.*  It added: "Today, April 1, there will be no changes to your current employment or EVV system." *Id.*  The message to these PAs ended simply: "Please continue to use . . . Care[T]ime . . . and do not begin using PPL's Time4Care system until further notice." *Id.*

That same day, April 1, CDChoices received a letter signed by Vince Coppola, CEO of PPL.  It laid out what PPL expected from its Facilitators in light of the *Engesser* TRO.  SAC ¶ 61; *see* SAC, Ex. D, Dkt. No. 61-4 at 2.

The letter said that Facilitators must "help quell . . . confusion in the coming days[,] [f]ulfill [their] contractual duties to PPL[,]" and "continu[e] . . . to register consumers and PAs with PPL and help them onboard[.]"  SAC, Ex. D, Dkt. No. 61-4 at 2.  If asked about the TRO, Facilitators were expected to "respond with the truth—that [it] [was] limited in scope, temporary in nature, and should not affect . . . ongoing registration effort[s] with PPL." *Id.*; *see* SAC ¶ 62.

Coppola's letter also issued a warning: "Any action by a facilitator to retain or somehow re-direct the registration of a consumer with PPL will be considered a blatant violation of our agreement[.]"  SAC, Ex. D, Dkt. No. 61-4 at 2; SAC ¶ 62.  Moreover,  PPL would "be unable to continue [its] partnership with any facilitator who cannot meet these expectations and who does not follow in all respects the terms of its agreement with PPL, as well as be truthful about the scope of the TRO."  SAC, Ex. D, Dkt. No. 61-4 at 2; SAC ¶ 62.

That afternoon, at about 3:00 pm, PPL's General Counsel, Deborah Drexler ("Drexler"), sent CDChoices a cease-and-desist letter by email, addressed to CDChoices' CEO, Christopher Graber ("Graber").  *See* SAC ¶ 63; SAC, Ex. E, Dkt. No. 61-5 at 2; SAC, Ex. H, Dkt. No 61-8 at 3.  In the letter, Drexler claimed that PPL had learned CDChoices "has made public statements to personal assistants [or PAs] . . .  that may be false, coercive or deceptive, and that may jeopardize our working relationship."  SAC, Ex. E, Dkt. No. 61-5 at 2; *see* SAC ¶ 63.

Drexler also accused CDChoices' of taking the position that the TRO allowed PPL to serve PAs and consumers "only if the PAs [were] 'cleared to work' by PPL." SAC, Ex. E, Dkt. No. 61-5 at 2. PPL rejected that interpretation, stating that there was no such thing as a "cleared to work" status with PPL. *Id.*

In underlined text, Drexler emphasized: "We hereby notify you that you must immediately cease and desist from making any further statements that state or suggest that consumers or PAs should cease or slow their efforts to register with PPL or that PAs should continue to submit time to their current facilitators." SAC, Ex. E, Dkt. No. 61-5 at 3; SAC ¶ 63.

Drexler directed CDChoices to correct its previous statements and affirm that consumers and assistants should continue registering with PPL and submit time on PPL's EVV app as soon as they were able. SAC, Ex. E, Dkt. No. 61-5 at 3. She reiterated PPL's earlier message: "In addition, as we stated in the letter that you received this morning, as our trusted Facilitator partner, we expect you to (1) act at all times in the best interests of consumers and PAs, and (2) fulfill your contractual duties to PPL[.]" *Id.*

To fulfill those duties, Drexler repeated the expectations Coppola had laid out in writing earlier that day. *See id.* ("[Y]ou must continue to assist consumers and PAs in the process of completing their registration with PPL, including providing onboarding support, providing guidance on using PPL's EVV system, and providing other support as detailed in the contract's scope of work. If asked about the TRO, we expect you to respond that the TRO is limited in scope, temporary in nature, and should not affect their registration efforts. We expect you to counsel consumers who have already taken registration steps with PPL that their best course of action is to continue as planned with PPL, and to counsel workers that they should start submitting time to PPL.").

Drexler's letter concluded: "If you are unable or unwilling to comply with these directives, please let us know, so that we can make plans to assign your consumers to other facilitators and end our contractual relationship." *Id.*

The next day, April 2, at about 7:00 pm, Drexler sent a follow-up email to CDChoices, with another letter attached. *See* SAC, Ex. H, Dkt. No. 61-8 at 2–3.

In the letter, Drexler wrote that "[i]n accordance with Section 5(a)(1)" of the Agreement, she was notifying CDChoices of a material breach of its obligations. SAC, Ex. F, Dkt. No. 61-6 at 2; *see* SAC ¶ 64. The breach, she stated, arose from the following actions: (1) making statements publicly to PAs that "may be false, coercive or deceptive"; (2) issuing directions to PAs and others "contrary" to the TRO; (3) posting website content encouraging consumers and their PAs to continue receiving services from CDChoices after April 1, 2025, instead of from PPL; and (4) failing to fulfill its duty under the Agreement to help consumers and their PAs register with PPL. *See* SAC, Ex. F, Dkt. No. 61-6 at 2; SAC ¶ 64. Additionally, Drexler reported that PPL "received numerous complaints from health plans that [CDChoices] ha[s] been attempting to solicit service authorizations and ha[s] told PAs to use the CDChoices EVV system rather than PPL's." SAC, Ex. F, Dkt. No. 61-6 at 2.

She continued: "It may not be possible to undo the damage [CDChoices] caused to consumers, to PAs, to CDPAP in general, and to PPL's legitimate business interests when [it] took these actions." *Id.* "Nonetheless," in accordance with Section 5(a)(1),[3] PPL directed CDChoices "to attempt to cure [its] material breach by taking the following corrective actions:"

- Immediately issuing a correction to your previous public statements, making it clear that all consumers and PAs should continue registering with PPL and should submit time on PPL's EVV app, as soon as they are able.

---

[3] The letter states that the relevant provision is "Section 5(1)(a)"; however, this appears to be a typo. No such provision exists in the Agreement. *See* SAC, Ex. C, Dkt. No. 61-3 at 3–4.

- Immediately removing all information from your website and other public sources that states or implies that consumers and their PAs should not continue the registration process with PPL.

- Immediately resume counseling consumers who have already taken registration steps with PPL that their best course of action is to continue as planned with PPL, and counseling workers who have started the registration process that they should start submitting time to PPL.

- If asked about the TRO, responding that the TRO is limited in scope, temporary in nature, and should not affect a CDPAP participant's registration efforts.

SAC, Ex. F, Dkt. No. 61-6 at 2–3. Drexler requested that CDChoices "please reply within 48 hours with evidence that [it] h[ad] taken these corrective actions." *Id.* at 3.

At around 10:30 am on April 3, Drexler emailed CDChoices again. *See* SAC, Ex. H, Dkt. No. 61-8 at 2. In this message, she stated that PPL had learned CDChoices was instructing PAs associated with fully registered consumers that they "should not transition to PPL's EVV system until further notice," and "should keep using CareTime for EVV—do not switch to Time4Care." *Id.* These statements, Drexler wrote, were "in direct violation of [PPL's] instructions" to CDChoices and "inconsistent with Judge Block's order[.]" *Id.* As a result, PPL could "no longer allow [CDChoices] to act as [its] subcontractor," and had "removed all of [CDChoices'] access to PPL@Home." *Id.*; SAC ¶ 72.

## B.  STANDARD OR REVIEW

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

when the pleaded factual content allows [a] court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 545).

When assessing this facial plausibility requirement, a court "must assume all well-pleaded facts to be true, 'drawing all reasonable inferences in favor of the plaintiff.'" *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 457 (S.D.N.Y. 2024) (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Generally, courts do not look beyond "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel*, 820 F.3d at 559 (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.,* 817 F.3d 46, 51 n.2 (2d Cir. 2016) (internal alterations omitted).

## C.    DISCUSSION

CDChoices now asserts five breach-of-contract claims, along with a slew of tort claims for defamation, injurious falsehood, deceptive trade practices under New York General Business Law § 349, tortious interference with prospective contractual relations. *See* SAC ¶¶ 96–168. CDChoices also seeks a declaratory judgment. *See* SAC ¶¶169–172.

