**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CONSUMER DIRECTED CHOICES, INC.,

*Plaintiff*,

vs.

PUBLIC PARTNERSHIPS, LLC,

*Defendant*.

Case No. 1:25-cv-0868-AJB/DJS

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

I.      CDChoices Serves as a Fiscal Intermediary in the CDPAP Program Until the
        Transition. ................................................................................................... 3

II.     The Parties Enter into a Subcontractor Agreement ..................................... 4

III.    Transition Problems Prompt a Temporary Restraining Order. ...................... 5

IV.     CDChoices Responds to the TRO in Order to Support Consumers and PAs. ........... 7

V.      PPL's Response. .......................................................................................... 9

PROCEDURAL HISTORY .................................................................................. 11

LEGAL STANDARD ........................................................................................... 11

ARGUMENT ........................................................................................................ 12

I.      PPL Fails to State a Claim for Breach of Contract. .................................... 12

        A.      PPL Fails to Allege that Any Duty of Loyalty Applies to or Restricts
                CDChoices' Communications with Consumers and PAs. .................... 13

                1.      In Any Event, CDChoices' Statements Were Not Misleading. .............. 16

        B.      PPL Fails to Adequately Allege that CDChoices Breached any Contractual
                Obligation to Facilitate the Transition in Any Way ............................... 19

II.     PPL Fails to State a Claim for Breach of the Implied Covenant of Good Faith and
        Fair Dealing. .............................................................................................. 21

III.    PPL Fails to State a Claim for Tortious Interference with Prospective Economic
        Relations. ................................................................................................... 23

CONCLUSION .................................................................................................... 25

## TABLE OF AUTHORITIES

Page

CASES

*Abramo v. HealthNow New York, Inc.*,
  23 A.D.3d 986 (N.Y. App. Div. 2005) ....................................................................14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................11

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004).....................................................................................2

*Cordero v. Transamerica Annuity Serv. Corp.*,
  211 N.E.3d 663 (N.Y. 2023).........................................................................21, 22, 23

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).......................................................................................8

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) .........................................................................................2

*Cronas v. Willis Grp. Holds. Ltd.*,
  2007 WL 2739769 (S.D.N.Y. Sept. 17, 2007).........................................................14

*Dalton v. Educ. Testing Serv.*,
  663 N.E. 2d 289 (N.Y. 1995)...................................................................................21

*Engesser v. McDonald*,
  No. 25-cv-1689 (E.D.N.Y.) ..................................................................................1, 2

*Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*,
  2008 WL 2754069 (S.D.N.Y. June 30, 2008) .........................................................12

*Friedman v. Coldwater Creek, Inc.*,
  321 F. App'x 58 (2d Cir. 2009) ...............................................................................25

*Gally v. Columbia Univ.*,
  22 F. Supp. 2d 199 (S.D.N.Y. 1998).......................................................................20

*Geler v. Nat'l Westminster Bank USA*,
    770 F. Supp. 210 (S.D.N.Y. 1991)......................................................................22

*Harris v. Provident Life & Acc. Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)................................................................................22

*Huen N.Y., Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*,
    67 A.D.3d 1337 (N.Y. App. Div. 2009) ............................................................15

*ICD Holdings S.A. v. Frankel*,
    976 F. Supp. 234 (S.D.N.Y. 1997)....................................................................22

*In re Allergan PLC Sec. Litig.*,
    2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) ................................................19

*Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*,
    810 F. Supp. 501 (S.D.N.Y. 1992)....................................................................25

*JTRE Manhattan Ave. LLC v. Cap. One, N.A.*,
    585 F. Supp. 3d 474 (S.D.N.Y. 2022)...............................................................12

*Keene Corp. v. Bogan*,
    1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) ....................................................14, 16

*Korn v. Fed. Ins. Co.*,
    2019 WL 4277187 (W.D.N.Y. Sept. 10, 2019) .................................................21

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)............................................................................2, 9

*Madej v. Yale Univ.*,
    2022 WL 710905 (2d Cir. Mar. 10, 2022) ........................................................15

*Masefield AG v. Colonial Oil Indus.*,
    2006 WL 346178 (S.D.N.Y. Feb. 15, 2006)......................................................25

*Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical*, *Inc.*,
    659 F. Supp. 2d 332 (N.D.N.Y. 2009) ................................................................9

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*,
    87 N.Y.2d 614 (N.Y. 1996) ..............................................................................25

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013)..............................................................................24

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998)........................................................................................2

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)....................................................................................16

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
    704 F. Supp. 3d 473 (S.D.N.Y. 2023).....................................................................21

*Zaret v. Bonsey*,
    2023 WL 6317956 (S.D.N.Y. Sept. 28, 2023).........................................................24

## STATUTES

N.Y. Soc. Servs. Law
    § 365-f (2024) .....................................................................................................3, 18
    § 365-f (4-a)(ii-b).......................................................................................................4

## OTHER AUTHORITIES

Black's Law Dictionary.................................................................................16, 19, 25

Fed. R. Civ. P. 10(c) .........................................................................................................2

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 11

Fed. R. Evid. 201(b).........................................................................................................2

## <u>INTRODUCTION</u>

This is a contract dispute.  Plaintiff Consumer Directed Choices, Inc. ("CDChoices") and Defendant Public Partnerships, LLC ("PPL") signed a Subcontractor Agreement in late 2024 (the "Agreement" or the "Subcontractor Agreement").  Pursuant to that Agreement, CDChoices agreed to provide services to certain Medicaid beneficiaries as part of New York's Consumer Directed Patient Assistance Program ("CDPAP"), and PPL agreed to work in good faith to help CDChoices reach its capacity for beneficiaries and to otherwise pay CDChoices for its efforts.  Instead, PPL chose to shut CDChoices out of PPL's electronic system, to direct beneficiaries to other entities instead of CDChoices, and to refuse payment to CDChoices for the work it had already done.  CDChoices brought this case to force PPL to honor its promises and compensate CDChoices for the damages caused.

PPL now has filed counterclaims that attempt to rewrite the Agreement between the parties, as well as history.  Disappointed with the contract it signed, PPL attempts to invent language not in the Agreement and to bind CDChoices to obligations CDChoices never agreed to.  And PPL attempts to bring tort claims duplicative of its contract claims, even after PPL itself argued, and the Court previously agreed, that duplicative claims fail under New York law.

PPL's counterclaims should be dismissed for several reasons.  First, contrary to PPL's assertion, the parties' Agreement did not prohibit CDChoices from communicating about the Temporary Restraining Order ("TRO") entered by Judge Block in *Engesser v. McDonald*, No. 25-cv-1689 (E.D.N.Y.) (hereinafter "*Engesser*"), which (in Judge Block's words) "paused" the transition of thousands of CDPAP beneficiaries from hundreds of prior Fiscal Intermediaries ("FIs") and to PPL as the single statewide FI.  CDChoices was one of those prior FIs.  Nothing in the Agreement prevented CDChoices from reaching out to affected Consumers, and as explained

1

below, the Agreement expressly contemplated that in certain circumstances, CDChoices would

communicate with Consumers regarding their CDPAP start date and the registration process.

