UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CONSUMER DIRECTED CHOICES, INC.,

                Plaintiff,

    -against-

PUBLIC PARTNERSHIPS, LLC,

                Defendant.

Case No. 25-cv-0868-AJB/DJS

**DEFENDANT PUBLIC PARTNERSHIPS, LLC'S**
**AMENDED ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant, Public Partnerships, LLC ("PPL" or "Defendant") hereby submits its Answer to the allegations in the Second Amended Complaint (the "Complaint") of Plaintiff Consumer Directed Choices, Inc. ("CDChoices" or "Plaintiff"), along with its Counterclaims against CDChoices. The paragraphs of the Complaint are grouped under headings and subheadings that state legal conclusions as to which no response is required, and to the extent any response is required, Defendant denies any allegations contained within such headings or subheadings.

Except as explicitly admitted herein, each and every allegation of the Complaint is denied. All paragraphs and footnotes referenced herein refer to paragraphs and footnotes of the Complaint unless otherwise indicated. Defendant further answers the numbered paragraphs of the Complaint on personal knowledge as to its respective activities, and on information and belief as to the activities of others, as follows:

**RESPONSE TO PLAINTIFF'S PRELIMINARY STATEMENT**

1.     The allegations contained in Paragraph 1 of the Complaint constitute legal conclusions to which no response is required. The allegations in Paragraph 1 also purport to characterize the contents of documents, which, being in writing, speak for themselves, and no

response is required to such characterizations. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 1.

2. The allegations contained in Paragraph 2 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 2.

3. The allegations in Paragraph 3 purport to characterize the contents of a statute, which, being in writing, speak for themselves, and no response is required to such characterizations. Defendant lacks sufficient information to admit or deny the allegations in Paragraph 3 and, thus, they are denied.

4. The allegations in Paragraph 4 purport to characterize the contents of a statute, which, being in writing, speak for themselves, and no response is required to such characterizations. Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 4 and, thus, they are denied.

5. The allegations contained in Paragraph 5 characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required.

6. Admitted that the New York State Department of Health ("DOH") appointed Defendant to serve as the single statewide Fiscal Intermediary ("FI") to administer New York State's Consumer Directed Personal Assistance Program ("CDPAP"). The remaining allegations in Paragraph 6 characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required. To the extent any further response is deemed necessary, Defendant denies the remaining allegations contained in Paragraph 6.

7.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 7 and, thus, they are denied.

8.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 8 and, thus, they are denied.

9.    The allegations of Paragraph 9 purport to characterize the contents of documents, including a temporary restraining order issued by the United States District Court for the Eastern District of New York on March 31, 2025, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 9 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 9.

10.    The allegations of Paragraph 10 purport to characterize the contents of documents, including a temporary restraining order issued by the United States District Court for the Eastern District of New York on March 31, 2025, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 10 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 10.

11.    Admitted that PPL entered into a subcontract with CDChoices.  The remaining allegations in Paragraph 11 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

12.    The allegations of Paragraph 12 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

3

13.     The allegations of Paragraph 13 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

14.     Admitted that PPL terminated CDChoices' access to PPL@Home on April 3, 2025. Defendant denies the remaining allegations contained in Paragraph 14.

15.     The allegations of Paragraph 15 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 15.

16.     The allegations of Paragraph 16 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 16.

17.     The allegations of Paragraph 17 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 17.

18.     The allegations of Paragraph 18 purport to characterize the contents of documents, including a proposed settlement agreement filed before the United States District Court for the Eastern District of New York on July 7, 2025 and the contents of PPL's website as of the date of the original Complaint, which, being in writing, speak for themselves, and no response is required. Additionally, the allegations in Paragraph 18 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 18.

19.     The allegations of Paragraph 19  purport to characterize the contents of documents, including an article published by the New York Post on June 2, 2025, which, being in writing,

4

speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 19.

20.     The allegations of Paragraph 20 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 20.

**RESPONSE TO PLAINTIFF'S ALLEGATIONS AS TO "JURISDICTION AND VENUE"**

21.     The allegations of Paragraph 21 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 21.

22.     The allegations of Paragraph 22 constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 22.

**RESPONSE TO PLAINTIFF'S ALLEGATIONS AS TO "PARTIES"**

23.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 23 and, thus, they are denied.

24.     Admitted to the extent that Defendant PPL is a limited liability company organized under the laws of Delaware and that, as of the date of the Complaint's filing, PPL's principal place of business was 8000 Avalon Blvd., Suite 300, Alpharetta, Georgia 30009.

25.     Admitted.

26.     Denied.

27.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 27 and, thus, they are denied.

5

28.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 28 and, thus, they are denied.    .

29.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 28 and, thus, they are denied.

30.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 28 and, thus, they are denied.

31.     Admitted to the extent that, as of the date of the Complaint's filing, PPL's sole member was PPL Acquisition LLC, a limited liability company organized under the laws of Delaware with its principal place of business at 8000 Avalon Blvd., Suite 300, Alpharetta, Georgia 30009, and that PPL Acquisition LLC's sole member was PPL Intermediate Holdings Inc., a company organized under the laws of Delaware with its principal place of business at 8000 Avalon Blvd., Suite 300, Alpharetta, Georgia 30009.

### RESPONSE TO PLAINTIFF'S ALLEGATIONS AS TO "FACTS"

32.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 32 and, thus, they are denied.

33.     The allegations contained in Paragraph 33 characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 33 and, thus, they are denied.

34.     The allegations contained in Paragraph 34 characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 34 and, thus, they are denied.

35.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 35 and, thus, they are denied.

36.     The allegations contained in Paragraph 36 purport to characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required.   Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 36 and, thus, they are denied.

37.     Admitted.

38.     The allegations contained in Paragraph 38 purport to characterize the requirements of a statute, the terms of which speak for themselves and the interpretation of which constitutes a legal conclusion to which no response is required.   Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 38 and, thus, they are denied.

39.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 39 and, thus, they are denied.

40.     The allegations of Paragraph 40 purport to characterize the contents of documents, including a temporary restraining order issued by the United States District Court for the Eastern District of New York on March 31, 2025, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 40 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 40.

41.     The allegations of Paragraph 41 purport to characterize the contents of documents, including a preliminary injunction issued by the United States District Court for the Eastern District of New York on April 10, 2025, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 41 constitute legal conclusions for

which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 41.

42.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 42 and, thus, they are denied.

43.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 43 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 43.

44.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 44 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 44.

45.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 45 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 45.

46.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 46 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 46.

47.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 47 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 47.

48.    Admitted that PPL entered into a subcontract with CDChoices.  The remaining allegations in Paragraph 48 purport to characterize the contents of documents and statutes, which, being in writing, speak for themselves, and no response is required to such characterizations.

8

49.     The allegations in Paragraph 49 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

50.     The allegations in Paragraph 50 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

51.     The allegations in Paragraph 51 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

52.     The allegations in Paragraph 52 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

53.     The allegations in Paragraph 53 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

54.     The allegations in Paragraph 54 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required to such characterizations.

55.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 55 and, thus, they are denied.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 55.

56.     The allegations contained in Paragraph 56 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such

characterizations.    Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 56 and, thus, they are denied.

57.    The allegations contained in Paragraph 57 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.    Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 57 and, thus, they are denied.

58.    The allegations contained in Paragraph 58 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.    Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 58 and, thus, they are denied.

59.    The allegations contained in Paragraph 59 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.    Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 59 and, thus, they are denied.

60.    The allegations contained in Paragraph 60 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.    Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 60 and, thus, they are denied.

61.    The allegations contained in Paragraph 61 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.

62.     The allegations contained in Paragraph 62 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.

63.     The allegations contained in Paragraph 63 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.

64.     The allegations contained in Paragraph 64 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.

65.     The allegations contained in Paragraph 65 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.

66.     The allegations contained in Paragraph 66 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 66.

67.     The allegations contained in Paragraph 67 purport to characterize the contents of documents, the terms of which speak for themselves, and no response is required to such characterizations.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 67.

68.     The allegations of Paragraph 68 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 68 constitute legal conclusions for which no response is required.  To the

11

extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 68.

69. The allegations of Paragraph 69 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required. Additionally, the allegations in Paragraph 69 constitute legal conclusions for which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 69.

70. The allegations contained in Paragraph 70 of the Complaint constitute legal conclusions to which no response is required and purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required. Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 70 and, thus, they are denied.

71. The allegations of Paragraph 71 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 71.

72. Admitted that PPL terminated CDChoices' access to PPL@Home on April 3, 2025. The allegations of Paragraph 72 otherwise purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 72.

73. Denied.

74. The allegations contained in Paragraph 74 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 74.

75.    The allegations contained in Paragraph 75 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 75.

76.    The allegations contained in Paragraph 76 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 76.

77.    Admitted that, following April 3, 2025, Consumers and Managed Care Plans could no longer use CDChoices as a Facilitator for CDPAP.  Defendant otherwise denies the allegations contained in Paragraph 77.

78.    The allegations contained in Paragraph 78 of the Complaint constitute legal conclusions to which no response is required and purport to characterize the contents of documents, which being in writing, speak for themselves and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 78.

79.    Admitted that CDChoices did not execute an Amendment to the Subcontract Agreement between PPL and CDChoices.  Defendant otherwise denies the allegations contained in Paragraph 79.

80.    Denied.

81.    The allegations contained in Paragraph 81 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 81.

82.    The allegations of Paragraph 82 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  Additionally, the

allegations in Paragraph 82 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 82.

83.     The allegations in Paragraph 83 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 83.

84.     Admitted that PPL terminated CDChoices' access to PPL@Home on April 3, 2025. Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 84 and, thus, they are denied.

85.     Denied.

86.     The allegations of Paragraph 86 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 86.

87.     The allegations in Paragraph 87 constitute legal conclusions for which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 87 and, thus, they are denied.  And to the extent any additional response is required, Defendant denies the allegations contained in Paragraph 87.

88.     The allegations in Paragraph 88 constitute legal conclusions for which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 87 and, thus, they are denied.  And to the extent any additional response is required, Defendant denies the allegations contained in Paragraph 88.

89.     The allegations in Paragraph 89 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 89.

90.     The allegations in Paragraph 90 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 90.

91.     The allegations of Paragraph 91 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 91.

92.     Denied.

93.     The allegations in Paragraph 93 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 93.

94.     The allegations of Paragraph 94 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 94.

95.     The allegations in Paragraph 95 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 95.

**DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S FIRST CLAIM**

96.     Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

97.    The allegations in Paragraph 97 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 97.

98.    The allegations of Paragraph 98 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 98.

99.    Admitted that PPL terminated CDChoices' access to PPL@Home on April 3, 2025, and that such access has not been reinstated.