### i.    Initial Matters

As an initial matter, the Court had great difficulty wading through the parties' citations to the record.  *See generally* Def.'s Mot. to Dismiss, Dkt. No. 48-2 (quoting record without providing pincites); *see, e.g.*, Pl.'s Resp., Dkt. No. 56 (citing Def.'s Mot. to Dismiss, Dkt. No. 48-2 throughout solely as "Mot." without providing corresponding docket number or noting that page references corresponded to dismissal motion's internal pagination); Pl.'s Resp., Dkt. No. 56 at 11 (quoting FAC, Ex. C, Dkt. No. 14-10 as "Agreement" without corresponding docket number); Pl.'s Resp., Dkt. No. 56 at 13, 28 (later citing to Agreement as "Dkt. 14-3" despite Pl.'s FAC, Ex. C, Dkt. No. 14-3 being a one-page document bearing only the words "SEALED EXHIBIT C" and unsealed version being placed on record two weeks prior).

Additionally, neither party requested the Court take judicial notice of materials referenced that were not attached to the pleadings or otherwise integral to the complaint.  Rather, the parties treated motion practice surrounding PPL's motion to dismiss as a free-for-all.  *See, e.g.*, Def.'s Reply, Dkt. No. 58 at 8 ("And documentary evidence demonstrates that CDChoices' allegations that it 'cured' its breach are meritless.  *Compare* Am Compl. Ex. F *with* Motion for Temp. Rest. Ord., Ex. G."); Def.'s Reply, Dkt. No. 56 at 5 ("But the *actual* TRO (attached as Exhibit A to the Amended Complaint) and the *actual* communications (attached as an exhibit to CDChoices' motion for emergency relief) flatly contradict CDChoices' self-serving allegations about its performance."); Pl.'s Resp., Dkt. No. 56 at 13, 14, 22 (citing and quoting from exhibits attached to CDChoices' Motion for Preliminary Injunction).

Both parties are represented by skilled and experienced counsel.  They know, or should know, that "if, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary

judgment under Rule 56." FED. R. CIV. P. 12(d).  The Court, thus, reiterates that any material outside the pleadings have been excluded from its consideration of PPL's motion to dismiss.

The Court also recommends that in future filings in this case, references to the record include the corresponding docket number and use the pagination provided by CM/ECF.  It is also recommended that references to the complaint be limited to the Second Amended Complaint. Where references are to be made to previously redacted filings, it is recommended that the parties reference the non-redacted version.  These recommendations are not to be construed as immutable rules; rather, they are suggestions to avoid further waste of judicial (and party) time and resources.

### ii.    Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Dunham v. Sherwin-Williams Co.*, 636 F. Supp. 3d 308, 317 (N.D.N.Y. 2022) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).  "Under New York law, a plaintiff must identify the specific contractual provision or provisions that were allegedly breached."  *Schoenhals v. Dowling Coll.*, 2019 WL 1284259, at *7 (E.D.N.Y. Mar. 20, 2019).

PPL now seeks dismissal of CDChoices' five breach-of-contract claims, arguing the complaint and its exhibits show CDChoices failed to meet its own obligations under the Agreement and thus cannot sustain a breach claim against PPL.  Moreover, the claims rest on misstatements and misinterpretations of the Agreement, which are contradicted by its clear, unambiguous terms.  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 8.

### iii.    Material Breach

PPL contends that "[a]s an initial matter," each of the breach-of-contract claims must fail because the complaint makes clear that "CDChoices itself breached the terms of the Agreement, and accordingly cannot meet the fundamental pleading standard for such claims."  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 17; *see id.* at 7 ("The instant action amounts to nothing more than a transparent effort by [CDChoices] to twist its own material breaches of the subcontractor agreement . . . into frivolous claims against PPL.").

PPL argues that the Agreement made CDChoices "specifically . . . responsible for communicating with Consumers and PAs[,] both through the transition to PPL, and after[,] in accordance with the goals to transition all Consumers by a date certain."  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 18 (citing First Am. Compl., Ex. C, Att. A, Dkt. No. 14-3).  PPL adds that "the Agreement provided that CDChoices would be compensated for assisting in the transition to PPL, receiving a set sum for each Consumer and PA who transitioned from CDChoices to PPL between January 6, 2025 to March 30, 2025."  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 18 (citing First Am. Compl., Ex. C, Att. B, Dkt. No. 14-3).

Attachment A defines the scope of CDChoices' services.  *See* SAC, Ex. C, Att. A, Dkt. No. 61-3 at 17–18.  It lists numerous ways CDChoices is to communicate with consumers and PAs.  But it says nothing about advancing any "goal" of transition.

For instance, Attachment A says CDChoices must: "[p]rovid[e] the Consumer with an annual reminder to ensure the annual PA health assessment is completed" (*id.* at 18); offer "telephonic customer support to Consumers and PAs to answer questions related to their CDPAP services" (*id.*); and "[e]nsur[e] the Consumer has . . . new hire training and orientation schedule[,] and online resources explaining the hiring process, wages and benefits" (*id.* at 17).

14

None of this points to any transition goal, nor does the Attachment ever even allude to a "transition" or set a deadline for it (PPL's use of the vague phrase "by a date certain" in its argument hints as much).  *See* Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 18.

More importantly, the duties in Attachment A apply only to consumers who have both enrolled in the PPL@Home portal and selected CDChoices as their Facilitator.  *See* SAC, Ex. C, Att. A, Dkt. No. 61-3 at 17 ("[CDChoices] will provide the following support services to CDPAP consumers who have enrolled with the facilitator in the PPL@Home portal[.]").

Attachment B, which covers CDChoices' compensation, on the other hand, mentions CDChoices "facilitating the transition of Consumers and their associated [PAs] to PPL as their fiscal intermediary[.]"  SAC, Ex. C, Att. B, Dkt. No. 61-3 at 19.  It states that CDChoices "will earn a one-time payment" for each facilitated transition "during the period between January 6, 2025 – March 30, 2025[,]" defined there as the "Transition Period."  *Id.*

But Attachment B—which provides the only methods by which CDChoices may receive compensation under the Agreement—does not require CDChoices to facilitate transitions.  *See* SAC, Ex. C, Dkt. No. 61-3 at 2 (The Agreement provides that PPL "shall compensate [CDChoices] pursuant to the provisions contained in Attachment B and this Section[,][4] and shall not pay [CDChoices] any other benefits, expenses, or compensation.").   Attachment B outlines three payment mechanisms: (1) A one-time transition payment; (2) a monthly per-member-per-month ("PMPM") payment "for each active Consumer that is registered with PPL as their fiscal

---

[4] The referenced section discusses the amount of compensation owed in the event of the Agreement's "termination or expiration[.]"  *See* SAC, Ex. C, Dkt. No. 61-3 at 3.  It does not, though, provide any more grounds for compensation.  *See id.* ("Upon termination or expiration of this Agreement SUBCONTRACTOR other than for cause, SUBCONTRACTOR shall be entitled to receive compensation for Subcontracted Services that it satisfactorily provided prior to the effective date of termination, provided that NYSDOH has accepted the Subcontracted Services or the associated deliverables and has paid PPL for them. Upon termination by PPL for cause, PPL may deduct from any compensation otherwise owed to SUBCONTRACTOR all costs, expenses, and damages reasonably attributable to the breach by SUBCONTRACTOR; SUBCONTRACTOR promptly shall return to PPL any compensation that was paid in excess of this net amount due.").

intermediary and with [CDChoices] as their facilitator", and (3) two performance-based monthly

bonuses—one for maintaining a 90% EVV compliance rate and another for an 85% PA retention

rate.  SAC, Ex. C, Att. B, Dkt. No. 61-3 at 19–20.

The "Monthly PMPM Payment" and "Monthly Value-Based Payment" are unrelated to

the transition.  PPL is, therefore, correct that Attachment B compensates CDChoices for each

consumer and PA it transitioned during the defined "Transition Period."  But beyond that,

Attachment B is silent.  By its own terms, it can be read as simply incentivizing CDChoices to

assist with transitions, not requiring CDChoices to do so—during that period or any other.

PPL further argues that "[t]he Agreement specifically ensured—through both the PPL

Subcontractor Code of Conduct, and through its non-disparagement clause—that CDChoices

would communicate with Consumers and PAs honestly and in ways that furthered the

implementation of the CDPAP Amendment."  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 18 (citing

FAC, Ex. C, Att. C, Dkt. No. 14-3).  If Attachment C or the Agreement's non-disparagement

clause explicitly required CDChoices to communicate with participants "in ways that further[]

the implementation of the CDPAP Amendment[,]" PPL does not cite that language.  Nor does

the Court find any such directive stated in either provision.

As presented in CDChoices' operative complaint and attached exhibits, it is unclear

whether CDChoices breached the Agreement.  *See* SAC, Dkt. No. 61; SAC, Exs. A–H, Dkt. Nos.