That registration process was the very process that Judge Block's order affected.

      Further, the statements of which PPL complains were accurate and in no way misleading.

For instance, CDChoices' statement that Judge Block entered a "pause" was not misleading as a

matter of law.[1]  On March 31, 2025, during the TRO hearing in *Engesser*, Judge Block explicitly

stated:

> And, so, it seems to me the common sense thing to do is this. I don't think there's
> a horrible harm **if we have a pause for a few days here** and I don't think that
> those people who are registered would have to be adversely affected.

*See* Dkt. No. 56 (CDChoices' Response to PPL's Mot. to Dism. at 36–53; *see also* Tr. Civ.

Cause for Oral Arg. at 13:23–14:1, *Engesser v. McDonald*, No. 25-cv-1689 (E.D.N.Y. Mar. 31,

2025), Dkt. No. 39-1 (emphasis added).[2]

      Later in the proceedings, Judge Block discussed with counsel for the New York State

Department of Health ("NYSDOH") a "brief pause" to the transition.  *Id*. at 16:15–22.  Nothing

in the Agreement before this Court stopped CDChoices from communicating with CDPAP

---

[1] In ruling on a motion to dismiss, a court may consider "documents attached [to the complaint] as exhibits or incorporated by reference."  *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  PPL's Answer and Counterclaims incorporate the Subcontractor Agreement and its Attachments A–D as Exhibit A, Dkt. No. 70-1, along with other relevant documents and communications between the parties.  For ease of reference, and based on the Court's prior Order, CDChoices references pagination provided by CM/ECF, unless otherwise noted. *See* Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 12–13.

[2] CDChoices is mindful of this Court's instruction that the parties should "request[] the Court take judicial notice of materials referenced that were not attached to the pleadings or otherwise integral to the complaint."  Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 12.  Accordingly, CDChoices requests that this Court take judicial notice of the litigation in *Engesser*.  Fed. R. Evid. 201(b) (permitting a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  CDChoices asks that the Court "take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings," rather than their truth.  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (permitting reliance on the existence of other court proceedings).

Consumers and their personal assistants ("PAs"), and its communications with these individuals regarding Judge Block's TRO appropriately mirrored Judge Block's own language. PPL may have been unhappy with Judge Block's order, but that does not mean statements that Judge Block entered a "pause" were false or somehow breached the parties' Agreement. And each of PPL's new-found claims against CDChoices fails on that basis alone.

Nor can PPL conjure up tort claims in this dispute. As the Court made clear in its Order adjudicating PPL's Motion to Dismiss, duplicative tort claims, such as PPL's good faith and fair dealing claim, should not proceed. And PPL cannot clear the high bar for a tortious interference claim. In the end, PPL's counterclaims run afoul of the plain language of the parties' contract and governing New York law. They must be dismissed.

## FACTUAL BACKGROUND

### I.    CDChoices Serves as a Fiscal Intermediary in the CDPAP Program Until the Transition.

CDChoices is a New York not-for-profit corporation that, until recently, provided FI services to participants in New York's Medicaid-funded CDPAP program. Def. PPL's Answer to Pl.'s Second Am. Compl., Dkt. No. 70 at 30, ¶¶ 24–25. CDPAP enables chronically ill and physically disabled individuals to direct their own care by recruiting, hiring, training, scheduling, and supervising their PAs, while working with an FI to handle functions such as wage and benefit processing, tax withholdings, employment records, and compliance standards that support consumer-directed care in the home and community. *Id.* at 30–31, ¶¶ 24–25, 30–35.

In April 2024, New York passed legislation amending the CDPAP framework, reorganizing the program to move from hundreds of FIs to a single statewide FI. N.Y. Soc. Servs. Law § 365-f (2024). That single FI was statutorily required to subcontract with certain

qualifying entities,[3] who were "required to provide any delegated fiscal intermediary services with cultural and linguistic competency specific to the population of consumers and those of the available workforce." *Id.* § 365-f (4-a)(ii-b).  The amendments to the CDPAP framework provided in pertinent part that, "[e]xcept for the statewide fiscal intermediary and its subcontractors, as of April first, two thousand twenty-five, no entity shall provide, directly or through contract, fiscal intermediary services." *Id.* § 365-f (4-a-1)(a).  Under the amended framework, beginning April 1, 2025, CDChoices would be barred from providing FI services absent a subcontract with the statewide FI, but as the amended framework contemplates, CDChoices was permitted to serve CDPAP Consumers as their FI up to April 1, 2025.  *Id.*

The transition and selection process was administered by the NYSDOH, which, on September 27, 2024, chose PPL as the single statewide FI for the CDPAP program.  PPL's Counterclaims, Dkt. No. 70 at 30, ¶¶ 47, 49, 51, 57.  PPL alleges that it executed subcontracts with at least 44 former FIs, including CDChoices, to facilitate CDPAP services in designated regions consistent with the statute's criteria.  *Id.* at 34, ¶ 58.

## II.    The Parties Enter into a Subcontractor Agreement.

As part of the statewide transition, PPL and CDChoices executed a Subcontractor Agreement effective December 30, 2024, under which CDChoices was to provide Consumer-facing services, including services associated with the transition like orientation, onboarding support, electronic visit visitation ("EVV"), compliance support, utilization monitoring, and customer support functions, among others.  PPL's Counterclaims, Dkt. No. 70 at 35, ¶ 63; PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 17–18.  CDChoices also

---

[3] The single statewide FI was also required to subcontract with at least one "service center for independent living".  N.Y. Soc. Servs. Law § 365-f (4-a)(ii-b).

agreed to in certain circumstances (1) "[n]otify[] the Consumer of their CDPAP start date . . .";
and (2) "provide . . . support services to CDPAP consumers . . . and to personal assistant
caregivers," including by "[p]roviding . . . an overview of the Consumer's registration process
including online through the PPL@Home portal."  PPL's Counterclaims, Ex. A (Subcontractor
Agreement), Dkt. No. 70-1 at 17–18.

Section 8(c) of the Subcontractor Agreement incorporates as Attachment C a lengthy
Subcontractor Code of Conduct, *id.* at 6, which in turn provides that, "Subcontractors owe a duty
of loyalty to PPL, and indirectly, to NYSDOH" requiring them to "disclose to PPL the relevant
facts whenever the Subcontractor believes that a conflict, real or apparent, may exist."  *Id.* at 22.