100.    Admitted that, after April 3, 2025, CDChoices could no longer service Consumers and PAs performing work under CDPAP who had completed registration with PPL as such services required access to PPL@Home.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 100 and, thus, they are denied.

101.    The allegations in Paragraph 101 constitute legal conclusions for which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 101 and, thus, they are denied.

102.    The allegations in Paragraph 102 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 102.

**<u>DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S SECOND CLAIM</u>**

103.    Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

104.     The allegations in Paragraph 104 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 104.

105.     The allegations of Paragraph 105 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 105.

106.     The allegations in Paragraph 106 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 106.

107.     Admitted to the extent that CDChoices facilitated consumers.  Defendant denies the remaining allegations contained in Paragraph 107.

108.     Admitted that PPL terminated CDChoices' access to PPL@Home on April 3, 2025. Defendant denies the remaining allegations contained in Paragraph 108.

109.     Denied.

110.     The allegations in Paragraph 110 constitute legal conclusions for which no response is required.  Defendant otherwise lacks sufficient information to admit or deny the allegations in Paragraph 110 and, thus, they are denied.

111.     The allegations in Paragraph 111 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 111.

112.     The allegations in Paragraph 112 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 112.

**DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S THIRD CLAIM**

113.    Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

114.    The allegations in Paragraph 114 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 114.

115.    The allegations of Paragraph 115 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 115.

116.    The allegations of Paragraph 116 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 116.

117.    The allegations in Paragraph 117 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 117.

118.    The allegations in Paragraph 118 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 118.

119.    The allegations of Paragraph 119 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required.  Additionally, the allegations in Paragraph 119 constitute legal conclusions for which no response is required.  To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 119.

120.    The allegations in Paragraph 120 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 120.

121.    The allegations in Paragraph 121 constitute legal conclusions for which no response is required.  To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 121.

**DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S FOURTH CLAIM**

122.    Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

123.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

124.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

125.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

126.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

127.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

128.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

129.    Plaintiff's Fourth Claim for Relief for breach of contract has been dismissed.  *See* ECF No. 63 at 20-24.  Accordingly, no response to this paragraph is required.

## DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S FIFTH CLAIM

130. Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

131. The allegations in Paragraph 131 constitute legal conclusions for which no response is required. To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 131.

132. The allegations of Paragraph 132 purport to characterize the contents of documents, which, being in writing, speak for themselves, and no response is required. To the extent a response is deemed necessary, Defendant denies the allegations contained in Paragraph 132.

133. Denied.

134. Denied.

135. The allegations in Paragraph 135 constitute legal conclusions for which no response is required. To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 135.

136. The allegations in Paragraph 136 constitute legal conclusions for which no response is required. To the extent any additional response is required, Defendant denies the allegations contained in Paragraph 136.

## DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S SIXTH CLAIM

137. Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

138. Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

139.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

140.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

141.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

142.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

143.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

144.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

145.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

146.    Plaintiff's Sixth Claim for Relief for defamation has been dismissed. *See* ECF No. 63 at 25-30. Accordingly, no response to this paragraph is required.

### DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S SEVENTH CLAIM

147.    Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

148.    Plaintiff's Seventh Claim for Relief for injurious falsehood has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

149.    Plaintiff's Seventh Claim for Relief for injurious falsehood has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

150.    Plaintiff's Seventh Claim for Relief for injurious falsehood has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

151.    Plaintiff's Seventh Claim for Relief for injurious falsehood has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

152.    Plaintiff's Seventh Claim for Relief for injurious falsehood has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

## DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S EIGHTH CLAIM

153.    Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

154.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

155.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

156.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

157.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

158.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

159.    Plaintiff's Eighth Claim for Relief for deceptive trade practices has been dismissed. *See* ECF No. 63 at 33-35. Accordingly, no response to this paragraph is required.

## DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S NINTH CLAIM

160. Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

161. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

162. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

163. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

164. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

165. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

166. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

167. Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed. *See* ECF No. 63 at 31-33. Accordingly, no response to this paragraph is required.

168.   Plaintiff's Ninth Claim for Relief for tortious interference with prospective contractual relations has been dismissed.  *See* ECF No. 63 at 31-33.  Accordingly, no response to this paragraph is required.

### DEFENDANT DENIES THE ALLEGATIONS IN PLAINTIFF'S TENTH CLAIM

169.   Defendant hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

170.   Plaintiff's Tenth Claim for Relief for declaratory judgment has been dismissed.  *See* ECF No. 63 at 35.  Accordingly, no response to this paragraph is required.

171.   Plaintiff's Tenth Claim for Relief for declaratory judgment has been dismissed.  *See* ECF No. 63 at 35.  Accordingly, no response to this paragraph is required.

172.   Plaintiff's Tenth Claim for Relief for declaratory judgment has been dismissed.  *See* ECF No. 63 at 35.  Accordingly, no response to this paragraph is required.

### PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any relief, and respectfully requests that Plaintiff take nothing by way of its Complaint, and that Defendant be awarded costs, attorney's fees, and any additional relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Defendant denies that Plaintiff is entitled to a jury trial, but also demands a trial by jury in accordance with Rule 38(b) of the Federal Rules of Civil Procedure.

### AFFIRMATIVE AND OTHER DEFENSES

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Defendant sets forth the following affirmative and other defenses, on personal knowledge as to their own actions and on information and belief as to the actions of others.  By pleading these defenses, Defendant does not

24

concede that it bears the burden of proof or persuasion on any claim or defense. Defendant reserves the right to assert additional defenses and counterclaims in the event that discovery or further investigation reveals such defenses or counterclaims to be appropriate to the extent permitted by the Federal Rules of Civil Procedure.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by documentary evidence.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrines of unclean hands and/or *in pari delicto*.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of waiver.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of equitable estoppel.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred by CDChoices' bad faith.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred by CDChoices' own breaches of the Agreement.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

The Complaint is barred by CDChoices' own fraudulent conduct.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of unjust enrichment.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

CDChoices has failed to mitigate its alleged damages.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

To the extent the Court finds that CDChoices is entitled to any recovery from PPL, which PPL denies, such amounts should be reduced and offset by the damages suffered by PPL.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because PPL's conduct, if any, was undertaken in good faith for legitimate business and economic purposes.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

PPL reserves the right to raise and assert other Affirmative Defenses as the course of discovery and investigation progresses in this action.

## DEFENDANT'S COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Public Partnerships LLC ("PPL") states the following counterclaims against Plaintiff/Counterclaim Defendant Consumer Directed Choices, Inc. ("CDChoices").

## PRELIMINARY STATEMENT

1.     PPL's counterclaims center on the deliberate, disloyal actions undertaken by CDChoices to mislead participants in New York's Consumer Directed Personal Assistance Program ("CDPAP") and delay the transition of all fiscal intermediary ("FI") services provided under CDPAP solely for its own benefit and at PPL's expense.

2.     N.Y. Soc. Serv. Law § 365-f, the New York State's recent amendment to CDPAP, required that all FI services provided under CDPAP be transitioned from hundreds of FIs (including, but not limited to, CDChoices) to a single, statewide FI.  The New York State

26

Department of Health ("NYSDOH") selected PPL to serve as the single, statewide FI for New York.

3.     N.Y. Soc. Serv. Law § 365-f required that the transition of all FI services from hundreds of FIs to the single, statewide FI be completed by March 31, 2025.

4.     On March 31, 2025, the United States District Court for the Eastern District of New York issued a temporary restraining order that temporarily suspended enforcement of the transition to PPL from March 31, 2025 to April 4, 2025.

5.     That same day, CDChoices sent misleading messages to participants in the CDPAP by email, text message, and voice message regarding the scope and impact of that temporary restraining order on their respective transitions to PPL.

6.     Among other things, CDChoices misrepresented that participants' transitions to PPL had been "paused" and instructed those participants to continue using CDChoices' own systems to administer CDPAP (as opposed to PPL's) "until further notice."

7.     CDChoices' communications to these CDPAP participants not only ran contrary to the directives included in the temporary restraining order and N.Y. Soc. Serv. Law § 365-f itself (both of which unequivocally mandated the transition of FI services under CDPAP to PPL), they also breached CDChoices' obligations to PPL under the Subcontractor Agreement dated December 30, 2024 (the "Agreement").

8.     For example, in the Agreement, CDChoices agreed to be subject to a duty of loyalty to PPL.

9.     CDChoices' decision to send misleading communications to participants in CDPAP about the status of the transition of their FI services from CDChoices to PPL on and after March 31, 2025 unquestionably breached that duty.

10. CDChoices further agreed to execute its duties under the Agreement—which centered on communications with participants in CDPAP and which contemplated CDChoices' assistance in facilitating the transition of all FI services to PPL by March 31, 2025 required by N.Y. Soc. Serv. Law § 365-f —"with the highest standards of ethics and integrity."

11. CDChoices' decision to send misleading communications to participants in CDPAP—some of whom had already begun transitioning services to PPL with CDChoices' assistance—about the status of the transition of FI services to PPL unquestionably breached that obligation.

12. CDChoices refused to cure these breaches of the Agreement despite being afforded multiple opportunities to do so and despite the urgent consequences of its breaches on PPL and on the Consumers and PAs who they misled.

13. CDChoices' actions also breached the implied covenant of good faith and fair dealing inherent in the Agreement by frustrating the fundamental purpose of the Agreement and of N.Y. Soc. Serv. Law § 365-f itself.

14. CDChoices' actions damaged PPL, and necessitated the instant action.

## PARTIES

15. Defendant/Counterclaim-Plaintiff PPL is a limited liability company organized under the laws of Delaware with its principal place of business at 17 Plaza Drive, Suite 300, Latham, NY 12110. As of the date of the filing of the Complaint, however, PPL's principal place of business was 8000 Avalon Blvd., Suite 300, Alpharetta, GA 30009.

16. Defendant/Counterclaim-Plaintiff PPL has a single member, PPL Acquisition LLC, which is a limited liability company organized under the laws of Delaware with its principal place of business at 17 Plaza Drive, Suite 300, Latham, NY 12110. As of the date of the filing of the

28

Complaint, however, PPL Acquisition LLC's principal place of business was 8000 Avalon Blvd., Suite 300, Alpharetta, GA 30009.

17.     PPL Acquisition LLC has a single member, PPL Intermediate Holdings, Inc., which is a corporation organized under the laws of Delaware with its principal place of business at 17 Plaza Drive, Suite 300,  Latham, NY 12110.  As of the date of the filing of the Complaint, however, PPL Intermediate Holdings, Inc.'s principal place of business was 8000 Avalon Blvd., Suite 300, Alpharetta, GA 30009.