61-1–61-8.  "Where questions exist as to whether a party has . . . breached the agreement or

whether a breach is material, dismissal prior to fact discovery is inappropriate." *Campbell v.*

*Mark Hotel Sponsor, LLC*, 2010 WL 3466020, at *4 (S.D.N.Y. Sept. 3, 2010); *see Mayweather*

*Promotions, LLC v. PAC Ent. Worldwide LLC*, 2022 WL 3997014, at *7 (S.D.N.Y. Sept. 1,

2022) ("[T]he question of the materiality of a breach is usually a question of fact and should be decided as a matter of law only where the inferences are certain.").

### iv.    Terms of the Agreement

PPL asserts, "in the alternative," CDChoices' claims for breach of contract are "otherwise premised on misrepresentations" of the Agreement's terms and are squarely contradicted by its plain language.  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 17.  "To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 387 (S.D.N.Y. 2023) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004)).  The Court will consider CDChoices' five breach claims, and their corresponding terms and provisions, in turn.

### 1.    Section 4(a) — Failure to Assist CDChoices to Reach Its Desired Capacity

CDChoices centers its first contract claim on PPL's alleged breach of Section 4(a) of the Agreement, which states as follows:

> PPL will include [CDChoices] in its recommendations to consumers when appropriate based on geographic location, cultural competency, and language abilities.  PPL will work in good faith to assist [CDChoices] to reach its desired capacity.  Unless [CDChoices] agrees in writing, PPL will not recommend more than 20,000 new consumers per month.

SAC, Ex. C, Dkt. No. 61-3 at 3.

PPL's argument for this claim's dismissal rests on a single point: "[T]he Agreement does not guarantee that CDChoices will reach its desired capacity."  Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 20.  PPL further contends that "CDChoices' first cause of action both overreads PPL's

obligations under Section 4(a) and purely speculates that CDChoices would have reached its desired capacity had it not been terminated." *Id.* at 21.

CDChoices' claim does appear to imply that, but for PPL's conduct, it would have assuredly reached its desired capacity. *See* SAC ¶ 101 ("PPL's actions prevented CDChoices from reaching its desired capacity and thus breached the Agreement."); *see id.* ¶ 50 ("That capacity plan laid out the process for CDChoices to achieve a capacity of facilitating 50,000 CDPAP consumers."); *id.* ("Attachment A to the Agreement provides further details on the capacity that PPL would help CDChoices achieve. It reads: 'PPL will support SUBCONTRACTOR in efforts to reach full capacity as stated in its approved capacity plan.'"); *see also* SAC, Dkt. No. 61 at 21 (titling CDChoices' first claim "Failure to Assist CDChoices to Reach Its Desired Capacity").

Section 4(a) may not have guaranteed that PPL reached its capacity goal. But it did require PPL to "*work in good faith* to assist" CDChoices in the latter's efforts to do so. SAC, Ex. C, Dkt. No. 61-3 at 3 (emphasis added). "Unlike an 'agreement to agree,' which does not constitute a 'closed' proposition, and consequently is not an agreement at all, an agreement to use best efforts is a closed proposition, discrete and actionable." *Thompson v. Liquichimica of Am., Inc.*, 481 F. Supp. 365, 366 (S.D.N.Y. 1979). "Such an agreement does not require that the agreement sought be achieved, but does require that the parties work to achieve it actively and in good faith." *Id.*

CDChoices' claim plausibly alleges that, in terminating the Agreement entirely, PPL made no good-faith effort whatsoever. At the pleadings stage, that allegation is sufficient for the claim to proceed.

### 2.    Section 4(c) — Failure to Recommend Consumers

CDChoices bases its second contract claim on PPL's alleged breach of Section 4(c) of the

Agreement, which states as follows:

> PPL shall recommend to [CDChoices] all Consumers that [CDChoices] is already
> serving at the time this Agreement becomes effective.  However, any Consumer
> who elects to receive Subcontracted Services from another Subcontractor shall have
> the right to transfer to the Subcontractor of their choice in accordance with program
> guidelines.

SAC, Ex. C, Dkt. No. 61-3 at 3.

PPL asserts that Section 4(c) "does not . . . require PPL to assign each and every Consumer

that CDChoices served before the transition to CDChoices."  Def.'s Mot. to Dismiss, Dkt. No. 48-

2 at 21.  PPL argues that CDChoices "overreads PPL's obligations . . . and speculates that each

and every Consumer that previously worked with CDChoices would [have] elect[ed] to continue

working with CDChoices through the transition to PPL had it not been terminated."  *Id.*

Section 4(c) may not have guaranteed that every consumer served by CDChoices pre-

transition would choose to remain with CDChoices as its Facilitator.  But the provision did require

PPL to recommend CDChoices to that group of consumers.  CDChoices asserts that PPL did not

do so and instead reassigned these consumers to other subcontractors.  *See* SAC ¶ 106.

The claim may proceed.

### 3.    Section 5(a)(1) — Improper Termination of the Agreement

CDChoices' third claim argues that PPL's termination of the Agreement was

procedurally improper.  *See* SAC ¶¶ 113–121.  It contends that Section 5(a)(1) "requires 30 days'

notice and an opportunity to cure any material breaches."  *Id.* ¶ 115.

PPL counters that its April 2 message met the requirements of Section 5(a)(1), "namely, specification of 'the breach and required corrective actions' to be taken."  Def.'s Reply to Mot. to Dismiss, Dkt. No. 58 at 8.

Even if PPL is correct that the letter met Section 5(a)(1)'s content requirements, it still fails to address CDChoices' argument: CDChoices was entitled to 30 days' notice and an opportunity to cure; it did not receive that.

Therefore, the claim may proceed.

### 4.    Section 26(b) — Disparaging Statements

Section 26(b) of the Agreement provides: "Each party agrees that they shall not at any time make disparaging statements . . . about the other party[.]"  SAC, Ex. C, Dkt. No. 61-3 at 15. CDChoices alleges that PPL breached Section 26(b) by telling consumers and managed care plans that CDChoices had been "terminated" as a Facilitator.  *See* SAC ¶¶ 125–26.  According to CDChoices, these were disparaging statements.  *See id; see, e.g.*, Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 22–23 ("By communicating to third parties that CDChoices was incapable or unable to perform as a Facilitator, PPL caused reputational injury to CDChoices' business."); *id.* at 23 ("And by stating that CDChoices was 'terminated' as a Facilitator when it in fact was not terminated, PPL disparaged CDChoices in the eyes of consumers and managed care plans.").

Based on the complaint and its attached exhibits, CDChoices cannot maintain this claim. Section 5 of the Agreement—titled, in bold, "Termination"—provides that "[t]he Agreement may be terminated before the end of the term pursuant to the following subsections[.]"  SAC, Ex. C, Dkt. No. 61-3 at 3.  Subsection 5(a), "Termination for Cause," makes clear: "This Agreement may be terminated *immediately* by either party" under certain circumstances.  *Id.* at 3–4 (emphasis added).

20

On Tuesday, April 1, 2025, PPL emailed its Facilitators—including CDChoices—a letter in which Coppola, PPL's CEO, stated that he "wish[ed] to make clear that [PPL] will be unable to continue [its] partnership with any facilitator who cannot meet [PPL's] expectations . . . about the scope of the TRO."  SAC, Ex. D, Dkt. No. 61-4 at 2.  Later that day, PPL emailed CDChoices a cease-and-desist letter that stated: "If you are unable or unwilling to comply with these directives, please let us know, so that we can make plans to assign your consumers to other facilitators and end our contractual relationship."  SAC, Ex. E, Dkt. No. 61-5 at 3.

Then, on Wednesday, April 2, 2025, PPL followed up with an email notice stating that "in accordance with Section 5(a)(1)," PPL was directing CDChoices to cure its purported material breach(es).  SAC, Ex. F, Dkt. No. 61-6 at 2; *see* SAC ¶ 64.

CDChoices' complaint emphasizes that the April 2 notice "demanded . . . CDChoices take certain 'corrective actions' *within 48 hours*—despite the Agreement allowing *30 days* to cure."  SAC ¶ 71 (emphasis in original).  The only place the Agreement discusses "cure" or even uses the term is Section 5: the "termination" provision.  *See* SAC, Ex. C, Dkt. No. 61-3 at 3–4 ("Termination for Cause: This Agreement may be terminated immediately by either party: (1) Following a material breach of this Agreement and a failure to cure such breach within 30 days after written notice specifying the breach and required corrective actions.  If the breach cannot reasonably be cured within 30 days, the non-breaching party may grant an additional 30 days, subject to reasonable approval[.]").