The Code of Conduct also notes that PPL "performs professional services for its clients,
most of which are state and local government agencies, with the highest standards of ethics and
integrity.  PPL expects its Subcontractors to meet the same standards in the performance of
contracted services."  *Id.* at 21.

Compensation schedules incorporated into the Agreement as Attachment B guaranteed
PPL would pay CDChoices for its services.  *Id.* at 19–20.  PPL also agreed to recommend
CDChoices to eligible consumers, including those already served by CDChoices at the
Agreement's effective date, and to "work in good faith to assist SUBCONTRACTOR to reach its
desired capacity[,] [but that] [u]nless SUBCONTRACTOR agrees in writing, PPL w[ould] not
recommend more than 20,000 new consumers per month."  *Id.* at 3.

## III.    Transition Problems Prompt a Temporary Restraining Order.

In the days leading up to and following the transition's April 1, 2025 effective date, there
were widespread operational challenges associated with moving hundreds of thousands of
Consumers and PAs to PPL's systems, which included registration through "PPL@Home" and

completing EVV through PPL's "Time4Care" system.  PPL's Counterclaims, Dkt. No. 70 at 37,
¶¶ 74–78.

On March 26, 2025, a group of CDPAP Consumers filed suit against the Commissioner
of NYSDOH in *Engesser v. McDonald* and, on March 27, moved for a TRO and Preliminary
Injunction ("PI").  *See* PPL's Counterclaims, Dkt. No. 70 at 37, ¶ 77.  In their request for
injunctive relief, the *Engesser* plaintiffs asserted that the botched transition to PPL violated
Consumers' rights under the Medicaid Act and Due Process Clause.  *See* Decl. of R. Martin.  The
plaintiffs also asserted that PPL had "unlawfully failed to adequately and timely notify CDPAP
consumers of this need to enroll [in PPL's system], the consequences for not doing so[, including
lapse in care or payment of wages to their PAs], and their rights to contest any loss of their care if
they do not complete the multi-step enrollment process by March 28[, 2025]."  *Id.*[4]

On March 31, 2025, "for the reasons set forth in Plaintiffs' [Request for a TRO]," Judge
Block issued a TRO in *Engesser*, prohibiting NYSDOH from "disallowing other Fiscal
Intermediaries from servicing those CDPAP participants who have not yet registered with PPL,"
while not "prevent[ing] [PPL] from operating, processing applications, servicing and paying
CDPAP participants who have already registered with PPL."  PPL's Counterclaims, Ex. B
(*Engesser* TRO), Dkt. No. 70-2 at 3.

During the hearing on the plaintiffs' TRO request, Judge Block noted that he did not think
there would be significant adverse consequences "if we have a **pause** for a few days here."  Tr. at

---

[4] The U.S. Department of Justice filed a Statement of Interest in *Engesser*, asserting that the United States
was concerned with, among other things, "the veracity of representations and assurances made by key drivers of the
transition in communications to CDPAP patients, their PAs, and the public," "[a]t least some of [which] appear[ed]
to be in tension with the on-the-ground reality," which was relevant to federal law "proscrib[ing] any materially
false or misleading statements involving federal health care benefit programs like Medicaid."  DOJ Statement of
Interest at 3–4, Decl. of R. Martin (No. 25-cv-1689).  The United States also was concerned about "the handling of
CDPAP patients' HIPAA-protected personal and sensitive health data," noting that it was "unclear" whether the
transition "complie[d]" with federal law's "strict requirements regarding the lawful disclosure of protected health
information."  *Id.* at 5–6.

13:23–14:1, *Engesser*, Dkt. No. 39-1 (No. 25-cv-1689) (Mar. 31, 2025) (emphasis added).  Judge

Block also discussed with NYSDOH's counsel a "brief pause," as NYSDOH advocated against

any "pause" whatsoever.  *Id.* at 16:15–22.  Nevertheless, NYSDOH itself described the TRO as

"*pausing* certain elements of New York State's transition to PPL as the single statewide fiscal

intermediary."  *See* Statewide Fiscal Intermediary Transition MCO Meeting Presentation at 4,

Dkt. No. 56 (Ex. 2 to CDChoices' Response to PPL's Mot. to Dism.) (emphasis added).

## IV.    CDChoices Responds to the TRO in Order to Support Consumers and PAs.

The TRO issued the evening of March 31 – mere hours before the April 1, 2025 transition

deadline was set to take effect.  *See* PPL's Counterclaims, Ex. B (*Engesser* TRO), Dkt. No. 70-2.

CDChoices was serving Consumers as their FI until that transition and had been assisting them

in their registration with PPL. PPL's Counterclaims, Dkt. No. 70 at 34–35, ¶¶ 60–63.  At 6:07

p.m. that evening, CDChoices' Transitional Services Project Lead, Jocelyn Arndt, emailed PPL

asking for guidance on PPL's plans and the implications for Consumers and PAs in various

stages of transition, including which groups would remain with their current FIs and which

would move to PPL during the TRO's pendency.  PPL's Counterclaims, Ex. H (Mar. 31 Arndt

Email), Dkt. No. 70-8 at 6–7.

CDChoices issued communications to Consumers and PAs of the TRO and its

implications.  PPL's Counterclaims, Ex. C (CDChoices Mar. 31 Comms.), Dkt. No. 70-3 at 4.

CDChoices' communications to PAs and Consumers tracked the TRO's distinction between

"CDPAP participants who have already registered with PPL" on the one hand and "CDPAP

participants who have not yet registered with PPL" on the other.[5]  CDChoices stated the

following:

---

[5] When the *Engesser* court entered a preliminary injunction requiring NYSDOH to ensure timely payment
and provision of statutory benefits to PAs throughout the transition, the court similarly divided the Consumers and

- To Consumers already registered with PPL: "Earlier today, a federal judge issued a Temporary Restraining Order that pauses the transition to PPL for a limited group of consumers.  However, **your transition will go ahead** as scheduled because you have already completed your registration with PPL." *Id.* at 2 (emphasis in original).

- To PAs already registered with PPL: the TRO "delays the State's transition to PPL for a specific group of consumers.  However, since your **consumer/employer has completed their registration with PPL**, your transition to PPL will continue as scheduled." *Id.* at 3 (emphasis in original).

- To Consumers not yet registered with PPL: "A federal judge issued a **Temporary Restraining Order** that halts the State's transition to PPL.  As a result your transition has been **<u>paused</u>**, and **no changes will be made to your current services.**" *Id.* (emphasis in original).

- To PAs not yet registered with PPL: as a result of the TRO, "**your transition to PPL has been paused** …Please continue to use the **<u>Caretime</u>** system for Electronic Visit Verification (EVV), and **do not begin using PPL's Time4Care system** until further notice." *Id.* at 3–4 (emphasis in original).