18.     PPL has existed since 1999 and is the nation's largest provider of fiscal intermediary ("FI") services for Medicaid programs.

19.     PPL provides FI or other financial management services to Medicaid programs and Medicaid recipients in fifty (50) different programs across twenty (20) different states across the United States.

20.     Fifteen (15) states across the nation have selected PPL as a designated provider of FI services:  Alabama (since 2020), Arkansas (since 2023), Arizona (since 2005), California (since 2012), Colorado (since 2009), Florida (since 2013), Indiana (since 2006), Maryland (since 2022), Michigan (since 2015), Minnesota (since 2024), New Jersey (since 2016), Ohio (since 2019), Oregon (since 2014), Pennsylvania (since 2012), and Virginia (since 2004).

21.     Indeed, PPL leads the industry in state partnerships, and has a rich history of completing successful statewide implementations, including most recently in Indiana and Arkansas.

22.     PPL operates as the single, statewide FI for Pennsylvania, and has served in that role since 2012.  In that role, PPL facilitates the financial management of Pennsylvania's Medicaid

program for at-home care for people with disabilities and chronic conditions to receive funds required for their in-home care.

23. Each month, PPL answers between 500,000 and 1 million phone calls from consumers, workers, and case managers across the country in connection with its FI services. And each month, PPL processes over 4 million time entries from personal assistants ("PAs") in connection with its FI services.

24. Plaintiff/Counterclaim-Defendant CDChoices is a not-for-profit corporation organized under New York Not-for-Profit Corporations Law in 1997.

25. Among other things, CDChoices operated as a FI to administer New York State's CDPAP.

26. CDChoices has offices throughout New York, including at 7 Washington Square, Albany, New York.

## JURISDICTION AND VENUE

27. This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a).

28. This Court also has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a).

29. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

**A. New York's Original Consumer Directed Personal Assistance Program.**

30. New York's CDPAP is a Medicaid-funded initiative established under New York Social Services Law § 365.

31.     CDPAP was established to grant chronically ill and physically disabled individuals (referred to as "Consumers") greater flexibility and autonomy in managing their home care services.

32.     One of the biggest benefits afforded to Consumers by CDPAP is giving them the opportunity to remain independent, remain in their own homes, and retain the ability to direct and manage their own medical care.

33.     To participate in CDPAP, a Consumer must be eligible for Medicaid and must meet certain other criteria, *e.g.*, require long-term care.

34.     And through CDPAP, each Consumer is required to assume numerous responsibilities including, but not limited to, recruiting, hiring, training, scheduling, and supervising their personal assistants ("PAs").

35.     Under the original CDPAP framework, a Consumer worked with an FI to perform administrative functions associated with CDPAP, *e.g.*, wage and benefit processing for PAs, processing all income tax and other required wage withholdings, and maintaining employment records on behalf of the Consumer.

36.     Under the original CDPAP framework, FIs were paid for each Consumer they serviced, and FIs charged significant sums for their services with payments-per-Consumer-per-month ranging from $150 to $1,000.

37.     Fees charged by New York-based FIs under CDPAP were significantly higher than those charged by FIs in other states.  Indeed, the national average per-Consumer-per-month payment is approximately $70.

38.     Under the original CDPAP framework, the NYSDOH approved FIs that performed FI services, and separately contracted directly with Managed Care Organizations ("MCOs") and

31

local departments of social services ("LDSS") to act as administrative agents for CDPAP and oversee FIs.

39.    Accordingly, after receiving NYSDOH approval to serve as an FI, FIs were able to provide services under CDPAP without being subject to NYSDOH oversight; FIs' sole contacts were with MCOs.  And NYSDOH could not terminate an FI from CDPAP without expelling that FI from Medicaid completely.

40.    As of 2024, there were over 600 FIs operating in New York.

41.    New York's FI model was an outlier when compared to the rest of the nation.

42.    Most states that offer CDPAP to residents employ less than three (3) FIs statewide, and many states employ a single, statewide FI.

43.    By funding more FIs than funded by every other state in the country combined, New York paid an excessively high administrative rate to FIs, resulting in CDPAP becoming prohibitively expensive.

44.    Indeed, funding for FI services for CDPAP exceeded the entirety of New York State Medicaid payments to nursing facilities.

45.    And, under the original CDPAP framework, FIs profited significantly from their work in New York, charging upwards of $1,000 per-Consumer-per-month for CDPAP administrative services.

46.    For example, in 2023, CDChoices brought in a staggering $69.9 million in gross revenue,    and    $3.6    million    in    annual    profits.    *See* https://projects.propublica.org/nonprofits/organizations/161516618.

**B.      New York's Amendment to CDPAP.**

47.    On April 20, 2024, the New York State Legislature passed an amendment to CDPAP, codified at N.Y. Soc. Serv. Law § 365-f (the "CDPAP Amendment").

48.    The CDPAP Amendment required the NYSDOH to issue a Request for Proposals ("RFP") in order to contract with a single, statewide FI charged with providing FI services to any and all Consumers and PAs enrolled in CDPAP.

49.    The transition from a CDPAP system employing over 600 FIs to one utilizing a single, statewide FI (like several other states) is estimated to reduce administrative costs for CDPAP from 8% of CDPAP spending to 3% of CDPAP spending without impacting funding for or wage reimbursement to the PAs delivering services to Consumers.

50.    On June 17, 2024, the NYSDOH issued the RFP for the single, statewide FI for CDPAP.

51.    In accordance with the CDPAP Amendment, the RFP set out the minimum qualifications for bidders for New York's single, statewide FI as follows:

> An entity capable of performing statewide fiscal intermediary services with demonstrated cultural and language competencies specific to the population of consumers and those of the available workforce with experience serving individuals with disabilities and as of April 1st, 2024, is providing services as a fiscal intermediary on a statewide basis in at least one other state.

52.    The NYSDOH received more than 100 bids in response to the RFP.

53.    With the understanding that the transition from hundreds of FIs to a single, statewide FI for CDPAP services would involve a significant undertaking, the CDPAP Amendment also called for the single, statewide FI to subcontract certain services to former FIs.

54.    Specifically, the CDPAP Amendment called for PPL to subcontract with at least four (4) subcontractors—at least one in each of the "rate setting regions" identified in the CDPAP Amendment.  N.Y. Soc. Serv. Law § 365-f, 4-a(ii-b).

55.    The CDPAP Amendment required these subcontractors to meet certain prerequisites.  Namely, the CDPAP Amendment required that the subcontractors "ha[ve] a proven record of delivering services to individuals with disabilities in the senior population, and ha[ve] been providing fiscal intermediary services since January first, two thousand twelve."  *Id.*

56.    The CDPAP Amendment also called for these subcontractors to provide "any delegated fiscal intermediary services with cultural and linguistic competency specific to the population of consumers and those of the available workforce, and shall comply with the requirements for registration as a fiscal intermediary" set by the CDPAP Amendment.  *Id.*

57.    The CDPAP Amendment required that the transition of all FI services from former FIs to the single, statewide FI to be completed by March 31, 2025 as it forbade other FIs from servicing participants under CDPAP from April 1, 2025 onward. N.Y. Soc. Serv. Law § 365-f, 4-a-1(a).

58.    On September 27, 2024, the NYSDOH selected PPL as the single, statewide FI for CDPAP, and PPL was then appointed as the single, statewide FI for CDPAP.

59.    PPL executed subcontracts with 44 former FIs, many of which meet the standards for the four (4) subcontractors required by the CDPAP Amendment.

60.    One of the former FIs with which PPL subcontracted is CDChoices.

61.    CDChoices was one of twenty one (21) former FIs that subcontracted with PPL to serve the upstate and southwestern regions of New York as a Facilitator for CDPAP.

62. The upstate and southwestern regions of New York included Allegany, Oswego, Hamilton, Clinton, and the surrounding counties.

63. At least six (6) of the other former FIs that subcontracted with PPL to serve as Facilitators for CDPAP in the upstate and southwestern regions of New York meet the statutory requirements for the regional subcontractor called for by the CDPAP Amendment.

64. The CDPAP Amendment was very unfavorable for former FIs like CDChoices because it meant they could no longer charge the significant fees that they had historically charged for administering CDPAP.

65. Instead, former FIs were required either to accept the fees offered to subcontractors for PPL (which were substantially less than the charged by former FIs) or to stop administering CDPAP altogether.

66. Accordingly, former FIs engaged in a misinformation campaign designed to negatively impact Consumer perception of the CDPAP Amendment and, ultimately, to prompt the New York Legislature and Governor Hochul to undo it.

67. On June 27, 2024, CDChoices contributed $100,000 to the Alliance to Protect Home Care, a lobbying group. A record of this is attached as **Exhibit A**.

68. The Alliance to Protect Home Care lobbied against the CDPAP Amendment and the transition to a single, statewide FI.

69. The Alliance to Protect Home Care's website currently contains lies and misinformation about PPL in order to cast aspersions on PPL and undermine the transition to PPL. *See* https://www.protecthomecare.org.

70. For example, a video on the Alliance to Protect Home Care's website contains statements from "Actual Home Care Consumers" who say that the transition to PPL "puts lives like theirs at risk" because of PPL's "record of failure."

71. Other examples include statements such as: "Elderly & disabled NYers will lose access to trusted, affordable home care workers who speak their language, leaving them no other option than being forced into costly hospitals or nursing homes" and "One big business will be handed control of all of NY's home care industry, leading to gaps in service, lack of accessibility, and lower quality care driven by profits - not people."

## C.    Relevant Terms of the Agreement.

72. On December 30, 2024, PPL entered into a Subcontractor Agreement with CDChoices (the "Agreement"), which allowed CDChoices to facilitate the provision of CDPAP to certain Consumers and PAs enrolled in those services.  A copy of the Agreement is attached as **Exhibit B.**

73. The Agreement required that CDChoices perform all of its obligations under the Agreement—including, but not limited to, interfacing with Consumers and PAs—in accordance with the "PPL Subcontractor Code of Conduct."

74. Specifically, Attachment C of the Agreement, entitled the "PPL Subcontractor Code of Conduct," stated "Public Partnerships LLC ("PPL") performs professional services for its clients, most of which are state and local government agencies, with the highest standards of ethics and integrity.  PPL expects its Subcontractors to meet the same standards in the performance of contracted services."

75. Attachment A stated that CDChoices "will provide the following support services to CDPAP consumers who have enrolled with the facilitator in the PPL@Home portal

36

("Consumers") and to personal assistant caregivers who are associated with enrolled Consumers ("PAs")"

76.     The "following support services" contemplated that CDChoices would communicate with Consumers and PAs about their transitions to PPL.