The next day, Thursday, April 3, 2025, PPL sent a follow-up message in the same email chain: "[W]e can no longer allow you to act as our subcontractor, and we have removed all of your access to PPL@Home."  SAC, Ex. H, Dkt. No. 61-8 at 2.

CDChoices' complaint alleges that, from this point forward, "Consumers and Managed Care Plans could no longer use CDChoices as a Facilitator." SAC ¶ 77; *see id.* ¶ 14 ("Only two days after the Transition, on April 3, 2025, PPL shut off CDChoices' access to PPL's administrative system, PPL@Home, that allowed CDChoices to fulfill its functions as a Facilitator under the subcontract."); *id.* ¶ 107–08 ("Prior to April 3, 2025, CDChoices facilitated over 3,500 consumers. CDChoices no longer assistants any consumers through PPL's system."); *id.* ¶ 101 ("Without access to the database, CDChoices cannot serve consumers through the current CDPAP program.").

Yet this claim—and several others—are founded on CDChoices' assertion that the Agreement has not, in fact, been terminated. *See, e.g.*, Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 31 ("PPL falsely told consumers that CDChoices was terminated when CDChoices was trying to serve those consumers."); *id.* ("PPL interfered with these business relationships when it made defamatory statements that CDChoices was terminated[.]").

The Agreement, CDChoices contends, somehow both has and has not been terminated because it "requires PPL to give notice to CDChoices of an alleged breach and 30 days to cure." SAC ¶ 171. CDChoices alleges, "in truth, PPL *never* sent CDChoices a written notice of termination. Nor did it allow a 30-day cure period." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 26. Thus, "PPL failed to abide by the conditions it had agreed to." *Id.*

Yet, for these inactions to be "fail[ures] to abide by the conditions" of the Agreement, as CDChoices argues, by necessity the Agreement must have been terminated when PPL shut off CDChoices' access on April 3, 2025. *See, e.g., id.* at 7 ("As an initial matter, although PPL purports to seek dismissal of the Amended Complaint in its entirety, its motion offers no direct argument for dismissal of Count III regarding PPL's improper termination of the Agreement.

That claim must proceed regardless, and for good reason: the allegations demonstrate that PPL failed to comply with the Agreement's termination provision.").

Moreover, CDChoices misstates the requirements of Section 5(a)(1). PPL need only provide "written notice specifying the breach and [the] required corrective actions." SAC, Ex. C, Dkt. No. 61-3 at 4. If thirty days without cure passes after that written notice is given, the Agreement "may be terminated immediately by either party." *See id.* at 3–4. Nothing suggests that the termination itself must be in writing to be effective.

Further, the only statement that CDChoices asserts is "disparaging" is that "CDChoices had been 'terminated' as a Facilitator." *See* SAC ¶¶ 125–26; *see, e.g.*, Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 21 ("PPL breached the Agreement by telling third parties that CDChoices was 'terminated' as a Facilitator[.]"); Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 21–22 ("PPL communicated to consumers and Managed Care Plans that CDChoices was 'terminated' as a Facilitator."); Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 22 ("The *first time* that PPL ever told CDChoices that PPL was terminating CDChoices was in a phone call in early June 2025.") (emphasis in original).

Regardless of its underling veracity, the statement itself is insufficient to constitute disparagement, even using the definitions CDChoices provides. Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 22 ("Black's Law Dictionary defines 'disparage' as 'to speak slightingly of; to criticize (someone or something) in a way showing that one considers the subject of discussion neither good nor important,' or 'to degrade in estimation by disrespectful or sneering treatment.' *Disparage*, Black's Law Dictionary (12th ed. 2024); *see also Disparage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disparage (last visited Sep. 19, 2025) ('to belittle

the importance or value of (someone or something)[;] to speak slightingly about (someone or

something)[;] to lower (someone or something) in rank or reputation').").

Nothing in the statement, "PPL communicated . . . that CDChoices had been 'terminated'

as a Facilitator," plausibly speaks slightingly or criticizes CDChoices, let alone in a way showing

that PPL considers CDChoices "neither good nor important." Nor is the statement disrespectful,

belittling, sneering, or degrading. The statement is not plausibly disparaging.

Therefore, this breach-of-contract claim is dismissed.

### 5.    Attachment B — Failure to Compensate for Transitioning Consumers & PAs

PPL argues CDChoices' fifth claim is founded on impermissible speculation and fails to

allege with particularity how many "completed transitions" occurred during the applicable

timeframe or how much PPL has already paid for them. *See* Def.'s Mot. to Dismiss, Dkt. No.

48-2 at 22.

Yet PPL offers no sound basis for why CDChoices must meet its metrics. Rather, PPL

cites only to caselaw stating New York courts dismiss breach-of-contract claims requesting

damages for lost profits when an award requires unreasonable speculation. *See, e.g.*, *id.* at 20

(citing *ACCD Glob. Agric. Inc. v. Perry*, 2013 WL 840706, at *5–6 (S.D.N.Y. Mar. 1, 2013)).

But those cases turned on the fact that "the profits alleged . . . could not be determined with a

reasonable degree of certainty." *ACCD Global Agriculture Inc.*, 2013 WL 840706, at *6

(quoting *Calip Dairies, Inc. v. Penn Station News Corp.,* 262 A.D.2d 193, 194 (1st Dep't 1999).

CDChoices' fifth claim is narrower. It seeks payment under the "One-Time Transition

Payment" provision of Attachment B. *See* SAC ¶ 132. Attachment B appears to require PPL to

pay CDChoices $48.00 for "each completed transition to PPL of a Consumer and all associated

PAs" during the period "between January 6, 2025 – March 30, 2025[.]" SAC, Ex. C, Att. B,

Dkt. No. 61-3 at 19.  The claim alleges CDChoices "facilitated the transition" of about 3,500 consumers and their PAs.  *See* SAC ¶ 133.  Nothing in the pleadings suggests that damages, if proven, could not be determined with reasonable certainty.

Thus, the claim may proceed.

**D.    Tort Claims**

**i.    Defamation**

CDChoices alleges that PPL's "communicat[ions] to consumers and . . . Managed Care Plans that CDChoices had been 'terminated' as a Facilitator . . . constitute defamation per se." SAC ¶¶ 138–140.  CDChoices maintains that "[t]hese false statements"[5] qualify as defamation per se as they had "a tendency to hurt and to prejudice the plaintiff's business."  *Id.* ¶ 140 (internal citations omitted).  As a direct result of the statements, CDChoices asserts it "lost the opportunity to serve . . . consumers and provide the services [that] consumers requested and need."  *Id.* ¶ 145.

Under New York law, to state a defamation claim "a plaintiff must allege that the defendant published a false statement, without privilege or authorization, to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se[.]"  *Davydov v. Youssefi*, 205 A.D.3d 881, 882–83 (2d Dep't 2022) (internal citations and alterations omitted).

"A false statement is defamation per se if it charges another with a serious crime or tends to injure another in his or her trade, business, or profession."  *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 260 (S.D.N.Y. 2023) (citing *Laguerre v. Maurice*, 192

---

[5] Cast in the plural form, these "statements" are not distinct.  CDChoices alleges only one was made, that "CDChoices had been 'terminated' as a Facilitator[.]"  *See* SAC ¶¶ 137–146.  Although CDChoices also alleges "upon information and belief" that PPL made "other false, defamatory and disparaging statements to third parties regarding CDChoices" (*id.* ¶ 142), such vague assertions cannot, on their face, sustain a defamation claim.

A.D.3d 44, 50 (2d Dep't 2020)).  "A statement which 'tend[s] to injure another in his or her trade, business or profession' must refer to 'a matter of significance and importance' related to the proper conduct of the business, rather than 'a more general reflection upon the plaintiff's character or qualities.'"  *S & P Pharmacy Corp. v. Syed*, 238 A.D.3d 1188, 1190 (2d Dep't 2025) (quoting *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1004–05 (2d Dep't 2008)).

   "At the motion to dismiss stage, the role of the Court is to 'decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury.'"  *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 776 (S.D.N.Y. 2025) (quoting *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021), *aff'd,* 2022 WL 598973 (2d Cir. Mar. 1, 2022)); *see also Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 272 (S.D.N.Y. 1989) ("To determine whether a statement is per se actionable, we must look at whether the character of the language used[,] as well as the circumstances of its issuance, would naturally import one of the above mentioned charges, in the mind of the average person.") (citing *James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976)).

   "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing."  *Crowley v. Billboard Mag.*, 576 F. Supp. 3d 132, 149 (S.D.N.Y. 2021) (internal citations omitted).  "Courts are not to render statements actionable by giving them a strained or artificial construction, nor are they to interpret potentially defamatory statements in their mildest and most inoffensive sense to hold them nonlibelous."  *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 161 (S.D.N.Y. 2020) (quoting *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 287 (S.D.N.Y. 2006)).