  To keep stakeholders apprised, CDChoices contemporaneously posted information on its

website on March 31, 2025:

- "[The TRO] prevents [NYSDOH] from enforcing the CDPA program's single Statewide Fiscal Intermediary (SFI) transition to [PPL] for consumers who have not yet registered with PPL.  This means other Fiscal Intermediaries can still operate and provide services to their existing consumers who have not completed their registration with PPL during this temporary period.  However, the order does not shut down PPL or stop it from processing applications or servicing and paying personal assistants who have already registered with PPL.  **The TRO does not stop the switch to PPL as the single SFI**." PPL's Counterclaims, Ex. H (Mar. 31 Website Post), Dkt. No. 70-8 at 20.[6]

---

PAs into categories based on their registration status with PPL.  *See* Dkt. No. 61-2 (Ex. B, CDChoices' Second Am. Compl.).

     [6] PPL incorporates as Exhibit H to its Answer and Counterclaims an April 11 email from CDChoices' CEO to PPL's General Counsel, along with the attachments to that email.  *See* PPL's Counterclaims, Dkt. No. 70 at 49, ¶ 136; Ex. H, Dkt. No. 70-8 at 2–26.  Among those attachments are CDChoices' March 31 website post and other statements by CDChoices.  Given that PPL's counterclaims hinge on the accuracy of CDChoices' statements, the Court would be entitled to consider such statements as "integral" to PPL's counterclaims, even if PPL had not incorporated those statements by attaching them to its counterclaims (which it has).  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts may consider "the very documents that are alleged to contain the various misrepresentations or omissions" given that they "are relevant not to prove the truth of their contents but only to determine what the documents stated"); *see also* Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 12 (advising parties to request the Court take judicial notice of materials "that were not attached to the pleadings *or otherwise integral to the complaint*" (emphasis added)).  PPL does not dispute whether CDChoices in fact made these statements or took the actions referenced in the attachments

- **"While the TRO is in place until at least Friday, it is important that consumers and personal assistants make every effort to complete their registration(s)."** *Id.*

## V.    PPL's Response.

On April 1, 2025, CDChoices received multiple communications from PPL. The first was directed "to all PPL's subcontractors, including CDChoices." PPL's Counterclaims, Dkt. No. 70 at 44, ¶¶ 109–110. In that letter, PPL's leadership expressed its view of the TRO's scope and directed entities to continue registration efforts and to avoid statements that would slow or redirect registration with PPL. *Id.*; Second Am. Compl., Ex. D (Apr. 1 PPL Statement), Dkt. No. 61-4.[7] Second, in a letter to CDChoices from PPL's General Counsel Deborah Drexler, PPL asserted its view that CDChoices' statements to PAs "may be false, coercive or deceptive" and demanded that CDChoices "cease and desist from making any further statements that state or suggest that consumers or PAs should cease or slow their efforts to register with PPL or that PAs should continue to submit time to their current facilitators." PPL's Counterclaims, Ex. D (Apr. 1 Cease and Desist Letter), Dkt. No. 70-4 at 2.

The following day, April 2, PPL sent another letter asserting that CDChoices had breached the Agreement by making statements "that may be false, coercive or deceptive," communicating "directions that are contrary" to the TRO, "posting information on [CDChoices'] website encouraging consumers and their PAs to continue receiving services from" CDChoices, and otherwise "failing to fulfill [CDChoices'] contractual duties . . . to assist consumers and their

---

to the April 11 email, and instead argues that those statements and actions were insufficient to cure CDChoices' alleged breach of the Agreement. PPL's Counterclaims, Dkt. No. 70 at 49, ¶¶ 138–39.

[7] PPL's "reli[ance]on and/or reference" to this statement permits the Court to consider it, "even if th[e] document[] [is] not attached to the [counterclaims]." *See Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.*, 659 F. Supp. 2d 332, 338 (N.D.N.Y. 2009) (citation omitted). Indeed, PPL's counterclaims quote at length from this April 1 statement to all "subcontractors." PPL's Counterclaims, Dkt. No. 70 at 44, ¶¶ 109–110; *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

PAs to register with PPL." PPL's Counterclaims, Ex. E (Apr. 2 Breach Letter), Dkt. No. 70-5 at 1; PPL's Counterclaims, Dkt. No. 70 at 46, ¶ 120. PPL demanded that CDChoices "attempt to cure" its purported breach by "issuing a correction to [CDChoices'] previous statements, making it clear that all consumers and PAs should continue registering with PPL and should submit time on PPL's EVV app as soon as they are able," and "removing all information from [its] website and other public sources that states or implies that consumers and their PAs should not continue the registration process with PPL." PPL's Counterclaims, Ex. E (Apr. 2 Breach Letter), Dkt. No. 70-5 at 2–3; PPL's Counterclaims, Dkt. No. 70 at 46–47, ¶¶ 120–21. PPL demanded that CDChoices "reply within 48 hours with evidence that [it] ha[d] taken these corrective actions." PPL's Counterclaims, Ex. E (Apr. 2 Breach Letter), Dkt. No. 70-5 at 2–3. All this, despite the fact that CDChoices' March 31 website post had explicitly advised that "it is important that consumers and personal assistants make every effort to complete their registration(s)." PPL's Counterclaims, Ex. H (Mar. 31 Website Post), Dkt. No. 70-8 at 20.

CDChoices disputed PPL's characterization of the Subcontractor Agreement and CDChoices' conduct. Nonetheless, between April 3 and 4, CDChoices issued revised statements to Consumers and PAs, which, among other things, "encourage[d] all to proceed with registration or completion of registration" and advised that, "[i]f access to PPL's Time4Care electronic visit verification (EVV) system is unavailable, [PAs and Consumers should] use paper timesheets to document and submit personal assistant worked time for CDPA services rendered." PPL's Counterclaims, Ex. H (CDChoices Apr. 4 Statements), Dkt. No. 70-8 at 9.

On April 3, less than one day after PPL purported to give CDChoices 48 hours to "attempt to cure" its asserted breach, PPL sent another letter to CDChoices, declaring that PPL "can no longer allow you to act as our subcontractor, and [] ha[d] removed all of your access to

PPL@Home."  PPL's Counterclaims, Ex. F (Apr. 3 Notice), Dkt. No. 70-6 at 2; PPL's

Counterclaims, Dkt. No. 70 at 47–48, ¶¶ 126–127.  CDChoices responded by emphasizing its

"Partnership" with PPL and "good faith actions," and the "corrective actions" it had

implemented at PPL's demand.  PPL, however, had terminated CDChoices' access to the

PPL@Home database and refused to reinstate it.  PPL's Counterclaims, Dkt. No. 70 at 42, ¶ 99.