77.     For example, Attachment A stated that CDChoices would "Provid[e] Consumers with an orientation to CDPAP" by giving them, among other things:  (1) "An overview of a Consumer's responsibilities as joint employers of their PAs, including Electronic Visit Verification ("EVV"), service utilization and overtime usage;" (2) "An overview of the Consumer's registration process including through the PPL@Home portal;" and (3) "An overview of EVV, review EVV options, compliance requirements, and how to access more training materials." Additionally, CDChoices had the responsibility of "Notifying the Consumer of their CDPAP start date and weekly and monthly service hours."

78.     Attachment A stated that these services will be provided "[p]ursuant to the terms and conditions of this Agreement" which included the Subcontractor Code of Conduct.

79.     Attachment B of the Agreement contemplated that CDChoices would assist PPL in facilitating the legally-mandated transition of all Consumers and their PAs from other FIs (including, but not limited to, CDChoices) to PPL between January 6, 2025 and March 30, 2025.

80.     In exchange for these services, Section 4(a) of the Agreement stated that PPL will include CDChoices in its "recommendations to Consumers when appropriate based on geographic location, cultural competency, and language abilities."

81.     Additionally, Attachment B provided, "SUBCONTRACTOR will earn a one-time payment for facilitating the transition of Consumers and their associated Personal Assistants

("PAs") to PPL as their fiscal intermediary during the period between January 6, 2025 – March 30, 2025 (the "Transition Period")."

82. Attachment B provided that the one-time payment it contemplated was to be calculated by assessing the number of "completed transition[s] to PPL of a Consumer and all associated PAs during the Transition Period." For each "completed transition," CDChoices would earn a total of $48.00.

83. Attachment B stated that "[a] 'completed transition' means that the Consumer and all associated PAs (1) have completed all registration paperwork, (2) are fully registered in PPL's systems, and (3) have completed one payroll cycle in which at least one of the Consumer's PAs has received a paycheck."

84. Attachment B further provided that the services to be provided pursuant to Attachment B (along with the compensation for such services) would be provided "[p]ursuant to the terms and conditions of this Agreement," which included the PPL Subcontractor Code of Conduct.

85. CDChoices also agreed to be subject to a duty of loyalty to PPL in the Agreement.

86. Specifically, Attachment C of the Agreement provided, "In carrying out their contracted work responsibilities, Subcontractors owe a duty of loyalty to PPL, and indirectly, to NYSDOH."

87. At all relevant times, CDChoices and PPL understood that the agreed-upon "duty of loyalty" was intended to prevent CDChoices from engaging in conduct that constituted a conflict of interest, including by acting in a manner to benefit itself at the expense of PPL and/or the NYSDOH. CDChoices and PPL further understood that the agreed-upon "duty of loyalty" was

intended to prevent CDChoices from engaging in conduct that would undermine PPL's obligations to the NYSDOH, the implementation of the CDPAP Amendment, or the fulfillment of the RFP.

88.    Attachment C of the Agreement further provided, "Violation of this Code of Conduct by a Subcontractor may serve as a basis for the termination of its contractual relationship with PPL."

89.    Additionally, Section 8(b) of the Agreement provided, "SUBCONTRACTOR shall comply with the provisions of the Subcontractor Code of Conduct attached as Attachment C," which included the commitment to perform all duties "with the highest standards of ethics and integrity" and which subjected CDChoices to a duty of loyalty to PPL.

90.    CDChoices' "contracted work responsibilities" included, among other things, communicating with Consumers and PAs by giving them "[a]n overview of a Consumer's responsibilities as joint employers of their PAs, including Electronic Visit Verification ("EVV"), service utilization and overtime usage," "[a]n overview of the Consumer's registration process including through the PPL@Home portal," "[a]n overview of EVV, review EVV options, compliance requirements, and how to access more training materials," and "[n]otifying the Consumer of their CDPAP start date . . ."  *See* Attachment A of the Agreement.

91.    PPL's requirement that CDChoices be subject to a "duty of loyalty" in performing its obligations under the Agreement makes sense in light of the significant conflict of interest presented here.

92.    As stated above, CDChoices benefitted significantly from the prior framework for CDPAP, and stood to lose significant profits following the implementation of the CDPAP Amendment and its shift from FI to Facilitator.

93.     By agreeing to a "duty of loyalty" to PPL and the NYSDOH, CDChoices resolved this conflict of interest and agreed not to advance its own economic interests at PPL's expense when communicating with Consumers and PAs (including when communicating with Consumers and PAs about their CDPAP start date).

94.     Although the Agreement does not require CDChoices to work solely for PPL on a full-time basis, it does require CDChoices to abide by the Subcontractor Code of Conduct in the work it performs outside of the Agreement.

95.     Specifically, Section 9 of the Agreement entitled "Relationship of the Parties" acknowledges that CDChoices is "not required to perform the Subcontracted Services on a full-time basis for PPL and may perform services for other individuals and organizations consistent with the requirements of the Agreement, including Attachment C."

96.     Therefore, if CDChoices wishes to perform work outside of the Agreement, it must do so subject to the "highest standards of ethics and integrity" and its duty of loyalty.

**D.      The Transition Process from Former FIs to PPL**

97.     As stated above, the CDPAP Amendment required all Consumers and PAs enrolled in CDPAP to transition from former FIs to PPL by the Registration Deadline (*i.e.*, April 1, 2025).

98.     The transition from former FIs to PPL was a multi-step process.

99.     A Consumer first needed to create an account with PPL@Home.

100.     After creating that account, a Consumer had the opportunity to "enroll" with a Facilitator to assist in managing their CDPAP benefits.  If a Consumer did not "enroll" with a Facilitator, PPL managed their CDPAP benefits directly.

101.     After completing those steps, a Consumer had to execute a Memorandum of Understanding with PPL.

102.    And after executing the Memorandum of Understanding, a Consumer had to ensure that all PAs associated with their CDPAP benefits had registered with PPL, which involved those PAs creating a separate account with PPL@Home, the Consumer ensuring that his/her PPL@Home account was linked to their PAs' PPL@Home accounts, and the PA executing various forms (*e.g.*, an Offer Letter (one per associated consumer); a Personal Assistant Agreement; IRS Form W-4;  State Form NY IT-2104-I; USCIS Form I-9 and supporting documentation; a Payment Method Form; and a Health Assessment).

103.    PAs also had to download the Time4Care application to log time and to complete Electronic Visit Verifications ("EVV").

104.    Only after executing the Memorandum of Understanding and ensuring that all associated PAs were registered with PPL was a Consumer considered "fully transitioned" to PPL.

105.    Indeed, such is reflected in Attachment B of the Agreement, which provides that CDChoices would receive a one-time payment "for facilitating the transition of Consumers and their associated Personal Assistants ("PAs") to PPL as their fiscal intermediary" and defined a "completed transition" as one where "the Consumer and all associated PAs (1) have completed all registration paperwork, (2) are fully registered in PPL's systems, and (3) have completed one payroll cycle in which at least one of the Consumer's PAs has received a paycheck."

106.    But Consumers who had created their PPL@Home accounts and had enrolled with a Facilitator were considered "enrolled" with a Facilitator.

107.    Put differently, not all Consumers who were "enrolled" with a Facilitator had completed their transitions to PPL.

108.    The terms of the Agreement provided that CDChoices' contractual obligations to communicate with Consumers (and to do so honestly) as PPL's subcontractor began once a Consumer had *enrolled* with CDChoices.

109.    Specifically, pursuant to Attachment A, if a Consumer enrolled with a Facilitator, that Facilitator was required to aid in the PA registration process by, among other things, collecting PA information from a Consumer to log the PA into PPL@Home and reviewing the PA's required documents.

110.    Also pursuant to Attachment A, if a Consumer enrolled with a Facilitator, that Facilitator was required to provide the Consumer "[a]n overview of the Consumers *registration process* including online through the PPL@Home portal" and to "notify[] the Consumer of their CDPAP start date and weekly and monthly service hours."

**E.      The Transition from Former FIs to PPL and the TRO.**

111.    N.Y. Soc. Serv. Law § 365-f required all CDPAP participants to transition their FI services from former FIs to PPL by registering with PPL by March 31, 2025 (the "Registration Deadline").

112.    But, as the Registration Deadline approached, certain CDPAP participants had not yet completed their transitions from former FIs to PPL.

113.    These delays were, at least in part, due to misinformation and smear campaigns undertaken by former FIs to undermine the enforcement of the CDPAP Amendment.

114.    Specifically, former FIs communicated to Consumers and PAs utilizing CDPAP that the transition from former FIs to PPL would not occur, and instructed those Consumers and PAs to remain registered with their former FIs instead of transitioning to PPL.

42

115. The misinformation campaign was so pervasive that the NYSDOH issued letters, which were publicly posted, to sixteen former FIs on March 10, 2025 to cease and desist making false statements to Consumers and PAs about CDPAP and the transition to PPL ("NYSDOH's Cease and Desist Letter"). A copy of the NYSDOH's Cease and Desist Letter is attached as **Exhibit C**.

116. On March 26, 2025, a federal class action lawsuit was filed against the NYSDOH before the United States District Court for the Eastern District of New York under the case caption *Engesser, et al. v. McDonald*, Case No. 25-CV-1689 ("*Engesser*").

117. The plaintiffs in *Engesser* sought only to prevent Consumers from losing their services under CDPAP during the transition to PPL and provide them more time to register with PPL, not to call for the Court to deem the CDPAP Amendment (and its requirement that Consumers transition to PPL, the sole-statewide FI) unenforceable. A copy of the complaint in *Engesser* is attached as **Exhibit D**.

118. Specifically, the *Engesser* plaintiffs alleged that Medicaid recipients cannot lawfully be deprived of home-care services during the transition without constitutionally required notice, a fair hearing, and aid-continuing. The complaint accepted the transition as a given, and challenged only the fact that CDPAP beneficiaries would lose their benefits without these constitutional protections being met.

119. To address these alleged harms, the *Engesser* plaintiffs requested a tailored order requiring the NYSDOH to, among other things, "ensure that payments to CDPAP Personal Assistants continue uninterrupted while CDPAP Consumers have a longer time to make the transition to PPL, and "provide any CDPAP consumer who will have their CDPAP services suspended or terminated as a result of the effectiveness of the CDPAP Amendment on September

30, 2025, with timely and adequate notice—sent no later than September 10, 2025—and an opportunity for a fair hearing…".