"If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for [a] court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 689–90 (S.D.N.Y. 2022) (quoting *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000)).

PPL asserts that CDChoices fails to state an actionable defamation claim as the statements are true and, otherwise, not defamatory as a matter of law. Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 24. "[C]ourts have repeatedly held that the word 'terminated' without more does not carry a defamatory construction because 'the use of the word 'terminated' alone does not convey whether the employee was terminated for cause or for other reasons (*e.g.*, company economics).'" Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 24–25 (quoting *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 174 (S.D.N.Y. 2021)). Further likening this matter to that of an employee's dismissal or separation, PPL notes: "The mere fact of one's removal from office carries no imputation or dishonesty or lack of professional capacity[;] It is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory." Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 25 (quoting *Nichols v. Item Publishers*, 132 N.E.2d 860, 860 (N.Y. 1956)).

Here, PPL argues, "[t]he Amended Complaint does not include allegations indicating that PPL made statements to third parties (*e.g.*, Consumers or Managed Care Plans) that falsely indicated or insinuated that CDChoices' 'termination' as a Facilitator was for cause or following some sort of misconduct." Def.'s Mot. to Dismiss, Dkt. No. 48-2 at 25. "Indeed," PPL adds, "the Agreement specifically provides that either party can terminate the Agreement solely for *convenience* on ninety (90) days' notice, indicating that CDChoices could have been properly

'terminated' by PPL without cause, which itself confirms that PPL's representations that CDChoices was 'terminated' did not, in and of themselves, carry any negative implications." *Id.* (emphasis in original).[6]

CDChoices counters that defendant "misconstrues CDChoices' argument[,]"—that, in fact, CDChoices "alleged PPL communicated CDChoices could not act as a Facilitator, implying it lacked the capabilities of other Facilitators." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 25 (citing First Am. Compl., Dkt. No. 14 ¶¶ 69–70, 158). CDChoices insists it "does not argue that PPL's mere use of the word 'terminated' itself was what defamed CDChoices[;] rather, PPL's statements that CDChoices was 'terminated,' when taken *in context*, amount to defamation as a matter of law because of how that term altered consumers' perceptions of CDChoices and ultimately affected CDChoices' business." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 25–26.

Of course, CDChoices' defamation claim includes none of this. It provides only that the statements were false, that they tended to hurt and prejudice CDChoices' business, and that as a result, CDChoices lost the opportunity to serve consumers. *See* SAC ¶¶ 138–140, 145. The Court sees no meaningful difference between the cases PPL cites on employee terminations and the instant matter. Nor does CDChoices provide any reason why the Court should. *See, e.g.*, Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 25–27; *see also* Def.'s Reply to Mot. to Dismiss, Dkt. No. 58 at 11 (remarking that CDChoices' opposition "entirely ignores the contrary precedent cited in PPL's opening brief").

---

[6] PPL's briefing undercuts this argument. The parties previously submitted several motions to seal, based "entire[ly] [on] the purportedly confidential nature of their written agreement." *Consumer Directed Choices, Inc. v. Pub. Partnerships, LLC*, 2025 WL 2531357, at *2 (N.D.N.Y. Sept. 3, 2025) (denying motions to seal). If the agreement was, until the Court's recent ruling, confidential, it seems counterintuitive to point to its provisions as showing—at least, to any third party—that termination did not carry negative implications. Even in its original redacted form, PPL's argument appeared publicly on the record as follows: "Indeed, the Agreement specifically provides [redacted] which itself confirms that PPL's representations that CDChoices was 'terminated' did not, in and of themselves, carry any negative implications." PPL's Red. Mot. to Dismiss, Dkt. No. 48-1 at 25.

As an initial matter, and as CDChoices appears to acquiesce, the Court finds that the statement that CDChoices was "terminated" as a Facilitator is susceptible to only one meaning and, as a matter of law, is not defamatory on its face. *See Feldman v. Edwab*, 2011 WL 1298717, at *7 (N.D.N.Y. Mar. 31, 2011) (Kahn, J.) (holding same where statements were that plaintiff was "removed" and "dismissed" from role). As of December 2024, CDChoices was PPL's subcontractor. SAC ¶ 11. PPL ended that relationship. *See* SAC, Ex. H, Dkt. No. 61-8. Whatever the reason for doing so, CDChoices does not allege PPL shared it with others, only that PPL made known CDChoices was no longer one of its subcontractors.

When such a statement is not facially defamatory, "[i]t is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory." *Nichols*, 132 N.E.2d at 862 (N.Y. 1956) (collecting cases). To avoid the application of this legal principle, CDChoices now offers an assortment of vague assertions that PPL's statement(s)—when put "in context"—"altered consumers' perceptions of CDChoices" and "ultimately affected [its] business." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 25–26. But CDChoices provides no hint, let alone any plausible allegations, indicating how the statements altered consumer perception or how the statements, or the purportedly-altered consumer perceptions, affected its business.

CDChoices' ostensible elaboration that the statements caused it injury "because consumers would no longer view CDChoices as an option for a Facilitator" is similarly insufficient and unavailing. *See id.* at 26. As of April 3, 2025, consumers, in fact, could no longer choose or select CDChoices as an option.[7] *See* SAC ¶ 72 ("On the morning of April 3, 2025[,] PPL shut off CDChoices' access to PPL@Home and transferred CDChoices' consumers

---

[7] The Court sees no distinction between a consumer's ability to "view" CDChoices as a Facilitator option as opposed to "select" or "choose" it.

to other Facilitators." ); *id.* ¶ 87 ("As of this Complaint's filing, CDChoices is not able to serve any consumers through PPL's system."). If consumers no longer viewed CDChoices as an option, it was because CDChoices was no longer an option—not because of any allegedly defamatory statements. In this respect, CDChoices' defamation claim is merely an impermissible repackaging of its breach claims.

As for any assertion that the statements otherwise tended to "injure [CDChoices'] trade, business or profession[,]" on "a matter of significance and importance," *see S & P Pharmacy Corp.*, 238 A.D.3d at 1190, related to the proper conduct of the business, CDChoices presents only that the statements implied it "lacked the capabilities" of other Facilitators. The Court sees no merit in this argument.

"Whether . . . allegedly libelous language is capable of the libelous meaning charged by innuendo is a matter of law for the courts to decide." *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 63 (S.D.N.Y. 2021). "[T]he plain and obvious meaning of the challenged language cannot be altered or changed by innuendo." *Idema v. Wager*, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000), *aff'd,* 29 F. App'x 676 (2d Cir. 2002); *id.* (adopting plaintiff police training organization's interpretation of descriptor 'militant' as referring to 'revolutionary Socialism' would not explain any statement in defendants' article, but would add an entirely new and independent thought)

Here, PPL's statements contain no insinuation regarding CDChoices' "capabilities"— certainly not in any pejorative sense. Insomuch as CDChoices intends to assert that PPL's statements implied that CDChoices "lacked the capabilities" of other Facilitators in a literal sense, any such defamation claim would likewise fail.

CDChoices' defamation claim is dismissed.

### ii.        Injurious Falsehood & Tortious Interference

CDChoices also brings tort claims of injurious falsehood and tortious interference with prospective contractual relations.  *See* SAC ¶¶147–152, 160–168.

A claim for injurious falsehood "differs from defamation in that a defamatory statement impugns the basic integrity or creditworthiness of a business while an injurious falsehood is confined to denigrating the quality of the plaintiff's business's goods or service[.]"  *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518 (S.D.N.Y. 2017).

"To state a claim for tortious interference with prospective economic relations, 'a plaintiff in New York must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"[8] *Zaret v. Bonsey*, 2023 WL 6317956, at *5 (S.D.N.Y. Sept. 28, 2023), *reconsideration denied,* 2023 WL 7627806 (S.D.N.Y. Nov. 14, 2023) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182 (2004)); *see also Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994) (internal citations omitted); Pl.'s Resp. to Def.'s Mot. to Dismiss, Dkt. No. 56 at 30 (citing *Purgess*, 33 F.3d at 141).

---

[8] "Various terms are used for this cause of action, such as tortious interference with prospective economic advantage, tortious interference with business relations, and tortious interference with prospective contractual relations." *Zaret v. Bonsey*, 2023 WL 6317956, at *5 n.8 (S.D.N.Y. Sept. 28, 2023), *reconsideration denied,* 2023 WL 7627806 (S.D.N.Y. Nov. 14, 2023).  "Courts use these terms interchangeably to describe the same tort (with the same elements)." *Id.*  Critically, this tort—presented by CDChoices as "Tortious Interference with Prospective Contractual Relations")—differs from the tort of tortious interference with contractual relations as the alleged interference does not pertain to any preexisting contractual relationships. *See* SAC, Dkt. No. 61 at 27; *Zaret*, 2023 WL 6317956, at *5 n.8.