## PROCEDURAL HISTORY

CDChoices initiated this action on July 1, 2025.  CDChoices asserted that PPL breached

the Agreement, among other things, by cutting off system access, failing to recommend

CDChoices to Consumers (including those it had historically served), directing Consumers away

from CDChoices, and making disparaging statements that CDChoices had been "terminated"—

all contrary to the Agreement's recommendation, capacity-support, non-disparagement,

compensation, and termination provisions.  Second Am. Compl., Dkt. No. 61 ¶¶ 75, 86, 106,

109–111, 125–127, 138.  On January 20, 2026, PPL filed an answer and asserted state law

counterclaims for breach of contract, breach of the implied covenant of good faith and fair

dealing, and tortious interference with prospective economic relations.  CDChoices now moves

to dismiss PPL's counterclaims.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to

relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "When

deciding a 12(b)(6) motion to dismiss a counterclaim, the Court must take as true the facts as

alleged in the counterclaim, and may consider documents incorporated in the counterclaim by

reference, matters of which judicial notice may be taken, or documents that the counter-plaintiff

relied on in bringing suit."  *Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan

Chase Bank*, 2008 WL 2754069, at *2 (S.D.N.Y. June 30, 2008).

## **ARGUMENT**

PPL raises four counterclaims: two for breach of contract, one for breach of the implied covenant of good faith and fair dealing, and one for tortious interference with prospective economic relations. The counterclaims all are based on essentially the same alleged conduct and all fail to state a claim on which relief can be granted.

## I.    **PPL Fails to State a Claim for Breach of Contract.**

As the Court explained in its Order denying PPL's motion to dismiss CDChoices' breach of contract claims, "[t]o make out a viable claim for breach of contract a complaint [must] allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 13 (quoting *Dunham v. Sherwin-Williams Co.*, 636 F. Supp. 3d 308, 317 (N.D.N.Y. 2022)). And as the Court recognized in denying PPL's motion to dismiss CDChoices' breach of contract claims, issues of fact are not to be determined at the motion to dismiss stage. However, where a party's breach of contract claim ignores the plain language of the parties' agreement, as PPL's counterclaims do here, courts do not hesitate to dismiss. *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 482 (S.D.N.Y. 2022) ("On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the terms of the contract are unambiguous and the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach." (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–58 (2d Cir. 2016))).

PPL alleges that CDChoices breached the Subcontractor Agreement in two ways. First, PPL alleges that CDChoices' statements regarding the TRO constituted a breach of CDChoices' alleged duty of loyalty under Attachment C to the Subcontractor Agreement, as incorporated by § 8(c) of the Agreement. Second, PPL alleges that CDChoices' statements constituted a breach of

CDChoices' alleged duty to carry out its contractual duties consistent with the "Highest Standards of Ethics and Integrity."  For the reasons that follow, neither set of allegations suffices to state a claim.

### A.     PPL Fails to Allege that Any Duty of Loyalty Applies to or Restricts CDChoices' Communications with Consumers and PAs.

Section 8(c) of the Agreement between the parties specifies that CDChoices "shall comply with the provisions of the Subcontractor Code of Conduct attached as Attachment C." PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 6.  In turn, under the heading "CONFLICTS," the Subcontractor Code of Conduct provides in full:

> In carrying out their contracted work responsibilities, Subcontractors owe a duty of loyalty to PPL, and indirectly, to NYSDOH.  Subcontractors must disclose to PPL the relevant facts whenever the Subcontractor believes that a conflict, real or apparent, may exist.  This includes disclosing whether any Subcontractor employee (or an employee's relative or household member) is employed or contracted by NYSDOH for which the contracted services are being provided. Other examples include where the Subcontractor is approached by NYSDOH to perform work that PPL could perform."

*Id.* at 22.

PPL spins this tailored provision into a free-wheeling obligation to act and speak only in PPL's best interests, alleging that CDChoices breached its contractual "duty of loyalty" to PPL by "sen[ding] deliberately misleading communications to Consumers and PAs regarding the scope and impact of the TRO" in *Engesser*.  PPL's Counterclaims, Dkt. No. 70 at 52–53, ¶ 159. Such allegations fail to support a plausible inference that CDChoices breached any duty to PPL.

Both the language and the context of the provision on which PPL relies make clear that the "duty" at issue is tailored to require disclosure of conflicts relative to NYSDOH and does not encompass communications between CDChoices and Consumers.  As noted above, the provision is situated in the "Conflicts" section of the Code of Conduct and specifies that CDChoices'

extends to the *disclosure* to *PPL* of "relevant facts" regarding conflicts (actual or otherwise) and nothing more.  PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 22.

Further, that provision clarifies that the relevant potential conflicts relate to Subcontractor employees (or related parties) performing or being approached to perform similar work by NYSDOH.  *Id.*  Nothing in the plain language of the provision extends to communications between CDChoices and Consumers regarding any matter.  And as the context of the alleged contractual "duty of loyalty" makes clear, the provision (situated in the "Conflicts" section of the Code of Conduct) contemplates a duty to avoid conflicts of interest in connection with the parties' relationships with NYSDOH.  *See Keene Corp. v. Bogan*, 1990 WL 1864, at *3 (S.D.N.Y. Jan. 11, 1990) ("In order to determine the parties' intent, . . . one should not rip text from context and read a single clause without reference to the agreement—or even the paragraph—as a whole."); *see also Abramo v. HealthNow New York, Inc.*, 23 A.D.3d 986, 987 (N.Y. App. Div. 2005) ("In interpreting [] an agreement, the court must examine the terms of the agreement as a whole in order to determine the intent of the parties.").

Nothing in this provision applies to or restricts CDChoices' communications with Consumers and PAs, and nothing in the "duty of loyalty" referenced in the Code of Conduct imposes any restrictions or constraints on those communications.  "[A] party is only bound to a contract term to which she has actually agreed."  *Cronas v. Willis Grp. Holds. Ltd.*, 2007 WL 2739769, at *10 (S.D.N.Y. Sept. 17, 2007).  CDChoices was free to engage in these communications.

Separately, the Agreement clearly contemplated that CDChoices engage in communications with Consumers and PAs about matters related to the CDPAP program, benefits available and, where CDChoices was engaged in the transition process for certain Consumers,

about matters relating to the registration process.  For instance, the Agreement acknowledged that CDChoices would be conferring with Consumers.  PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 2 ("Whereas, Subcontractor possesses the expertise and skills to assist CDPAP consumers in registering, facilitating, and maintaining their participation in CDPAP"); *see also id.* at 3 § 4(d) ("SUBCONTRACTOR may perform outreach and education activities to inform eligible consumers of its availability to serve as a CDPAP facilitator."); *see also id*. at 17, Attach. A ("Provid[e] Consumers with an orientation to CDPAP, consisting of . . . an overview of the Consumer's registration process.").