120. On March 31, 2025, the District Court issued a TRO in *Engesser*, which temporarily restrained enforcement of the Registration Deadline pending a hearing on the *Engesser* plaintiffs' request for a preliminary injunction, which the District Court scheduled for April 4, 2025 (the "TRO"). A copy of the TRO is attached as **Exhibit E.**

121. In relevant part, the TRO stated, "Defendant James V. McDonald, as Commissioner of the New York State Department of Health, shall, upon filing of this Order, be immediately and temporarily restrained from implementing those sections of Part HH of Chapter 57 of the New York Session Laws of 2024 (the "CDPAP Amendment") that amend subdivision 4-a(ii-a) (see section 1 of Part HH) and 4-a-1(a) (see section 3 of Part HH) of section 365-f of the social services law."

122. The TRO further stated, "Importantly, this Order does not prevent the Statewide Fiscal Intermediary ("PPL") from operating, processing applications, servicing and paying CDPAP participants who have already registered with PPL. Rather, this Order restrains Defendant from *disallowing* other Fiscal Intermediaries from servicing those CDPAP participants who have not yet registered with PPL."

123. In short, the TRO effectively extended enforcement of the Registration Deadline from March 31, 2025 to April 4, 2025 (when the District Court would assess whether to issue a preliminary injunction in connection with the *Engesser* plaintiffs' claims) to ensure that Consumers and PAs had limited additional time to complete the transition of FI services from former FIs to PPL without losing their CDPAP benefits.

124. The TRO did not stop the transition to PPL.

44

125.    The TRO did not invalidate the sections of the CDPAP Amendment that provided that CDPAP would be administered by a single, statewide FI as opposed to hundreds of separate FIs.

126.    The District Court entered into a preliminary injunction on April 4, 2025 (the "Preliminary Injunction").  A copy of the Preliminary Injunction is attached as **Exhibit F**.

127.    The terms of the Preliminary Injunction reinforce the limited scope and impact of the TRO, and the *Engesser* litigation overall.

128.    The Preliminary Injunction specifically stated that "[t]his Stipulation and Order does not prevent DOH or PPL from continuing to transition Consumers and their PAs to PPL" and "allow[s] for Consumers to continue receiving services and PAs to continue to be paid while Consumers and PAs fully transition to a single Statewide FI."

129.    The Preliminary Injunction defined the Registration Deadline as May 15, 2025.

130.    Again, neither the TRO nor the Preliminary Injunction "halted" or "paused" the transition to PPL contemplated by N.Y. Social Services Law § 365-f (4-a-1)(a).  Instead, it delayed *enforcement* of the Registration Deadline set in N.Y. Social Services Law § 365-f (4-a-1)(a) by a limited period of time.

131.    The transition of all Consumers and PAs to PPL contemplated by N.Y. Social Services Law § 365-f (4-a-1)(a) is now complete.  CDPAP services for all Consumers and PAs are administered either by a Facilitator or by PPL directly, depending on the Consumer's stated preference during registration.

**F.    CDChoices Breaches the Agreement by Sending Misleading Messages to Consumers and PAs about the TRO.**

132.    On March 31, 2025, only hours after the TRO was issued, and before PPL had the opportunity to digest the scope and impact of the TRO, CDChoices sent misleading messages to

45

Consumers and PAs via-email, text message, and call in violation of the Agreement.  A copy of the

messages CDChoices sent to Consumers and PAs on March 31, 2025 is attached as **Exhibit G.**

133.    CDChoices sent Consumers who had enrolled with CDChoices but had not yet

completed their transitions to PPL (referred to by CDChoices as "Staying Consumer[s]") the

following email message:

> **Important:**  In our effort to get you important updates quickly, you may have received conflicting or unclear information.  This message provides your **official and final transition status** and replaces any previous guidance.  We sincerely apologize for any confusion caused.
>
> We are reaching out to share a significant legal update regarding your transition to Public Partnerships LLC (PPL).
>
> On Monday evening, a federal judge issued a **Temporary Restraining Order** that halts the State's transition to PPL.  As a result, your transition has been **<u>paused</u>** and **no changes will be made to your current services.**
>
> Please continue to manage your CDPA services with CDChoices' support.  On April 1 (today), there is **no change to how you schedule and submit hours,** and your Personal Assistants should continue using the **CareTime** system for Electronic Visit Verification (EVV) to get paid.  The transition to PPL's EVV system, Time4Care, will not occur until further notice.
>
> We understand that changes like this can be confusing, and we are here to support you.  CDChoices will monitor the situation closely and share updates as more information becomes available.

(emphasis in original).

134.    CDChoices sent PAs who had enrolled with CDChoices but had not yet completed

their transitions to PPL (referred to by CDChoices as "Staying Personal Assistant[s]") the

following email:

> **Important:**  In our effort to get you important updates quickly, you may have received conflicting or unclear information.  This message provides your **official and final transition status** and replaces any previous guidance.  We sincerely apologize for any confusion caused.

> On Monday evening, a federal judge issued a **Temporary Restraining Order** that pauses the State's transition to PPL. As a result, **your transition to PPL has been paused**. Today, April 1, there will be **no changes to your current employment or EVV system.**
>
> Please continue to use the **Caretime** system for Electronic Visit Verification (EVV), and **do not begin using PPL's Time4Care system** until further notice.
>
> We understand that changes like this can be confusing, and we are here to support you. CDChoices will monitor the situation closely and share updates as more information becomes available.

(emphasis in original).

135. CDChoices sent Consumers who had enrolled with CDChoices but had not yet completed their transitions to PPL (referred to by CDChoices as "Staying Consumer[s]") the following voice message:

> This is an important CDPA legal update from C D Choices. A federal judge issued a Temporary Restraining Order that pauses the States [sic] transition to Public Partnerships LLC. As a result, your program transition to PPL has been paused. Please continue to manage your CDPA services with Consumer Directed Choices with no change to how you currently track and submit hours. Your Personal Assistants should continue to use the Care Time system for EVV and will not transition to PPLs EVV system until further notice. CDChoices will follow up this week as things develop. Visit c d choices dot org forward slash transition for more information about what this legal update means for your current services. THANK YOU.

136. CDChoices sent PAs who had enrolled with CDChoices but had not yet completed their transitions to PPL (referred to by CDChoices as "Staying Personal Assistant[s]") the following voice message:

> This is an important CDPA legal update from C D Choices. A federal judge issued a Temporary Restraining Order that pauses the States transition to Public Partnerships LLC. As a result, your transition to PPL has been paused. You will continue to use the Care Time system for EVV and should not transition to PPLs EVV system until further notice. C D Choices will follow up this week with additional updates. Visit c d choices dot org forward slash transition for more information about what this legal update means for your current CDPA services. Thank YOU.

137.    CDChoices sent Consumers who had enrolled with CDChoices but had not yet completed their transitions to PPL (referred to by CDChoices as "Staying Consumer[s]") the following text message:

> A federal judge has paused the State's transition to PPL.  As a result, your transition has been paused.  Continue managing your CDPA services with CDChoices as usual.  Your PAs should keep using Care Time for EVV-Do not switch to Time4Care.  We'll follow up with updates this week.

138.    CDChoices sent PAs who had enrolled with CDChoices but had not yet completed their transitions to PPL (referred to by CDChoices as "Staying Personal Assistant[s]") the following text message:

> **PA Important CDPA Update from CDChoices:**
> CDPAP Legal Update: A judge has paused the State's transition to PPL.  As a result, **your transition is on HOLD.  Continue** using **CareTime** for EVV – **do not switch to Time4Care** until further notice.  More information will be provided this week.

(emphasis in original).

139.    CDChoices' statements to Consumers and PAs who had enrolled with CDChoices but had not yet completed their transitions to PPL fundamentally and deliberately misrepresented the TRO in a number of ways.  *First*, CDChoices' statements represented to Consumers that the TRO "halts the State's transition to PPL" and represented to PAs that the TRO "pauses the State's transition to PPL."  But the very terms of the TRO state the opposite.

140.    *Second*, CDChoices' statements represented to Consumers that, as a result of the TRO, "your transition [to PPL] has been **<u>paused</u>** and **no changes will be made to your current services**" and represented to PAs that "**your transition to PPL has been paused**" and "there will be **no changes to your current employment or EVV system**."  But the very terms of the TRO did no such thing.  Instead, the TRO temporarily restrained enforcement of the Registration

48

Deadline by only four (4) days—from March 31, 2025 to April 4, 2025—and otherwise directed that participants in CDPAP should continue transitioning FI services to PPL.

141.    *Third*, CDChoices statements instructed CDPAP participants to continue using CDChoices' electronic platforms to manage their CDPAP services and instructed, partially in *bold-face type*, *not* to begin using PPL's electronic systems for their CDPAP services "until further notice."  As with the rest of the messages, these instructions—which sought to stop the transition—go against the TRO's terms, which temporarily restrained enforcement of the Registration Deadline until April 4, 2025 (not, as CDChoices suggested, "until further notice") and which made clear that Consumers and PAs could and should continue transitioning their FI services to PPL as required by the CDPAP Amendment by the briefly-extended Registration Deadline.

142.    *Fourth*, CDChoices told Consumers and PAs who were enrolled with CDChoices but had not yet completed their transitions to PPL that this was their "official and final transition status and replaces any previous guidance" despite the fact that this was a *temporary* restraining order which specifically said that it "*temporarily restrained*" the enforcement of the Registration Deadline.  Nothing about the TRO was "final."

143.    CDChoices did not state that the TRO temporarily restrained enforcement of the Registration Deadline pending the April 4 preliminary injunction hearing in its messages to Consumers and PAs.

144.    CDChoices' malicious intent behind these misleading communications to Consumers and PAs is demonstrated by the differences between its messages to Consumers.

145.    On its website, CDChoices told Consumers that the TRO "does not stop the switch to PPL as the single [statewide FI]" and that "it is important that consumers and personal assistants make every effort to complete their registration(s)."

146.    But in its direct communications to Consumers through calls, emails, and text messages, CDChoices told Consumers that their "official and final transition status" was that the "transition has been paused and no changes will be made to your current services" and that "there will be no changes to your current employment or EVV system."

147.    As stated above, Attachment A of the Agreement specifically required CDChoices to communicate with these Consumers—namely, Consumers who had enrolled with CDChoices but had not yet completed their transitions to PPL—by, among other things "[p]roviding Consumers with an orientation to CDPAP, consisting of . . . [a]n overview of the Consumer's registration process including online through the PPL@Home portal."

148.    Attachment A of the Agreement also required CDChoices to "notify[] the Consumer of their CDPAP start date and weekly and monthly service hours."