CDChoices' claims for injurious falsehood and tortious interference both rely on the same allegations and conduct as the defamation claim. *See, e.g.*, SAC ¶ 138 (Count Six: Defamation—"On or around April 3, 2025, PPL communicated to consumers that CDChoices had been 'terminated' as a Facilitator. This was false."); *id.* ¶ 148. (Count Seven: Injurious Falsehood—"On or around April 3, 2025, PPL intentionally made false statements to third parties regarding CDChoices, including but not limited to statements that CDChoices had been 'terminated' as a Facilitator."); *id.* ¶ 163 (Count Nine: Tortious Interference—"PPL used wrongful means when it interfered with these business relationships by making its defamatory statements that CDChoices had been 'terminated' as a Facilitator for the over 3,500 consumers it had been assisting prior to the transition to the single FI model.").

As such, CDChoices' injurious falsehood claim and tortious interference claim are dismissed as duplicative. *See Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995) ("New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained."); *see also, e.g.*, *Uribe v. Nieves*, 2022 WL 17770288, at *8 (E.D.N.Y. Sept. 13, 2022) (recommending dismissal of tortious interference claim as duplicative of defamation claim); *Sweigert v. Goodman*, 2024 WL 4493768, at *5 (S.D.N.Y. Oct. 11, 2024), *reconsideration denied,* 2024 WL 5047302 (S.D.N.Y. Dec. 9, 2024) ("As for trade libel, the plaintiff's claims rely on the same statements and alleged harm that form the basis for his defamation claims. Therefore, his trade-libel claims must be dismissed as duplicative[.]").

As to the injurious falsehood claim, the complaint fails to allege any statements by PPL relating to the quality of the services CDChoices provides. Even were the claim not duplicative, on this basis alone, CDChoices' injurious falsehood claim warrants dismissal for failing to allege

an essential element. *See, e.g.*, *Hollander v. Pressreader, Inc.*, 2020 WL 2836189, at *6 (S.D.N.Y. May 30, 2020) (dismissing injurious falsehood claim as complaint failed to allege any statements regarding "the quality of the services [plaintiff's] law practice or business consultancy" provided); *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 472–73 (S.D.N.Y. 2006) (accusations impugning plaintiff's integrity and methods, but not quality of plaintiff's goods or services, failed to state essential element of injurious falsehood claim).

### iii.    Deceptive Trade Practices

New York General Business Law § 349 "prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Shakespeare v. Compu-Link Corp.*, 848 F. App'x 474, 476 (2d Cir. 2021) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). To successfully assert a claim under Section 349, a plaintiff "must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 472 (S.D.N.Y. 2022) (quoting *Orlander*, 802 F.3d at 300)).

CDChoices' claim does not meet this pleading standard. CDChoices alleges that PPL's statement(s) to consumers that it had been "terminated" as a Facilitator "constituted a deceptive consumer-oriented act" in violation of Section 349. SAC ¶ 154. It asserts that this statement was false, and therefore, materially misleading. SAC ¶ 156; Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 29 ("PPL's statements that CDChoices had been 'terminated' as a Facilitator were materially misleading because they were false."). Additionally, "PPL's statement misled consumers, thereby harming CDChoices." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 29.

Bare recitation of the elements of a cause of action under Section 349 is insufficient to rise to the level of a plausible claim. *See Wurtzburger v. Kentucky Fried Chicken*, 2017 WL 6416296, at *2 (S.D.N.Y. Dec. 13, 2017) (citing *Roth v. CitiMortgage Inc.*, 2013 WL 5205775, at *12 (E.D.N.Y. Sept. 11, 2013), *aff'd,* 756 F.3d 178 (2d Cir. 2014)).

Momentarily putting aside whether PPL's statements were materially misleading, it is not enough for CDChoices to declare that an act occurred, that the act misled, and that CDChoices was injured. CDChoices' injury must allege facts tending to show that the injury resulted from the allegedly deceptive act. Yet CDChoices seems averse to drawing such a connection. *See, e.g.*, Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 30 ("PPL's false statement that CDChoices was terminated as a Facilitator harmed thousands of consumers and was materially misleading, thus warranting relief under N.Y Gen. Bus. Law § 349.").

When CDChoices attempts to make a connection, it becomes evident the claim lacks merit: "As a result of PPL's statement, consumers lost the opportunity to receive assistance from CDChoices, and CDChoices suffered damages from not having the opportunity to serve these consumers." Pl.'s Resp. to Mot. to Dismiss, Dkt. No. 56 at 29–30. This assertion exemplifies CDChoices' efforts to emphasize causality where none exists, while skirting the requirement where necessary.

Put simply, the flaws fatal to CDChoices' defamation claim are the same fatal to its Section 349 claim. CDChoices tries to pin an injury caused by one act—PPL's reassignment of consumers—on another act—PPL's allegedly false (and, thereby, "deceptive") statements that CDChoices was terminated as a Facilitator. Thus, the Section 349 claim is "nothing more than an attempt to dress up yet another claim for breach-of-contract in a tort's clothing." *Mayweather*

*Promotions, LLC v. PAC Ent. Worldwide LLC*, 2022 WL 3997014, at *8 (S.D.N.Y. Sept. 1, 2022).

Accordingly, CDChoices' Section 349 claim is dismissed.

### E.    Declaratory Judgment

CDChoices also seeks a declaratory judgment that PPL "must abide by the Agreement" and, specifically, "restore CDChoices' access to PPL@Home, recommend CDChoices to consumers, assist CDChoices in reaching its desired capacity, and compensate CDChoices per the Agreement."  SAC ¶ 172.

PPL argues that CDChoices' claim for declaratory judgment should be dismissed because declaratory judgment "is a procedural mechanism to afford relief, not an independent cause of action."  Def.'s Reply to Mot. to Dismiss, Dkt. No. 58 at 13.  The Court agrees.

A declaratory judgment is a remedy, not a cause of action.  *Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 210–11 (S.D.N.Y. 2024) (listing cases); *Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 474–75 (S.D.N.Y. 2021) ("A request for relief in the form of a declaratory judgment does not constitute an independent cause of action.") (citing *In re Joint Eastern & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993)).

Accordingly, CDChoices' stand-alone declaratory judgment claim is dismissed. This ruling, however, should not be construed as a holding that CDChoices is prohibited from seeking a declaratory judgment as a remedy for its surviving claims.  *See, e.g.*, *Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55, 72 (S.D.N.Y. 2022) ("[T]here is no independent cause of action for a declaratory judgment, but plaintiff may nevertheless pursue declaratory relief to the extent [its] substantive claims survive.").

III.    MOTION FOR PRELIMINARY INJUNCTION

Having resolved PPL's motion to dismiss (Dkt. No. 48), the Court now turns to CDChoices' motion for preliminary injunction (Dkt. No. 15).

A.    Standard of Review

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (internal citations omitted). "To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

i.    Irreparable Harm

"'The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction' and 'must therefore be satisfied before the other requirements for an injunction can be considered.'" *St. Joseph's Hosp. Health Ctr.* at 106 (quoting *State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 80).

CDChoices claims that its "loss of staff, loss of contact with customers, and ultimately *potential* loss of relationships" constitutes irreparable harm: "Relationships with thousands of consumers have been tarnished[;] CDChoices will have to terminate employees [and] reduce salaries[;] CDChoices has already reduced its workforce by 15 percent and terminated all subcontracted temporary employees[;] It is in the process of separating additional employees . . .

[and] will have to separate many more if PPL terminates the Agreement." Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 21–22 (emphasis added).

In support of this argument, CDChoices cites several supposed exemplars. For instance, CDChoices points to *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.* for the proposition that, "[c]ritically, the 'Second Circuit . . . recognizes that the loss of potential business opportunities, such as relationships with customers and business partners, may constitute irreparable harm.'" Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 21 (quoting *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 261 (N.D.N.Y. 2015) (Hurd, J.)). Yet, as with each of the other snippets CDChoices provides in support of its irreparable harm argument, this excerpt is stripped of context.