In construing contracts, this Court must abide by New York law, which makes clear that "specific provisions concerning an issue are controlling over general provisions."  *Huen N.Y., Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 67 A.D.3d 1337, 1338 (N.Y. App. Div. 2009).  The Agreement's terms demonstrate that the "duty of loyalty" to which CDChoices agreed relates to potential conflicts with NYSDOH and does not include a duty to refrain from speaking to Consumers and PAs about CDPAP registration or accessing their CDPAP benefits, truthfully or otherwise.  As a result, PPL has failed to allege the element of breach.[8]  *See Madej v. Yale Univ.*, 2022 WL 710905, at *2 (2d Cir. Mar. 10, 2022) ("Madej points to no specific contractual promise that Yale allegedly breached, so his breach of contract claim fails.").

Nor does PPL's assertion, that CDChoices' statements "benefitted CDChoices at PPL's expense," PPL's Counterclaims, Dkt. No. 70 at 42, ¶ 96, suffice to state a claim for breach of the alleged contractual duty of loyalty.  The duty of loyalty does not extend to any and all actions that might benefit CDChoices at PPL's expense.  The duty is instead limited only to conflicts of

---

[8] The duty of loyalty expressly included in the Agreement cannot be supplemented or expanded.  The Agreement provides that it "constitutes the entire agreement between the parties with respect to the subject matter of the Subcontracted Services."  PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 13.

interest vis a vis NYSDOH, merely requires disclosure to PPL, and does not purport to restrain or limit CDChoices' communications in any way.  *See Keene Corp.*, 1990 WL 1864, at *3.

### 1.    In Any Event, CDChoices' Statements Were Not Misleading.

Even if the Subcontractor Agreement and its Attachments did constrain CDChoices' ability to communicate with Consumers and PAs (which it does not), PPL's own allegations and documents attached to its Answer and Counterclaims show that CDChoices' communications were not misleading.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 442 n.65 (2d Cir. 2004) (citing *Black's Law Dictionary* (7th ed. 1999), which defines "misleading" as "delusive; calculated to be misunderstood"); *see also Misleading*, *Black's Law Dictionary* (12th ed. 2024).

PPL asserts that CDChoices breached its contractual duty of loyalty by sending "misleading" "communications to Consumers and PAs represent[ing] that the legally-mandated transition away from former FIs (like CDChoices) to the single, statewide FI (PPL) had been 'paused' and instructed Consumers and PAs to continue using CDChoices' electronic systems to administer CDPAP 'until further notice.'"  PPL's Counterclaims, Dkt. No. 70 at 53, ¶ 161; *see also id.* at 42, ¶ 96 ("CDChoices breached Attachment C of the Agreement in sending misleading, inaccurate messages to Consumers and PAs on March 31, 2025 as these messages misled Consumers and PAs and benefited CDChoices at PPL's expense.").  But PPL fails to allege any misleading statements by CDChoices and self-servingly muddies what CDChoices actually said.  PPL relies on statements issued by CDChoices to certain Consumers on March 31 and statements posted on CDChoices' website.  In those statements, CDChoices accurately informed Consumers and PAs who had registered with PPL that their transitions would proceed as scheduled and, also accurately, informed those who had not yet fully registered with PPL that their transitions were "paused" under the TRO and that they should continue to use CDChoices'

systems to obtain services and perform EVV.  PPL's Counterclaims, Ex. C (CDChoices Mar. 31 Comms.), Dkt. No. 70-3 at 2–4.

Further, CDChoices also contemporaneously posted information on its website on March 31, 2025, explaining that the TRO did "not stop the switch to PPL as the single" statewide FI or "shut PPL down or stop it from processing applications or servicing and paying personal assistants who have already registered with PPL."  PPL's Counterclaims, Ex. H (Mar. 31 Website Post), Dkt. No. 70-8 at 20.  And CDChoices correctly stated that, during the "temporary period" the TRO was in effect, FIs other than PPL could continue to "operate and provide services to their existing consumers who have not yet completed their registration with PPL."  *Id.* CDChoices specifically stated that, "[w]hile the TRO is in place until at least Friday, it is important that consumers and personal assistants make every effort to complete their registration(s)."  *Id.*

Every one of these communications accurately tracks the Court's order and statements during the TRO hearing.  For instance, PPL makes much of the use of the word "pause," but that is the very language that Judge Block himself used, describing the relief in *Engesser* as a "pause."  *Compare* PPL's Counterclaims, Ex. C (CDChoices Mar. 31 Comms.), Dkt. No. 70-3, *with* Tr. at 13:23–14:1, *Engesser*, Dkt. No. 39-1 (No. 25-cv-1689) (Mar. 31, 2025).

Further, CDChoices' statements tracked the TRO itself, which distinguished between "CDPAP participants who have already registered with PPL" and "CDPAP participants who have not yet registered with PPL."  *See* PPL's Counterclaims, Ex. B (*Engesser* TRO), Dkt. No. 70-2 at 3.  The TRO prohibited the NYSDOH Commissioner from "disallowing other Fiscal Intermediaries from servicing those CDPAP participants who ha[d] not yet registered with PPL," but did not "prevent [PPL] from operating, processing applications, servicing and paying CDPAP

participants who have already registered with PPL." *Id.* And CDChoices mirrored that distinction, stating that Consumers and PAs who had registered with PPL were told their transition would "go ahead as scheduled," while telling Consumers and PAs not yet registered with PPL the transition was "paused" and that CDChoices would continue to serve them until further notice. PPL's Counterclaims, Ex. C (CDChoices Mar. 31 Comms.), Dkt. No. 70-3.

Indeed, the *Engesser* Order paused the element of the CDPAP 2024 amendments requiring that the prior FIs cease serving Consumers on April 1, 2025. Under the TRO, "pending further Order of th[e] Court," FIs other than PPL (and including CDChoices) were permitted to continue serving CDPAP Consumers and PAs who had not yet registered with PPL. PPL's Counterclaims, Ex. B (*Engesser* TRO), Dkt. No. 70-2 at 3. This unquestionably paused the legislative requirement that CDChoices cease servicing CDPAP participants beginning April 1, specifically for Consumers who had not completed registering with PPL. *See* N.Y. Soc. Servs. Law § 365-f 3(c)(iv)(a). Although, under the terms of the TRO, PPL was permitted to operate and service participants who had successfully registered with PPL, the TRO by definition paused the state's transition to a *single* FI because the TRO permitted other FIs to continue operating as well.[9]

PPL ignores CDChoices' explicit encouragement of Consumers and PAs to continue attempting to register with PPL and flatly asserts that CDChoices' website instruction "sought to stop the transition" for Consumers and PAs who were not yet fully registered with PPL and

---

[9] PPL attempts to avoid the fundamental accuracy of CDChoices' statements by characterizing the TRO as merely "extend[ing] the Registration Deadline by only (4) days," PPL's Counterclaims, Dkt. No. 70 at 41, ¶ 92, rather than pausing the transition. But an injunction or restraining order is not an "extension" of any kind. *See Injunction*, *Black's Law Dictionary* (defining "Injunction" to mean "[a] court order commanding or preventing an action"). Nor did the *Engesser* court simply provide a four-day extension to the registration deadline. Instead, the TRO gave NYSDOH four additional days to "show cause . . . why an appropriate preliminary injunction . . . should not be issued enjoining" the transition. PPL's Counterclaims, Ex. B (*Engesser* TRO), Dkt. No. 70-2 at 3. The court ultimately did enter such a preliminary injunction. *See* Dkt. No. 61-2 (Ex. B, CDChoices' Second Am. Compl.); *see also* PI, *Engesser*, Dkt. No. 62 (No. 25-cv-1689) (Apr. 10, 2025).