149.    CDChoices breached Attachment A of the Agreement in sending misleading, inaccurate messages to Consumers and PAs who had enrolled with PPL, but had not yet completed their registrations with PPL.

150.    Specifically, CDChoices made misrepresentations about the "CDPAP start date" for Consumers and PAs by indicating that the TRO "paused" their transitions to PPL "indefinitely."

151.    CDChoices also made misrepresentations about the "registration process" for these Consumers and PAs by, again, indicating that the TRO "paused" their transitions to PPL (and accordingly "paused" their need to complete their registration with PPL) indefinitely.

152.    PPL was harmed by CDChoices' actions, and the delays to the transition that such actions caused.  For each and every day that CDChoices' statements delayed a Consumer or a PA from completing their registration with PPL (because those Consumers or PAs believed that transition to be "paused" and that they should continue using CDChoices' own systems "until

further notice"), the transition of all FI services to PPL was unnecessarily delayed. And PPL lost the compensation arising from each and every one of those misled Consumers and PAs as a result of CDChoices' self-serving actions.

153. CDChoices' actions also breached Attachment C of the Agreement. As stated above, Attachment C of the Agreement specifically required CDChoices to perform its contractual duties "with the highest standards of ethics and integrity" and states that "[CDChoices] owe[d] a duty of loyalty to PPL, and indirectly, to NYSDOH."

154. CDChoices breached Attachment C of the Agreement in sending misleading, inaccurate messages to Consumers and PAs on March 31, 2025 as these messages misled Consumers and PAs and benefited CDChoices at PPL's expense.

155. Specifically, CDChoices benefited from Consumers and PAs believing their transition to PPL had been "paused" and following CDChoices' instructions to continue using CDChoices' own platforms "until further notice," which enabled CDChoices to continue charging for FI services to those Consumers and PAs.

156. CDChoices' rates for providing FI services to Consumers and PAs significantly exceeded the rates PPL paid CDChoices for servicing Consumers and PAs as a subcontractor for PPL.

157. Accordingly, CDChoices had a significant financial interest in delaying the transition of all FI services from CDChoices to PPL for as long as possible. CDChoices' false, misleading instructions to Consumers and PAs on March 31, 2025 served that interest.

158. PPL was harmed by CDChoices' actions, and the delays to the transition that such actions caused. For each and every day that CDChoices' statements delayed a Consumer or a PA from completing their transition to PPL (because those Consumers or PAs believed that transition

51

to be "paused" and that they should continue using CDChoices' own systems "until further notice"), the transition of all FI services to PPL was unnecessarily delayed.  And PPL lost the compensation arising from each and every one of those misled Consumers and PAs as a result of CDChoices' self-serving actions.

159.    CDChoices' actions also breached Attachment B of the Agreement (as informed by the PPL Subcontractor Code of Conduct).

160.    Attachment B of the Agreement provided that CDChoices would be compensated by PPL for assisting in transitioning Consumers and PAs to PPL from January 6, 2025 through March 30, 2025.  Attachment B of the Agreement further provides that this is effected "[p]ursuant to the terms and conditions of this Agreement," which included the PPL Subcontractor Code of Conduct.

161.    In accepting that contractual term, particularly in tandem with its existing contractual obligations to perform its responsibilities "with the highest standards of ethics and integrity" and its contractual duty of loyalty to PPL, CDChoices agreed to communicate with Consumers and PAs about the transition and assist Consumers and PAs in completing the transition, and to engage in those activities honestly.

162.    A number of the Consumers and PAs to whom CDChoices sent the misleading messages on March 31, 2025 (and the days that followed) had *already begun*, but had not yet completed, transitioning their FI services from CDChoices to PPL as required by the CDPAP Amendment.

163.    Prior to March 31, 2025, CDChoices communicated with those transitioning Consumers and PAs regarding their transitions from CDChoices and PPL, and assisted those transitioning Consumers and PAs with their transitions from CDChoices to PPL.

164. CDChoices engaged in those communications knowing that it would be compensated for every "completed transition" (as defined in the Agreement) undertaken between January 6, 2025 and March 30, 2025.

165. CDChoices breached its contractual obligations under Attachment B (as informed by the PPL Subcontractor Code of Conduct and the other incorporated terms of the Agreement) by communicating dishonestly with Consumers and PAs who had not yet completed their transitions to PPL about the status of and need to complete those transitions.

166. Again, PPL was harmed by CDChoices' breaches. By violating the relationship of trust between CDChoices, PPL, and the Consumers and PAs transitioning from CDChoices to PPL established by Attachment B, CDChoices caused Consumers and PAs to stall their legally mandated transitions to PPL. And for each and every day that CDChoices' statements delayed a Consumer or a PA from completing their transition to PPL, the transition of all FI services to PPL was unnecessarily delayed. And PPL lost the compensation arising from each and every one of those misled Consumers and PAs as a result of CDChoices' self-serving actions.

## G. CDChoices Refuses to Cure Its Breaches & PPL Terminates the Agreement.

167. On April 1, 2025, Vince Coppola, the CEO of PPL, issued a statement to all of PPL's subcontractors, including CDChoices, regarding the scope and impact of the TRO.

168. In that statement, PPL stated, "We expect you to continue to fulfill, in all respects, your contractual duties to PPL and to the program, including continuing work to register consumers and PAs with PPL and help them onboard. If asked about the TRO, we expect you will respond with the truth—that the TRO is limited in scope, temporary in nature, and should not affect their ongoing registration effort with PPL." PPL further stated, "Any action by a facilitator to retain or

somehow re-direct the registration of a consumer with PPL will be considered a blatant violation of our agreement and of the scope and intent of the TRO."

169.    CDChoices made no effort to retract or adjust the communications sent to Consumers and PAs on March 31, 2025 after receiving the April 1, 2025 statement from PPL. Instead, CDChoices overrode PPL's directive and—acting solely in its own benefit—continued to send the same misleading messages to Consumers and PAs.

170.    Later on April 1, 2025, PPL became aware of CDChoices' misleading communications to Consumers and PAs regarding the scope and impact of the TRO.

171.    PPL interpreted CDChoices' communications to Consumers and PAs—particularly, though not exclusively, due to the repeated indication that Consumers' and PAs' transitions to PPL had been "pause[d]" and the instruction to use CDChoices as their fiscal intermediary for CDPAP "until further notice"—as self-serving, deliberate attempts by CDChoices to delay Consumers and PAs from completing their transitions to PPL in order to continue being paid as a fiscal intermediary for CDPAP for as long as possible in breach of the Agreement.

172.    Accordingly, on April 1, 2025, PPL sent a letter to CDChoices demanding that it cease and desist its communications to Consumers and PAs regarding the TRO.  A copy of the April 1, 2025 letter from PPL to CDChoices is attached as **Exhibit H.**

173.    In that letter, PPL demanded that CDChoices "must immediately cease and desist from making any further statements that state or suggest that consumers or PAs should cease or slow their efforts to register with PPL or that PAs should continue to submit time to their current facilitators."

54

174. PPL further demanded that CDChoices "immediately issue a correction to your previous public statements, making it clear that all consumers and PAs should continue registering with PPL and should submit time on PPL's EVV app, as soon as they are able."

175. PPL concluded the April 1, 2025 letter by stating, "If you are unable or unwilling to comply with these directives, please let us know, so that we can make plans to assign your consumers to other facilitators and end our contractual relationship."

176. CDChoices did not respond to the April 1, 2025 letter.

177. On April 2, 2025, PPL sent a notice of termination of the Agreement to CDChoices. A true and correct copy of the April 2, 2025 notice of termination from PPL to CDChoices is attached as **Exhibit I.**

178. In its April 2, 2025 notice, PPL notified CDChoices that the following actions amounted to material breaches of the Agreement: (1) making public statements to PAs working in CDPAP that may be false, coercive or deceptive; (2) communicating to PAs and others directions that were contrary to the TRO; (3) posting information on its website encouraging Consumers and their PAs to continue receiving services from CDChoices (rather than PPL) after April 1, 2025; and (4) failing to fulfill its contractual duties under the Agreement to assist consumers and their PAs to register with PPL. PPL further indicated in its April 2, 2025 notice, "It may not be possible to undo the damage you caused to consumers, to PAs, to CDPAP in general, and to PPL's legitimate business interests when you took these actions."

179. Notwithstanding, PPL gave CDChoices the opportunity to cure its material breaches of the Agreement in the April 2, 2025 notice. PPL instructed CDChoices that it needed to complete the following actions to cure: (1) immediately issue a correction to CDChoices' previous public statements, making it clear that all consumers and PAs should continue registering

55

with PPL and should submit time on PPL's EVV app, as soon as they are able; (2) immediately remove all information from CDChoices' website and other public sources that stated or implied that consumers and their PAs should not continue the registration process with PPL; (3) immediately resume counseling consumers who have already taken registration steps with PPL that their best course of action is to continue as planned with PPL, and counseling workers who have started the registration process that they should start submitting time to PPL; and (4) if asked about the TRO, respond that the TRO is limited in scope, temporary in nature, and should not affect a CDPAP participant's registration efforts. PPL requested that CDChoices "reply within 48 hours with evidence that you have taken these corrective actions."

180. PPL's turnaround time made sense in light of the terms of the TRO. At that point, only 48-hours remained before the slightly extended Registration Deadline set by the TRO. Accordingly, to have any remedial effect on Consumers and PAs who delayed their registration with PPL in light of CDChoices' misleading communications, CDChoices needed to take remedial action within 48-hours.

181. CDChoices did not respond to the April 2, 2025 notice of termination.

182. Instead, CDChoices continued to breach the Agreement by sending the same messages to Consumers and PAs misrepresenting the scope and impact of the TRO and improperly instructing them to continue using CDChoices as their FI and using CDChoices' systems for CDPAP administration.

183. CDChoices' decision to continue sending Consumers and PAs the same false, misleading messages about the TRO sent on March 31, 2025 *despite* demands from PPL to stop and despite repeated opportunities to cure amounted to additional breaches of the Agreement.

184.   In light of CDChoices' additional breaches, on April 3, 2025, PPL sent an email to Mr. Graber, the CEO of CDChoices, informing him of PPL's immediate termination of the Agreement.  A copy of the April 3, 2025 notice of termination and all attachments is attached as **Exhibit J.**

185.   In the April 3, 2025 notice, PPL indicated, "We have received complaints that you are instructing PAs associated with consumers who are fully registered with PPL that they 'should not transition to PPL's EVV system until further notice,' and that 'your PAs should continue using CareTime for EVV – do not switch to Time4Care.'"  PPL attached additional examples of text messages and voicemails sent by CDChoices to Consumers and PAs communicating these misleading, improper instructions to that notice.