In *Main Street Baseball*, the plaintiffs were co-owners of several minor league baseball teams, including the Wilmington Blue Rocks, a Single-A team. *Main St. Baseball, LLC*, 103 F. Supp. 3d at 251. They sought to upgrade the team to Double-A status by purchasing a Double-A team and relocating it to Wilmington, in the process selling the Blue Rocks to another buyer who would relocate that team. *Id.*

The plaintiffs entered negotiations with the Binghamton Mets Baseball Club, owners of the Binghamton Mets, who were the Double-A affiliate of the New York Mets. *Id.* Having reached an agreement in principle, and as was customary in the industry, the parties drafted a Letter of Intent ("LOI") to memorialize the terms of the deal. *Id.* Then, after months of continued discussions, the defendants claimed that the LOI was not binding, ceased negotiations with the plaintiffs, and proceeded to sign a new LOI with another potential buyer. *Id.* at 252. Less than three weeks later, plaintiffs sought a preliminary injunction to prevent the defendants

from engaging in discussions with any other parties about the sale of the team for six months. *Id.* at 252–53.

The district court, in entering an injunction, cited the plaintiffs' representations about the uniqueness of the team in finding the plaintiffs had satisfied the irreparable harm element. *See id.* at 261–62; *id.* at 261 ("The opportunity to own the BMets is unique and irreplaceable because it meets all of plaintiffs' requirements for a team to purchase: it is the only Double–A team that is for sale, that is portable, that is affiliated with a New York or Philadelphia Major League Baseball franchise, that is affordable to plaintiffs, and whose relocation would be likely approved by various baseball authorities.").

Sure, CDChoices accurately quotes the opinion. *See* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 21. The opinion does state that the Second Circuit "also recognizes that the loss of potential business opportunities, such as relationships with customers and business partners, may constitute irreparable harm." *Main Street Baseball, LLC*, 103 F. Supp. 3d at 261 (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). But the quote is divorced from context.

There, the court, correctly or otherwise, considered the "time-sensitive nature" of the dispute and LOIs. *See Main Street Baseball, LLC*, 103 F. Supp. 3d at 262 ("The time-sensitive nature of this action is recognized, given that the 2015 Minor League Baseball season is already underway and the goal was to execute the [agreement] by [a month prior to the suit's filing], with a closing date no later than [six months' time]. Further, this action is time-sensitive as defendants are in the process of negotiations to sell the BMets to another buyer, and have already signed a LOI with that buyer. Although not of relevance to the instant transaction, plaintiffs are

also in the process of negotiating, or have already completed negotiations to sell the Wilmington Blue Rocks to the Texas Rangers.").

"These facts," the court concluded, "coupled with plaintiffs' assertions about uniqueness of the team, and [a] finding that money damages would not be an adequate remedy" satisfied the irreparable harm requirement. *Id.* at 262.

The Court sees little comparison between *Main St. Baseball* and the present case, nor does it find support therein for the global principle CDChoices asserts. CDChoices fails to provide a consistent theory of who—whether that be managed care organizations, consumers, personal assistants, PPL, the state of New York, or others—it believes to be sufficiently analogous to the customer- or business partner-relationships warranting injunctive protection. It provides no indication of any uniqueness meriting consideration in this case and no time sensitivity that isn't artificially manufactured or, at most, tertiary to the matter at hand.

In sum, CDChoices offers no plausible explanation of any sorts connecting *Main St. Baseball* and this dispute—it merely quotes the case and moves on with no further consideration. *See* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 21.

If references to nebulous "potential business opportunities" are insufficient, CDChoices' next gambit is to note that preliminary injunctive relief has been granted where "among other harms," plaintiffs have "assert[ed] their inability to continue paying the salaries of [] permanent office staff, [and] the loss of contact with customers and temporary employees." *Id.* at 22.

For this notion, CDChoices cites *Gambar Enters., Inc. v. Kelly Servs., Inc*. 69 A.D.2d 297 (4th Dept. 1979); *see* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 22.

Unlike the present case, *Gambar* did not involve a typical corporate entity. It was about two plaintiffs: one individual and the corporation he solely owned, suing his former employer.

39

*Gambar Enterprises, Inc.*, 69 A.D.2d at 301.  What CDChoices labels "other harms" is, in the Court's reading, the crux of the *Gambar* decision: without injunctive relief, the parties' contract would bar the individual plaintiff—and, by necessary extension, the corporate plaintiff—from competing with the defendant for six months within 50 miles of any of the defendant's branch offices in 300-plus cities throughout the United States.  *Gambar Enterprises, Inc.*, 69 A.D.2d at 307 n.2.[9]  It was not simply the prospect of a business having to lay off some employees or lose some customers—unwelcome as both may be—that the court deemed merited injunctive relief. It was what would have been, in effect, the total cessation of business, the loss of all staff and customers, and the ability of the plaintiff to earn a livelihood anywhere in the country in the industry he had worked in for nearly a decade.

CDChoices represents that if it is not able to be a part of CDPAP, "ultimately[,]" it too will have to shutter its doors.  *See, e.g.*, Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 9.  But, as the Court discusses in greater depth below, the immediacy of such a fate is murky.  Moreover, termination of the Agreement does not preclude CDChoices from working in the health services industry, facilitating similar services and programs in other states, or even facilitating other New York state-run programs.  *See, e.g.*, Pl.'s Reply to Mot. for Prelim. Inj., Ex. A, Decl. of C. Graber, Dkt. No. 40-1 ¶ 17 ("CDChoices receives reimbursement from other state-run programs [such as] the Expanded In-Home Services for Elderly Program ('EISEP') and the Respite Care Program.").

---

[9] Furthermore, the Fourth Department's analysis was brief, entailing only whether the Special Term abused its discretion in granting the preliminary injunction.  *See Gambar Enters., Inc. v. Kelly Servs., Inc.*, 69 A.D.2d 297, 306 (4th Dept. 1979) ("[O]n an appeal from the granting of a preliminary injunction, we should not interfere with the exercise of discretion by Special Term and will review only to determine whether that discretion has been abused.") (internal citations omitted).

Even so, CDChoices invokes a hodgepodge of cases in New York and the Second Circuit to support its notion that courts have enjoined the termination of agreements in purportedly "similar situations." *See* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 22–23. Yet, again, each cited case is distinguishable.

For example, CDChoices offers *Wasilkowski v. Amsterdam Memorial Hospital* to illustrate that New York state courts have affirmed injunctions "reinstating the parties' contract and enjoining its termination." Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 22 (citing *Wasilkowski v. Amsterdam Mem'l Hosp.*, 461 N.Y.S.2d 451, 452 (3d Dept. 1983)).

But *Wasilkowski* is more nuanced. There, plaintiffs—like those in *Gambar*, an individual and his wholly owned corporation—appealed the trial court's denial[10] of a preliminary injunction. *Wasilkowski v. Amsterdam Mem'l Hosp.*, 92 A.D.2d 1016, 461 N.Y.S.2d 451 (3d Dept. 1983).

In a narrow 3-2 decision, the state mid-level appellate court ordered the defendant hospital to reinstate the plaintiff, a radiologist, and his corporate entity to their former contractual position as providers of radiological services. *Wasilkowski*, 92 A.D.2d at 1018.

The majority took note that the hospital had claimed it terminated the radiologist's contract "to reduce the operating expenses of the radiology department which operated at a loss for 1981[.]" *Id.* at 1017. Yet the record indisputably showed otherwise: Financial documents revealed the department had run at a substantial profit the prior year, and the hospital offered "no

_____

[10] CDChoices states the mid-level appellate court "upheld the trial court's granting of the injunction," Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 22, which appears to be an incorrect assessment of the lower court's holding. *See Wasilkowski*, 92 A.D.2d at 1016 ("Appeal from an order of the Supreme Court at Special Term, entered June 29, 1982 in Montgomery County, which denied plaintiffs' motion for a preliminary injunction."); *id.* at 1017 ("Special Term orally, without a written decision, denied the motion for the preliminary injunction and an order was duly entered to that effect.").

refutation of the facts set forth by plaintiff[s]" demonstrating that patient load, expenses, and patient charges between 1980 and 1981 were essentially the same.  *Id.*

Beyond co-opting a few choice lines from the majority, CDChoices provides no explanation how this case resembles *Wasilkowski*.  *See* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 22 ("The court upheld the trial court's granting of the injunction because: 'Disruption of plaintiffs' practice during the pendency of this action would undoubtedly result in the loss of good will and the loss of patient referrals which were acquired and maintained by him through contacts and personal service.  The value of such loss is difficult, if not impossible, to fully ascertain and therefore must be viewed as irreparable.'") (quoting *Wasilkowski*, 92 A.D.2d at 1017).