"[went] against the TRO's terms."  PPL's Counterclaims, Dkt. No. 70 at 41, ¶ 93.  CDChoices'

statements did no such thing.[10]  CDChoices specifically stated that "this does not stop the switch

to PPL" and that despite the TRO, "it is important that consumers and personal assistants make

every effort to complete their registration(s)."  PPL's Counterclaims, Ex. H (Mar. 31 Website

Post), Dkt. No. 70-8 at 20.  In short, the statement that Consumers and PAs could continue using

CDChoices' online system until further notice did not instruct Consumers and PAs to cease their

efforts to register with PPL or otherwise "s[eek] to stop the transition."  Indeed, as described

above, CDChoices stated just the opposite.  *Id.*

### B.    PPL Fails to Adequately Allege that CDChoices Breached any Contractual Obligation to Facilitate the Transition in Any Way.

PPL's Count II fares no better.  There, PPL suggests that CDChoices was obligated to

"undertake its contractual obligations to PPL—including the facilitation of the transition of

Consumers and their PAs to PPL as their FI—with the highest standards of ethics and integrity"

and that CDChoices' actions failed to accomplish this, purportedly breaching the Agreement.

PPL's Counterclaims, Dkt. No. 70 at 54, ¶¶ 171, 173.

PPL is wrong.  First, CDChoices had no obligation at all to transition any particular

Consumer.  The Court has recognized that the Subcontractor Agreement did "not require

CDChoices to facilitate transitions" and did not "require[] CDChoices to communicate with

participants 'in ways that further[] the implementation of the CDPAP Amendment.'"  Order on

PPL's Mot. to Dismiss, Dkt. No. 63 at 15–16.  The Agreement merely obligated PPL to pay

CDChoices a one-time per-transition payment for each "completed transition" within the

specified period (which PPL failed to do).  PPL's Counterclaims, Ex. A (Subcontractor

---

[10] Additionally, the instructions to Consumers about which PPL complains contain no statement of fact and thus could not have been misleading.  *See In re Allergan PLC Sec. Litig.,* 2022 WL 17584155, at * 16 (S.D.N.Y. Dec. 12, 2022) ("A statement cannot be misleading if it did not include an inaccurate fact.").

Agreement), Dkt. No. 70-1 at 19.  The Agreement did not, however, require CDChoices to transition any particular Consumer.  At most, the Agreement "can be read as simply incentivizing CDChoices to assist with transitions, not requiring CDChoices to do so."  Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 16.  PPL's attempt to rely on such a duty for its counterclaims therefore fails.  *See* PPL's Counterclaims, Dkt. No. 70 at 54, ¶ 173.

Second, the Subcontractor Agreement does not require CDChoices to act according to the "highest standards of ethics and integrity," as PPL suggests.  PPL's Counterclaims, Dkt. No. 70 at 54, ¶¶ 171, 173.  Instead, the Subcontractor Code of Conduct simply notes that PPL "performs professional services for its clients, most of which are state and local government agencies, with the highest standards of ethics and integrity [and] *expects* its Subcontractors to meet the same standards in the performance of contracted services."  PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 21 (emphasis added).  Under New York law, contracts should be read according to their plain language, and courts will not strain to bind parties based on such aspirational or precatory language.  *See Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998) (holding that "general promises about ethical standards," which "are subject to neither quantification nor objective evaluation," do not constitute a "specific promise . . . [adding] to valid breach of contract claims"); *Korn v. Fed. Ins. Co.*, 2019 WL 4277187, at *9 (W.D.N.Y. Sept. 10, 2019) (declining to find an enforceable promise in "language [that] . . . is clearly aspirational in nature"); *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 497 (S.D.N.Y. 2023) (noting that "precatory language" in a contract expressing the parties' "intention[s]" and "goal[s]" generally is not enforceable).

Finally, even if such an amorphous standard were enforceable, PPL fails to allege any dishonesty or unethical behavior on CDChoices' part. CDChoices accurately and appropriately described the scope of the TRO and worked to fulfill its contractual duties. *See supra* § I(A)(1).

## II. PPL Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Nor has PPL properly pled tort claims. PPL alleges that CDChoices breached the implied covenant of good faith and fair dealing by "misrepres[enting] the TRO's impact on the status of [Consumers' and PAs'] respective transitions to PPL" and by "falsely and self-servingly instruct[ing] Consumers and PAs to continue using CDChoices' electronic system to administer CDPAP benefits 'until further notice.'" PPL's Counterclaims, Dkt. No. 70 at 55, ¶¶ 181–82. As detailed above, *supra* § I(A)(1), CDChoices' communications were not misleading. This claim fails on that basis alone.

Further, PPL's claim fails to satisfy the basic requirements of such a claim under New York law. In New York, good faith and fair dealing requires that neither party "act arbitrarily or irrationally" in using discretion conferred by the contract terms. *Dalton v. Educ. Testing Serv.*, 663 N.E. 2d 289, 291 (N.Y. 1995). "[T]he covenant requires the parties to perform under the contract 'in a reasonable way.'" *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023) (citation omitted). "In discerning what is 'reasonable,' the Court looks to what the parties would have expected under the contract: the Court will infer that contracts 'include any promises which a reasonable person in the position of the promisee would be justified in understanding were included' at the time the contract was made." *Id.* (citation omitted).

"No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Id.* (citation omitted). "[I]t is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Id.* (citation

omitted).  "Additionally, for a plaintiff to plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff 'reasonably understood' the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action."  *Id.* at 670–71 (citation omitted).  Crucially, "[a] claim for breach of the implied covenant '[must] be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'"  *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997); *cf.* Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 32 (dismissing CDChoices' injurious falsehood and tortious interference claims as duplicative of its defamation claim).