## H.   CDChoices Attempts to be Reinstated as a Subcontractor, But Continues to Refuse to Cure its Breaches.

186.   Following its termination, CDChoices made overtures to PPL in an effort be reinstated as a subcontractor.

187.   On April 3, 2025, CDChoices sent a response to PPL's termination through counsel. In it, CDChoices stood by its misrepresentations of the scope and impact of the TRO to Consumers and PAs, and indicated that it had no obligation or intention to correct those misinterpretations.

188.   Despite those representations, PPL reached out to CDChoices to discuss its April 3, 2025 letter and the possibility of PPL reinstating CDChoices as a subcontractor.  PPL and CDChoices planned to meet on April 9, 2025 to discuss a possible resolution, and PPL requested that CDChoices send PPL evidence of corrective measures in advance of that meeting.

189.   Between April 3, 2025 and April 9, 2025, PPL did not receive any communications from CDChoices regarding any corrective measures taken.

190.    On April 9, 2025, CDChoices sent PPL a proposal for reinstatement of CDChoices as a subcontractor for PPL in the form of a proposed amendment to the Agreement.  A copy of CDChoices' April 9, 2025 letter is attached as **Exhibit K.**

191.    Among other things, CDChoices' proposed amendment indicated that, "Subcontractor shall not act as a Fiscal intermediary, provided, however, that if PPL's contract with the State Department of Health is terminated, or a court of competent jurisdiction authorizes entities to perform Fiscal Intermediary services, or the NY Social Services Law is amended to permit additional entities to provide Fiscal Intermediary Services, Subcontractor may terminate this Agreement immediately."

192.    CDChoices' proposed amendment revealed what PPL had already recognized (and what prompted PPL to terminate the Agreement):  CDChoices was aiming to have its cake (serve as a Facilitator for PPL in the event of a transition) and eat it, too (but keep as many Consumers and PAs on its own payroll for as long as possible in the event that something came along to frustrate or stall the transition).

193.    But CDChoices' contractual duty of loyalty to PPL, and the terms of the Agreement overall, precluded CDChoices from engaging in that very conduct.

194.    On April 11, 2025, CDChoices sent PPL evidence of purported "corrective actions" taken on April 4, 2025.  A true and correct copy of the April 11, 2025 letter including this evidence is attached as **Exhibit L.**

195.    CDChoices stated that, "[i]n response to the Emergency TRO Order issued at approximately 5:45 PM on April 2, and subsequent clarifications from the Department of Health articulated through the "Notice: Limited Temporary Restraining Order Issued for CDPAP

58

Statewide Fiscal Intermediary Transition," CDChoices acted to realign our operations with the updated directives."

196. But review of these corrective actions revealed that they were not the corrective actions demanded by PPL in its April 2, 2025 notice of termination (and, accordingly, failed to cure CDChoices' identified breaches).

197. Indeed, nowhere in these purported "corrective actions" did CDChoices even acknowledge (let alone correct) the March 31, 2025 communications. Instead, CDChoices appeared to *build* on its misrepresentations about the TRO, stating "A preliminary injunction hearing was conducted on April 4, which maintains the Temporary Restraining Order (TRO) initially issued. This order remains operative as we await further legal clarification." And nowhere in these purported "corrective actions" did CDChoices specifically state that *all* Consumers and PAs should complete registration with PPL, as PPL requested. Instead, CDChoices simply "encourage[d]" Consumers and PAs to "proceed with registration or completion of registration."

198. Despite this, on April 11, 2025, PPL informed CDChoices that it would be willing to reinstate CDChoices as a subcontractor for PPL if CDChoices executed an amendment to the Agreement drafted by PPL.

199. PPL's proposed amendment was focused on ensuring; (1) that CDChoices would use "best efforts" to facilitate the transition to PPL (including by communicating with Consumers and PAs that such transition was necessary and needed to be completed as soon as possible); (2) that CDChoices issued sufficiently corrective communications regarding the TRO and PI; and (3) that CDChoices would communicate truthfully with Consumers and PAs through both its one-on-one communications and in its public-facing communications.

59

200. And, in light of CDChoices' apparent conflicts of interest, PPL included language in the Amendment that called for PPL to approve of any public facing communications from CDChoices to Consumers and PAs and provided PPL the right to terminate the Agreement immediately in the event that CDChoices breached the Agreement (or Amendment) again.

201. On April 13, 2025, Mr. Fernandez indicated that CDChoices was willing to enter into the April 11 Proposed Amendment if PPL could confirm that the Consumers who were formerly assigned to CDChoices would be reassigned to CDChoices, and that CDChoices would be eligible for additional Consumers.

202. On April 14, 2025, PPL informed CDChoices of another example of CDChoices communicating with prior clients to solicit them back to CDChoices in which CDChoices misrepresented to the Consumer that insurance could not be started with PPL for another ninety (90) days.

203. That same day, PPL informed CDChoices that it would only be given "Category A Consumers" back upon reinstatement. On April 18, 2025, PPL clarified that "Category A Consumers" were consumers who were already fully registered with PPL.

204. CDChoices did not respond to PPL's April 18, 2025 email until May 1, 2025.

205. PPL and CDChoices did not correspond about CDChoices breaches or potential reinstatement as a subcontractor between May 1, 2025 and June 5, 2025.

206. Tellingly, on May 14, 2025, a New York State Senator Gustavo Rivera introduced Senate Bill S7954, which sought to amend the CDPAP Amendment to add a "new class" of fiscal intermediaries.

207. Senate Bill S7954 stated: "This bill would create a new class of FIs beyond the current State-wide Fiscal Intermediary (SFI). This new class of FIs would operate as the current

SFI in conjunction with entities that are (1) independent living centers that have been operating as a fiscal intermediary since January 1, 2024, or at the discretion of the Commissioner of Health; or (2) an entity selected as a subcontractor under the Single Fiscal Intermediary law as of April 1, 2025."

208.    Senate Bill S7954 was referred to the Senate Health Committee on May 14, 2025 and no other action has been taken since.

209.    On June 5, 2025, after Senate Bill S7954 failed, CDChoices reached out to PPL to discuss reinstatement of CDChoices as a subcontractor.

210.    On June 9, 2025, PPL indicated to CDChoices that it was no longer interested in reinstating CDChoices as a Facilitator and confirmed that the Agreement remained terminated in light of CDChoices' material breaches of the Agreement including its contractual duty of loyalty to PPL.

**I.    CDChoices Must Reimburse PPL's Attorney's Fees**

211.    Section 11(b) of the Agreement states:

> Each party shall indemnify and hold harmless the other party from all claims, losses, expenses, fees (including attorney's fees), costs, judgments, and liabilities arising from: (1) the indemnifying party's breach of this Agreement; (2) the indemnifying party's failure to meet statutory, regulatory, or legal obligations; or (3) third-party claims arising from either party's participation under this Agreement.

212.    CDChoices must accordingly pay PPL's attorney's fees for bringing the instant claim.

## CLAIMS FOR RELIEF

### COUNT ONE:  BREACH OF CONTRACT
### Violation of Contractual Duty of Loyalty
### (Section 8(b) of the Agreement, Attachment C of the Agreement)

213.    PPL incorporates by reference the allegations in Paragraphs 1 through 212 above as though fully set forth herein.

214.    PPL fully performed its obligations under the Agreement.

215.    Section 8(b) of the Agreement requires CDChoices to "comply with the provisions of the Subcontractor Code of Conduct attached as Attachment C."

216.    The Subcontractor Code of Conduct provides, among other things, that "Subcontractors owe a duty of loyalty to PPL, and indirectly to NYSDOH."

217.    CDChoices' duty of loyalty under Attachment C governs its communications with Consumers and PAs— including notifying Consumers of their CDPAP start date, registration/onboarding orientation, and EVV guidance— because those communications were part of its "contracted work responsibilities" under Attachment A.

218.    On March 31, 2025, and repeatedly thereafter, CDChoices sent deliberately misleading communications to Consumers and PAs regarding the scope and impact of the TRO issued by the United States District Court for the Eastern District of New York in *Engesser, et al. v. McDonald*, Case No. 25-CV-1689 on March 31, 2025.

219.    The TRO restrained enforcement of the deadline for all Consumers and PAs utilizing CDPAP to transition FI services from former FIs to PPL for only four (4) days—from March 31, 2025 to April 4, 2025.

220.    But CDChoices' communications to Consumers and PAs represented that the legally-mandated transition away from former FIs (like CDChoices) to the single, statewide FI

62

(PPL) had been "paused" and instructed Consumers and PAs to continue using CDChoices' electronic systems to administer CDPAP "until further notice."

221. CDChoices' communications to Consumers and PAs violated CDChoices' duty of loyalty to PPL as it benefited CDChoices at PPL's expense by instructing Consumers and PAs not to complete their transitions to PPL for an indefinite period, ensuring that CDChoices remain the FI for those Consumers and PAs for that same indefinite period.

222. CDChoices benefited by remaining the FI for any Consumers and PAs who delayed completing their transitions to PPL on or after March 31, 2025 because it continued collecting the substantial fees charged for its FI services for each and every day it remained an FI.

223. PPL was harmed by CDChoices remaining the FI for any Consumers and PAs who delayed completing their transitions to PPL on or after March 31, 2025 because PPL lost the fees associated with servicing those Consumers and PAs for that period of time.

224. PPL suffered damages as a result of CDChoices' breach.

**COUNT TWO:  BREACH OF CONTRACT**
**Violation of Obligations to Facilitate Consumer and PA Registration**
**(Violation of Attachment A)**

225. PPL incorporates by reference the allegations in Paragraphs 1 through 224 above as though fully set forth herein.

226. PPL fully performed its obligations under the Agreement.

227. Attachment A of the Agreement obligated CDChoices to communicate directly with Consumers and PAs who enrolled with CDChoices but had not fully registered with PPL, including by providing Consumers with an orientation to the registration process with PPL@Home, an overview of the PA hiring process, by working with Consumers and their PAs to register the PAs with PPL@Home, and notifying Consumers of their CDPAP start dates.

63

228.    Attachment A of the Agreement indicates that it is undertaken "[p]ursuant to the terms and conditions of this Agreement," including the PPL Subcontractor Code of Conduct laid out in Attachment C of the Agreement.

229.    Attachment C of the Agreement required that CDChoices undertake its contractual obligations to PPL—including the facilitation of the transition of Consumers and their PAs to PPL as their FI—"with the highest standards of ethics and integrity."