In truth, the outcome in *Wasilkowski* stands as an exception.  *See Wasilkowski*, 92 A.D.2d at 1017–18 ("In addition, Dr. Wasilkowski stated in his affidavit that the only other hospital in Amsterdam is St. Mary's Hospital which is fully staffed and that he would be left with no alternative position in the Amsterdam area.").As the *Wasilkowski* dissent observed: "An injunction restoring the corporate plaintiff to its former position should not issue because irremediable injury has not been demonstrated."  *Id.* at 1018 (Yesawich, J., dissenting).  "It is a principle of long standing of this court that loss of employment, although most likely to cause severe hardship, does not constitute irreparable damage."  *Id.* (internal citations omitted).  "There is nothing sufficiently uncommon about this case to require a departure from this prudent and serviceable rule."  *Id.*

The federal cases from this circuit that CDChoices directs the Court's attention to are no more availing.  For example, CDChoices references *Eastman Kodak Co. v. Collins Ink Corp.* Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 23; 821 F. Supp. 2d 582 (W.D.N.Y. 2011).  But, once

more, in its discussion of *Eastman Kodak Co.*, CDChoices overlooks key differences.  There, the parties—a manufacturer of commercial inkjet printers and its ink supplier—had been in a decade-long contractual relationship.  *Eastman Kodak Co.*, 821 F. Supp. 2d at 583.  Kodak, the plaintiff-manufacturer, filed suit and moved for a preliminary injunction just a week after receiving notice that Collins, its ink supplier, was terminating their agreement effective immediately.[11]

In its decision, the federal district court highlighted the plaintiff's dependence on the defendant for a product that was "not easily replaceable[.]"  *Id.* at 588; *see also id.* at 587 ("Kodak is threatened with the termination of a product that, if not literally unique, cannot easily or quickly be replaced[.]").  The plaintiff kept "no appreciable inventory" and the defendant "had the right to produce 88% of Kodak's ink supply[.]"  *Id.* at 583–585.  Accordingly, the court found that the contract's termination would cause irreparable harm, citing Second Circuit precedent that "irreparable harm . . . has [been] found . . . where one party is 'terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product,' since the termination of such a product 'almost inevitably creates irreparable damage to the good will of the distributor.'"  *Id.* at 586 (collecting cases).

The present case is readily distinguishable.  In *Eastman Kodak Co.*, the plaintiff relied entirely on the defendant to supply a unique product, one that was essential for very specific purposes, like printing lottery tickets.  *Id.* at 588–89.  An inability to provide such ink threatened

---

[11] Comparatively, CDChoices filed its complaint nearly three months after PPL shut off CDChoices' access to PPL@Home.  *See* Complaint, Dkt. No. 1; SAC ¶ 14.  It took CDChoices another two weeks after filing this suit for it to motion for emergency injunctive relief.  *See* Mot. for Prelim. Inj., Dkt. No. 15.

plaintiff's "customer goodwill," the loss of which, the court noted, could not easily be quantified. *Id.*

Here, however, the situation is reversed: a service provider seeks to stop a company from obtaining comparable services elsewhere. SAC ¶ 12 ("CDChoices was selected by PPL as one of . . . more than 30 other subcontracted partners."); *see also id.* ("CDChoices agreed to provide the various services to consumers[.]").

The remaining cases CDChoices cites, and the propositions it cites them for, are likewise distinguishable in critical ways. *See, e.g.*, Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 23 ("Other courts in the Second Circuit have similarly enjoined unilateral attempts to terminate an agreement.") (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)); Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 24 ("New York courts have observed . . . irreparable harm [where] . . . the viability of a company is threatened.") (citing *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023)); *but see JTH Tax, LLC*, 62 F.4th at 667–68 ("In *Semmes Motors, Inc.*[,] for example, we held that a family-owned car dealership would be irreparably injured by wrongful termination of its franchise agreement[.] Termination would 'obliterate' the business and, we emphasized, 'the right to continue a business . . . is not measurable entirely in monetary terms,' especially when that business is essential to the defendant's manner of living[.] 'A 'judgment for damages acquired years after his franchise has been taken away and his business obliterated is [a] small consolation to one who, as here, has had a Ford franchise' for many years.") (cleaned up); *see also JTH Tax, LLC*, 62 F.4th at 668 ("Like the family-owned businesses in those cases, Agnant would suffer irreparable harm if she were wrongfully put out of business. At the hearing, Agnant testified that she used her home as collateral for a loan to open her business and that, if her business were closed, she would be unable to provide for her family. Her counsel

explained, too, that she needed to continue operating her business in order to have the funds necessary to defend herself against [appellee].").

Consequently, two patterns emerge from the cases cited by CDChoices: When a business is an extension of an individual plaintiff, courts are more inclined to find irreparable harm when the individual's livelihood—not just their employment—is at significant risk. Yet, for a business that is not a stand-in for the individual plaintiff, such a finding is typically reserved for rare cases where denial of injunctive relief would result in immediate catastrophic harm to the business, or undermine a central purpose of the business to the point of defeating its very existence.

Nothing in the record suggests the former is applicable here. Therefore, CDChoices' strongest argument for irreparability of harm stems from the latter: "CDChoices derives 99% percent of its income from the services it provides to CDPAP participants" and "[t]he loss of revenue from this program threatens the existence of CDChoices." Pl.'s Mot. for Prelim. Inj., Dkt. No. 15-7 at 21–22. Thus, the immediacy and magnitude of loss is paramount here.

CDChoices appears aware as much, playing up the potentially ruinous fate that may await without injunctive relief. For instance, one of its foremost arguments is: "Without an Injunction, CDChoices May Not Exist at the End of Litigation." Pl.'s Reply to Mot. for Prelim. Inj., Dkt. No. 40-5 at 5; *see also* Pl.'s Reply to Mot. for Prelim. Inj., Ex. A, Suppl. Decl. of C. Graber, Dkt. No. 40-1 ¶ 19 ("Internal projections show a dire fiscal outcome for CDChoices."); Pl.'s Reply to Mot. for Prelim. Inj., Dkt. No. 40-5 at 5 ("Moreover, when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted[.]").

But CDChoices' assertions of calamity tend to lack indication of when—or, sometimes, even whether—such an occasion will come to pass. *See, e.g.*, Pl.'s Mot. for Prelim. Inj., Dkt.

No. 15-7 at 22 ("CDChoices will have to . . . *shrink* if it cannot participate in CDPAP.")

(emphasis added); Pl.'s Mot. for Prelim. Inj., Ex. 2, Decl. of C. Graber, Dkt. No. 15-3 ¶ 49

("*Ultimately*, if PPL's actions are not addressed and rectified, CDChoices will cease to exist.")

(emphasis added); Pl.'s Reply to Mot. for Prelim. Inj., Ex. A, Suppl. Decl. of C. Graber, Dkt. No.

40-1 ¶ 17 ("CDPAP comprises *up to* 99 percent of CDChoices annual revenue.") (emphasis

added); Pl.'s Reply to Mot. for Prelim. Inj., Dkt. No. 40-5 at 5 ("Here, if not reinstated,

CDChoices will lose up to 99% of its annual revenues and its ability to attract new consumers.").

CDChoices states that, "[w]ithout CDPAP reimbursements, CDChoices will operate at a

deficit of over $8.2 million this year." Pl.'s Reply to Mot. for Prelim. Inj., Ex. A, Suppl. Decl. of

C. Graber, Dkt. No. 40-1 ¶ 19. "That deficit will increase to $13.8 million in 2026." *Id.*

"CDChoices cannot sustain these losses and will have to shut down." *Id.* That CDChoices will

operate at a deficit over the course of this year and the next is not a sufficiently immediate and

irreparable harm to warrant injunctive relief. From CDChoices' telling, it would appear only

"*then* [will it] lose its staff, consumer relationships, and goodwill with managed care plans and

state agencies." *Id.* (emphasis added). Regardless, considered in their totality, CDChoices'

representations to the Court do not demonstrate such immediate, irreparable harm as to warrant a

preliminary injunction.

Because the Court finds that CDChoices has failed to adequately establish the existence

of irreparable harm, the Court does not address the other factors. *See, e.g.*, *Spring Hill Cap.*

*Partners, LLC v. Sec. & Exch. Comm'n*, 2015 WL 10714010, at *7 (S.D.N.Y. June 29, 2015).

## IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED IN PART** and **DENIED**

**IN PART** and the motion for a preliminary injunction is **DENIED**.

Count IV and Counts VI through X are dismissed.

Counts I, II, III, and V may proceed.

**SO ORDERED.**

Dated: December 4, 2025

       Utica, New York

                                      Anthony J. Brindisi
                                      U.S. District Judge