First, PPL's counterclaim for breach of the implied covenant of good faith and fair dealing is duplicative of its breach of contract claims and therefore barred.  PPL's counterclaim for breach of the implied covenant of good faith and fair dealing is based on the same alleged conduct and statements on which PPL's breach of contract claims are based.  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  PPL's claim for breach of the implied covenant of good faith and fair dealing is barred because it is "based on the same conduct as [PPL's] allegations" that CDChoices breached the parties' Agreement.  *See Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)*. Compare* PPL's Counterclaims, Dkt. No. 70 at 55, ¶¶ 181–82 (alleging that CDChoices breached the duty of good faith and fair dealing when it "misrepres[ented] the TRO's impact on the status of their respective transitions to PPL" and "falsely and self-servingly instruct[ed] Consumers and PAs to continue using CDChoices' electronic system to administer CDPAP benefits 'until further

notice'"), *with id.* at 52–54, ¶¶ 159, 161, 173–74 (alleging breach of the Agreement based on the very same conduct). The Court can and should dismiss this counterclaim on this basis alone.

Second, PPL impermissibly asks the Court to read into the Agreement an obligation that conflicts with the Agreement's other terms. Under the Agreement, CDChoices assisted Consumers and their PAs with the transition and communicated with them about the same. *See* PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 17–19.[11] The Agreement expressly preserves CDChoices' independent-contractor status and methods, confirming PPL "shall control only the result of the Subcontracted Services, not the method or means of performance." *Id.* at 5. Even if PPL attempts to quibble about the use of certain words, CDChoices' communications to Consumers and PAs were not misleading and reflected the terms of the TRO and specific language used by Judge Block. *See supra* § I(A)(1). PPL fails to establish anything in the Agreement suggesting that CDChoices "'reasonably understood' the contract or contractual provision at issue to state a duty to . . . refrain from" communicating with PAs and Consumers about registration-related logistics or other CDPAP-related matters. *See Cordero*, 211 N.E.3d at 671–72. And even though CDChoices requested guidance from PPL on the TRO, *see* PPL's Counterclaims, Ex. H (Mar. 31 Arndt Email), Dkt. No. 70-8 at 6–7, nothing in the Agreement required CDChoices to have PPL approve any language as CDChoices bargained to preserve its autonomy as to the "method or means of performance."

## III.    PPL Fails to State a Claim for Tortious Interference with Prospective Economic Relations.

---

[11] *See* PPL's Counterclaims, Ex. A (Subcontractor Agreement), Dkt. No. 70-1 at 17–18 (permitting CDChoices to "perform outreach and education activities to inform eligible consumers of its availability to serve as a CDPAP facilitator" and, as to certain Consumers, obligating it to "[n]otify[] the Consumer of their CDPAP start date" and "provide . . . support services to CDPAP consumers . . . and to personal assistant caregivers," including by "[p]roviding . . . an overview of the Consumer's registration process [] online through the PPL@Home portal").

"To state a claim for tortious interference with prospective economic relations, 'a plaintiff in New York must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  Order on PPL's Mot. to Dismiss, Dkt. No. 63 at 31 (quoting *Zaret v. Bonsey*, 2023 WL 6317956, at *5 (S.D.N.Y. Sept. 28, 2023)).

PPL alleges that CDChoices "tortiously interfered with PPL's relationships with Consumers and PAs who had not yet completed their" registration with PPL when CDChoices allegedly "sen[t] false, misleading messages to these Consumers and PAs representing that their transitions to PPL had been 'paused' and instructing them to continue using CDChoices' own electronic systems to administer CDPAP benefits 'until further notice.'"  PPL's Counterclaims, Dkt. No. 70 at 56, ¶¶ 186, 188.

First, as explained above, *supra* § I(A)(1), CDChoices' alleged statements were not false or misleading.  PPL's claim for tortious interference with prospective economic relations fails on that basis alone.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 499 (2d Cir. 2013) (district court properly dismissed the plaintiff's tortious interference claim in part because it did not "allege any [] misleading statements" of fact).

Second, PPL has not adequately alleged that CDChoices made its statements "solely out of malice."  *Zaret*, 2023 WL 6317956, at *5.  As an initial matter, CDChoices' statements were accurate, and no malice can plausibly be inferred.  So PPL rests its assertion of malice on the use of the phrases "Staying Consumers" and "Staying PAs."[12]  A choice of words that described a

---

[12] *See* PPL's Counterclaims, Dkt. No. 70 at 57, ¶ 190 ("[I]ndeed, CDChoices' intentions to keep these Consumers and PAs with CDChoices as long as possible were laid bare by its internal references to the Consumers and PAs in question as 'Staying Consumers' and 'Staying PAs'").

certain category of Consumer/PA does not plausibly support an allegation of "malice," which

requires an intent to commit a wrongful act or a reckless disregard for another's legal rights. *See*

*Malice*, *Black's Law Dictionary* (defining "malice" to mean "[t]he intent, without justification or

excuse, to commit a wrongful act," and/or "[r]eckless disregard of the law or of a person's legal

rights"). Nothing of the sort can be squeezed from the word "Staying" in the context of a TRO

that in fact did pause the transition to PPL for Consumers and PAs who had not completed their

PPL registration. Even if such statements were "self-serving" attempts by CDChoices to

"continue being paid as a fiscal intermediary for CDPAP as long as possible" as PPL alleges,

PPL's Counterclaims, Dkt. No. 70 at 48, ¶ 113, this would not suffice because motive of

"economic gain [] alone does not constitute malice" under New York law. *Inn Chu Trading Co.,*

*Ltd. v. Sara Lee Corp.*, 810 F. Supp. 501, 506 (S.D.N.Y. 1992) (denying dismissal on other

grounds); *see also Masefield AG v. Colonial Oil Indus.*, 2006 WL 346178, at *6 (S.D.N.Y. Feb.

15, 2006) (dismissing defendant's claim for tortious interference because it "clearly [] failed to

plead malice" because the "counterclaim only allege[d] that plaintiffs were motivated by a desire

for economic profit").[13] This claim for tortious interference should be dismissed.

**CONCLUSION**

CDChoices respectfully requests that PPL's counterclaims be dismissed.

Dated:    March 3, 2026
          New York, New York

Respectfully submitted,

Rebecca C. Martin
Sophie A. Leff
JONES DAY

---

[13] A defendant who has not committed a crime or an independent tort or acted solely out of malice may still be liable for tortious interference "if he has employed wrongful means." *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009). "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and 'extreme and unfair' economic pressure." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (N.Y. 1996) (citation omitted). PPL has not pleaded and cannot plead anything of the sort.

250 Vesey Street
New York, NY 10281
(212) 326-3939
rcmartin@jonesday.com
sleff@jonesday.com

B. Kurt Copper (admitted *pro hac vice*)
2727 N. Harwood
Dallas, TX 75201
(214) 969-5163
bkcopper@jonesday.com

*Attorneys for Plaintiff CDChoices*