230.    Attachment C of the Agreement further provided that CDChoices owed a duty of loyalty to PPL.

231.    CDChoices breached Attachment A of the Agreement—particularly as informed by its tandem obligations in Attachment C of the Agreement—by sending misleading communications to Consumers and PAs who had enrolled with CDChoices but had not completed their respective transitions to PPL.

232.    Among other things, CDChoices misled Consumers and PAs who were enrolled with CDChoices but had not completed their transition to PPL by representing that their transitions had been "paused" by the TRO (when they had not), that there would be no changes their current employment, and by instructing those Consumers and PAs to continue using CDChoices' own systems to administer CDPAP "until further notice."

233.    PPL suffered damages as a result of CDChoices' breach.

### COUNT THREE:  BREACH OF CONTRACT
### Violation of Obligations to Facilitate Transition
### (Violation of Attachment B)

234.    PPL incorporates by reference the allegations in Paragraphs 1 through 233 above as though fully set forth herein.

235.    PPL fully performed its obligations under the Agreement.

64

236. As stated above, Attachment A of the Agreement obligated CDChoices to communicate directly with Consumers and PAs regarding the transition to PPL, including notifying Consumers of their CDPAP start dates and providing orientation and onboarding support related to registration with PPL.

237. Attachment B of the Agreement provides that CDChoices will be compensated "for facilitating the transition of Consumers and their associated Personal Assistants ("PAs") to PPL as their fiscal intermediary during the period between January 6, 2025 – March 30, 2025 (the "Transition Period")."

238. The CDPAP Amendment *required* the transition of services contemplated by Attachment B of the Agreement, and required that transition to be completed by March 31, 2025.

239. Attachment B of the Agreement indicates that it is undertaken "[p]ursuant to the terms and conditions of this Agreement," including the PPL Subcontractor Code of Conduct laid out in Attachment C of the Agreement.

240. Attachment C of the Agreement required that CDChoices undertake its contractual obligations to PPL—including the facilitation of the transition of Consumers and their PAs to PPL as their FI—"with the highest standards of ethics and integrity."

241. Attachment C of the Agreement further provided that CDChoices owed a duty of loyalty to PPL.

242. CDChoices breached Attachment B of the Agreement—particularly as informed by its tandem obligations in Attachment C of the Agreement—by sending misleading communications to Consumers and PAs who they were assisting in their respective transitions to PPL.

243.    Among other things, CDChoices misled Consumers and PAs who they were assisting in transitioning to PPL by representing that their transitions had been "paused" by the TRO (when they had not) and by instructing those Consumers and PAs to continue using CDChoices' own systems to administer CDPAP "until further notice."

244.    PPL suffered damages as a result of CDChoices' breach.

### COUNT FOUR:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

245.    PPL incorporates by reference the allegations in Paragraphs 1 through 244 above as though fully set forth herein.

246.    To the extent the conduct by CDChoices is not otherwise prohibited by the terms of the Agreement, CDChoices' actions breached the covenant of good faith and fair dealing implied in every contract.

247.    As indicated above, the Agreement provided that CDChoices would assist Consumers and PAs with their respective transitions to PPL and would communicate with them in doing so.

248.    Fundamental to the agreement that CDChoices would communicate with Consumers and PAs about their transitions to PPL is the notion that CDChoices would be honest and forthright with Consumers and PAs in each and every one of those communications.

249.    And it was reasonable for PPL to assume that—in agreeing to communicate with Consumers and PAs about their transitions to PPL—CDChoices agreed to communicate with Consumers and PAs about their transitions to PPL honestly and completely.

250.    PPL's reasonable expectations under the Agreement included that CDChoices would not use its position, access to Consumers, or communications with Consumers to spread

66

false information regarding registering with PPL or to instruct Consumers to avoid or delay registration with PPL during the transition.

251.    PPL fully performed its obligations under the Agreement.

252.    CDChoices breached the implied covenant of good faith and fair dealing in sending false, misleading communications to Consumers and PAs regarding the transition of services from CDChoices to PPL on and after March 31, 2025.

253.    The Agreement contemplates that CDChoices will communicate with Consumers and PAs in connection with both the transition of FI services required by the CDPAP Amendment and the administration of CDPAP benefits as PPL's subcontractor.

254.    Specifically, Attachment A contemplates that CDChoices will communicate with Consumers and PAs by giving them "[a]n overview of a Consumer's responsibilities as joint employers of their PAs, including Electronic Visit Verification ("EVV"), service utilization and overtime usage," "[a]n overview of the Consumer's registration process including through the PPL@Home portal," and "[a]n overview of EVV, review EVV options, compliance requirements, and how to access more training materials." *See* Attachment A ¶ 1.

255.    Attachment A further contemplates that CDChoices will communicate with Consumers and PAs about their "start date" with PPL by requiring CDChoices to "notify[] the Consumer of their CDPAP start date and weekly and monthly service hours." Attachment A ¶ 3.

256.    Inherent in those contractual obligations is the expectation that CDChoices will communicate with Consumers and PAs honestly and completely about their respective transitions and registrations with PPL, and their "CDPAP start date" with PPL.

257. CDChoices accordingly breached the implied covenant of good faith and fair dealing, when it sent messages to Consumers and PAs on and after March 31, 2025 misrepresenting the TRO's impact on the status of their respective transitions to PPL.

258. CDChoices also breached the covenant of good faith and fair dealing, when it sent messages to Consumers and PAs on and after March 31, 2025 falsely and self-servingly instructing Consumers and PAs to continue using CDChoices' electronic systems to administer CDPAP benefits "until further notice."

259. CDChoices' breaches of the implied covenant of good faith and fair dealing prevented PPL from enjoying the fruits of the Agreement with CDChoices by delaying the statutorily-mandated transition of FI services from CDChoices to PPL for CDChoices' own benefit and at PPL's expense.

260. CDChoices' breaches of the implied covenant of good faith and fair dealing also prevented PPL from enjoying the fruits of the Agreement with CDChoices by demonstrating that PPL could not trust CDChoices to communicate with Consumers and PAs—its primary obligation under the Agreement—honestly.

**COUNT FIVE:  TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC RELATIONS**

261. PPL incorporates by reference the allegations in Paragraphs 1 through 260 above as though fully set forth herein.

262. CDChoices tortiously interfered with PPL's relationships with Consumers and PAs who had not yet completed their statutorily-mandated transitions to PPL as of March 31, 2025.

263. CDChoices was aware that PPL would replace CDChoices as the FI charged with administering CDPAP to the Consumers and PAs who had not yet completed their statutorily

68

mandated transitions to PPL as of March 31, 2025. Indeed, the CDPAP Amendment required PPL to become the FI charged with administering CDPAP to these Consumers and PAs.

264. CDChoices intentionally interfered with PPL's business relationships with the Consumers and PAs who had not yet completed their statutorily mandated transitions to PPL as of March 31, 2025 by sending false, misleading messages to these Consumers and PAs representing that their transitions to PPL had been "paused" and instructing them to continue using CDChoices' own electronic systems to administer CDPAP benefits "until further notice."

265. CDChoices' communications with Consumers and PAs were, in themselves, dishonest as CDChoices' communications fundamentally misrepresented the impact of the TRO on those Consumers' and PAs' transitions from CDChoices to PPL and improperly instructed those Consumers and PAs to continue using CDChoices' electronic systems to administer CDPAP "until further notice."

266. CDChoices actions were malicious because, through those actions, CDChoices sought to mislead Consumers and PAs about the status of their transition to PPL in order to prompt those Consumers and PAs to delay their transitions and allow CDChoices to continue collecting fees as the FI for those Consumers and PAs.

267. CDChoices' self-serving, malicious intentions to deceive Consumers and PAs about the status of their transitions to PPL and keep these Consumers and PAs with CDChoices as long as possible were laid bare by its internal references to the Consumers and PAs in question as "Staying Consumers" and "Staying PAs."

268. CDChoices' self-serving, malicious intentions are also evidenced by its decisions to publish messages on its website (which PPL could see) that were materially different from the

messages sent *directly* to Consumers and PAs via-email, voice mail, and text message (which PPL could not see on its own).

269.    And CDChoices' self-serving, malicious intentions were *further underscored* by its decision to continue sending the same misleading messages to Consumers and PAs after being put on notice of their impropriety by PPL on April 1, 2025.

270.    CDChoices' self-serving, malicious actions were intended both to benefit CDChoices economically (by ensuring that CDChoices could still collect FI fees for certain Consumers and PAs who were, at its own direction, halting their transitions to PPL) and to harm PPL (and frustrate the CDPAP Amendment itself) by delaying the completion of the statutorily-mandated transition to PPL as the single, statewide FI for CDPAP.

271.    Through its misleading statements to Consumers and PAs, CDChoices knowingly interfered with the implementation of the CDPAP Amendment, caused significant confusion amongst Consumers and PAs, and jeopardized continuity of service for those duped Consumers and PAs and limited PPL's ability to perform its role as the single, statewide FI for CDPAP.

272.    CDChoices' false, misleading communications with Consumers and PAs injured PPL's relationships with these Consumers and PAs by causing those Consumers and PAs to delay their transitions from CDChoices to PPL indefinitely.

**PRAYER FOR RELIEF**

WHEREFORE, PPL respectfully requests that judgment be entered:

1. Dismissing with prejudice all remaining claims by CDChoices against PPL;

2. Denying CDChoices' requested relief, including all damages, injunctive relief, attorneys' fees and costs, and pre- and post- judgment interest;

3. Awarding PPL damages, plus pre- and post- judgment interest as permitted under New York law, to account for CDChoices' breaches of the Agreement;

4. Awarding PPL damages, plus pre- and post- judgment interest as permitted under New York law, to account for CDChoices' breach of the implied covenant of good faith and fair dealing;

5. Awarding PPL damages, plus pre- and post- judgment interest as permitted under New York law, to account for CDChoices' tortious interference with PPL's prospective economic advantages;

6. Awarding PPL its attorneys' fees incurred as a result of the instant dispute; and

7. Awarding any further relief this Court may deem just and proper.


**DEMAND FOR JURY TRIAL**

PPL is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: March 24, 2026
New York, New York

COZEN O'CONNOR P.C.

By: */s/ Amanda Giglio*
Amanda Giglio (*pro hac vice*)
Andrew Vazquez (*pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel: (212) 453-3984
agiglio@cozen.com
avazquez@cozen.com

Walter M. Foster (*pro hac vice*)
200 State Street, Suite 1105
Boston, Massachusetts 02109
Tel: (617) 849-5012
wfoster@cozen.com

*Attorneys for Defendant*
*Public Partnerships LLC*

72

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 24, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Amanda Giglio*
Amanda Giglio
